Holland v. Taylor, et al.
Kevin Holland    C.A. # 05-464-SLR    August 22, 2006

Page 42

1   Now, if there was a problem within the chow
2   hall, there is other solutions, which mandates an officer
3   to -- now, if there was a situation of any type of --
4   give me a minute -- disorder, there is other ways you can
5   do that.
6       If it would seem to be a threatening
7   disorderly situation at the time, he could call for
8   assistance and mandate to go to the holding cell. But
9   instead of even trying to resolve the issue or even try
10  to fix the problem -- because he had been working there
11  for, awhile I'm pretty sure, so he should know that if
12  there is still required time to eat, then he could just
13  ask me or said no, I couldn't give you the required time
14  because I need the space.
15      But we are allowed 15 minutes to eat, so if
16  he is going by the rule book, if he is going by the rule
17  books that mandate all inmates give required time.
18  Q.  Now, in your answers to interrogatories you state
19  that you sustained a broken jaw; is that right?
20  A.  Actually, it wasn't a broken jaw. Through my
21  x-rays they believe it may have been a fracture at one
22  time. But that's just a fracture.
23  Q.  When did you have x-rays?
24  A.  I had x-rays taken in March, yes, in March of --

Page 43

1   I'm not sure of the exact date. I have to get the rest
2   of my information in the cell.
3   Q.  What year was it?
4   A.  Of this year.
5   Q.  While you were at DCC in pretrial, after the
6   incident with Lieutenant Bramble, did you ever get any
7   medical care for your jaw?
8   A.  Un-un.
9   Q.  Did you ever ask for any?
10  A.  Well, due to very, very poor medical treatment
11  here, I doubt if anything happened. But I did file, I
12  believe I did -- I'm pretty sure I filed a sick call slip
13  on that matter.
14  Q.  Were you seen in medical on the sick call slip we
15  were just talking about?
16  A.  No.
17  Q.  I believe you've told me this and I apologize if
18  you already have. When were you released from DCC on the
19  Lieutenant Bramble charges?
20  A.  I was released -- you mean leaving the facility
21  and going home?
22  Q.  Yes. When did you go home?
23  A.  I left in August of, August of 2005 -- no -- yes,
24  it was 2004.

Page 44

1   Q.  You mean 2005, right?
2   A.  Yes, 2005. I'm sorry. The 18th of the month.
3   18th day of August.
4   Q.  You went home at that point?
5   A.  Yes, on the 18th.
6   Q.  Once you were out of prison in August of 2005,
7   when did you first seek medical care for your jaw injury?
8   A.  Immediately. I went to James Williams Building
9   in Dover.
10  Q.  What is that?
11  A.  It is a clinic. It provides everything that you
12  may need for a person that doesn't have the proper funds.
13  If I needed medical care, dental care, any type of
14  assistance, I could go to that building and obtain a
15  card, it is like medical, medical card for people that
16  doesn't have the proper money or doesn't have the
17  financial funds to obtain some type of medical care. I
18  needed to go to them in order to get a carrier to handle
19  my situation.
20  Q.  Okay. Now, when you went to the clinic, what did
21  you tell them there?
22  A.  I told them that I was having problems and that I
23  needed -- I'm trying to think of what it was they gave
24  me. Basically sort of like, not quite like insurance,

Page 45

1   but they give you a card, they give you providers so when
2   you go to someone to treat you, you can bring to them the
3   card, which cuts back on the bill, where you won't have
4   to pay as much for any type of medication that you might
5   receive.
6   Q.  So does the clinic provide medical care or do
7   they just give you the card?
8   A.  They give you the card.
9   Q.  Oh. So then you have to go to a doctor or
10  something like that?
11  A.  Right, right.
12  Q.  So after you got a card, and I assume you did,
13  right?
14  A.  Yes.
15  Q.  When did you go see somebody about your jaw
16  problem?
17  A.  Shortly after I got the card. I went to see them
18  before I got the card, which I was receiving that bill.
19  I think I seen him two -- I'm not sure. But the name of
20  the doctor is also on that bill, I believe.
21  Q.  So before you got the card you went to see
22  somebody?
23  A.  Right, because I was having trouble eating.
24  Q.  You were having trouble eating. Do you remember

12 (Pages 42 to 45)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Page 46

1  who you went to see?
2  A. Not offhand. Not offhand. Like I said, most of
3  my paperwork isn't here. But I think I sent you a copy
4  of a bill, I'm not sure, or at least something with the
5  doctor's name on it.
6  Q. Let me check. When you went to this provider,
7  this medical provider, what did they do for you?
8  A. I'm not following you, please.
9  Q. Was that Bay Health Medical Center?
10 A. Bay Health Medical.
11 Q. Is that right?
12 A. Yes.
13 Q. What is that?
14 A. They provide you -- Bay Health Medical provides
15 you with proper funding to obtain a physician of your
16 choice that would cater to your medical needs or whatever
17 at the time that you are under Bay Health Medical care.
18 Q. Did you at some point see a doctor about your jaw
19 problem?
20 A. Yes.
21 Q. Do you remember when that was?
22 A. Maybe, maybe a week after, after my release. But
23 that's after I had to get the card. Once I got the card
24 I went to see the doctor.

Page 47

1  Q. Do you remember who the doctor was?
2  A. Un-un.
3  Q. Did he work at Bay Health?
4  A. It was a female.
5  Q. Did she work at Bay Health?
6  A. She works at her own private practice here in
7  Smyrna.
8  Q. Okay. Do you know what kind of doctor she was?
9  A. I don't know offhand.
10 Q. And was she suggested to you at Bay Health?
11 A. She was -- no, she was suggested by another
12 family member to go to her, because she was good. And
13 she, she didn't treat the jaw. She made appointments for
14 me to have something to take a look at my jaw, which was
15 from another facility, which is, that's where I obtained
16 the x-rays and medication.
17 Q. And do you remember where she sent you?
18 A. I don't know the name of the place until I get
19 the rest of my paperwork.
20 Q. I'm going to need you to let me know about that.
21 A. Yes.
22 Q. How come you didn't have your x-rays until March
23 of this year?
24 A. No. I had my x-rays before then. I had my

Page 48

1  x-rays before then. I'm sorry. Because I do remember I
2  got my x-rays before then, and I had to take them to this
3  other place in March, which was provided to me from the
4  physician, so to the other place to help me with the
5  problem.
6  Q. So do you remember when you had the x-ray?
7  A. No. That's why I couldn't -- as a matter of
8  fact, that's why I couldn't remember when I got the
9  x-rays tooken. I know I had them tooken. I took them to
10 this place. I'm going to have to get all that
11 information for you.
12 Q. Okay. Now, the first doctor was a woman here in
13 Smyrna?
14 A. Right.
15 Q. She sent you to another doctor?
16 A. Right.
17 Q. And that other doctor sent you for an x-ray?
18 A. No. She had x-rays taken there, because I guess
19 they were specialists in the jaw or something like that.
20 Q. Do you know what the x-rays showed?
21 A. He said that what he sees, it may have been a
22 hairline fracture or something like that at one time, but
23 it healed, and he said he believes that it may have
24 healed incorrectly. He says I was supposed to have been

Page 49

1  fitted for a brace, but he said -- he gave me medication,
2  told me if the problem doesn't heal after the medication
3  that he would fit me for a brace. He said if worst came
4  to worst, he probably would have to rebreak the jaw or
5  something like that.
6  Q. Do you know what kind of medication he gave you?
7  A. No.
8  Q. Was it for pain?
9  A. One of them was. He gave me two prescriptions.
10 One of them was for pain.
11 Q. Do you know what the other one was for?
12 A. No, not offhand.
13 Q. This doctor that we are talking about that gave
14 you the prescriptions, how many times did you see him?
15 A. Once. I had an appointment to see him in June --
16 no, in July, which I missed.
17 Q. Of this year?
18 A. Of this year. Because I was incarcerated.
19 Q. Did he send you, this doctor we are talking
20 about, did he send you to somebody else to look at your
21 x-rays? Is that what happened?
22 A. Un-un. The x-rays were taken and he looked at
23 them.
24 Q. Right.

13 (Pages 46 to 49)

Case 1:05-cv-00464-SLR    Document 53-4    Filed 11/27/2006    Page 3 of 9

Holland                              v.                          Taylor, et al.
Kevin Holland              C.A. # 05-464-SLR                    August 22, 2006

Page 50

1  A. But I'm going to try and obtain the information
2  and get it to you as soon as possible.
3  Q. You told me about two doctors you have seen?
4  A. Right.
5  Q. Have you seen any other doctors for this problem?
6  A. No, not that I know of, not that I can remember.
7  Q. Did you take the medication that was prescribed
8  for you?
9  A. Yes.
10 Q. Did that help?
11 A. Yes.
12 Q. You had testified that, I think you testified
13 that when you were in isolation the jaw was only
14 bothering you when you ate; is that right?
15 A. Mm-hmm, yes.
16 Q. Is that still true? Does it only bother you when
17 you eat?
18 A. No.
19 Q. When does it bother you?
20 A. Since, since the taking of the medication I
21 hardly have any pain at all. I don't have any pain at
22 all.
23 Q. Oh. How long did you take the medication?
24 A. From the time I got arrested or violated for my

Page 51

1  probation.
2  Q. Okay. So you were taking it from the time you
3  saw this doctor until you were violated?
4  A. Right.
5  Q. Do you have any medication you are taking in
6  here?
7  A. No. In here they require you to have proof of
8  medication you were taking on the street before they
9  issue you any medication in here.
10 Q. You didn't have any proof?
11 A. I still don't have any of my records now.
12 Q. And how is your jaw feeling today?
13 A. It is feeling all right.
14 Q. Does it hurt when you chew today?
15 A. No.
16 Q. Once you started taking the medication, how long
17 was it before your jaw started to feel better?
18 A. A week or two.
19 Q. I think you said right after the incident with
20 Lieutenant Bramble your shoulder was bothering you. Did
21 you say that?
22 A. Yes, it was a small abrasion out of the incident
23 where I sustained a small cut to the shoulder.
24 Q. And did that get better?

Page 52

1  A. Yes. It is healed. The only thing that's left
2  from is a scar, but it is healed.
3  Q. How long did that hurt?
4  A. For awhile. Just a short time. But at the time
5  I filled out the sick call slip, it was bothering me at
6  the time. So at the time of the sick call slip or the
7  time I was seen for the check-up or whatever they give
8  you, screening, it had already scabbed over and healed.
9  Q. Since the incident with Lieutenant Bramble in
10 November 2004, have you been involved in any other, for
11 example, accidents? Have you been involved in a car
12 accident or anything like that?
13 A. No.
14 Q. Have you been involved in any other type of
15 fight?
16 A. No.
17 Q. Have you ever been involved in any kind of
18 situation where you would have sustained some kind of
19 injury to your jaw or your neck?
20 A. No. You said before Lieutenant Bramble?
21 Q. No.
22 A. Okay.
23 Q. Since the incident with Lieutenant Bramble,
24 after, after the incident with Lieutenant Bramble?

Page 53

1  A. No.
2  Q. Have you had any fights or anything like that?
3  A. No.
4  Q. You told me about a number of injuries that you
5  feel were caused by Lieutenant Bramble. Are there any
6  other injuries that you haven't told me about?
7  A. No.
8  Q. One of the things I forgot to tell you before we
9  were starting was that if you need a break you need to
10 let me know. Okay?
11 A. I'm only aware of one other injury that occurred
12 at the time that was at the Violation of Probation
13 Center.
14 Q. What is that?
15 A. I had caught shingles.
16 Q. I'm going to go through that. Now I'm going to
17 go backwards to the beginning of your complaint.
18 A. Okay.
19 Q. I wanted to ask you about the events that began
20 with that write-up from CO Nock at MCC, at Morris. I
21 know that we have gone over this, but from my notes it is
22 a little hard for me to follow what happened. Did you
23 arrive at Morris in June of 2004 or had you been there?
24 A. No, I arrived in June of 2004.

| Holland | v. | Taylor, et al. |
|---|---|---|
| Kevin Holland | C.A. # 05-464-SLR | August 22, 2006 |

Page 54

1  Q. Where were you coming from again?
2  A. I came from Central Violation of Probation
3  Center.
4  Q. Morris is work release?
5  A. Yes.
6  Q. When you were at CVOP were you waiting for work
7  release?
8  A. Yes.
9  Q. Is it right that you had been sentenced to a year
10 of work release?
11 A. Yes.
12 Q. I want you to explain for me the incident
13 involving CO Nock that happened I think at a vending
14 machine; is that right?
15 A. Yes.
16 Q. Was this on June 28th?
17 A. It was on June 28th.
18 Q. Tell me what happened.
19 A. All right. Shortly after I came in from work, I
20 took a shower, laid down. One of my cellies came to me
21 and woke me up. It was way after dinner already. He let
22 me know -- I borrowed money from him. He let me know we
23 can go to the vending machines. I went out to the
24 vending machines to retrieve a snack.

Page 55

1       You have to wait in a long -- a line because
2  a lot of the tiers also went to the vending machines at
3  this time.
4       While I waited in line, a short time period,
5  maybe no more than two minutes later, Nock told everybody
6  that's on B Tier, which is work release, "If you are on B
7  Tier, I want everybody to go back on the tier."
8       It was kind of odd because everyone else
9  from all the other pods was still at the vending machine.
10      So I asked him, "What was the reason?
11 Because I haven't ate nothing yet." And he was like,
12 because he said so.
13      I said, "Was it an order from lieutenant or
14 something?" He said, "No. Because I said so."
15      So as I entered back on the pod, underneath
16 my breath I said, under my breath I said a smart comment
17 like, I believe I called him a -- excuse my language -- a
18 sucker ass, mother fucker, something like that. And he
19 asked me, he then replied, "What did you say?"
20      It wasn't meant for his ears, so that's why
21 I said it under my breath. He then gave me a direct
22 order to repeat what I said. By then I was already on
23 the pod. He then told me to come back off the pod. I
24 come off the pod. He said, "Repeat what you said." I

Page 56

1  then repeated what I said. And I went back on the pod.
2  He then followed me with two other officers and escorted
3  me to the holding cell.
4       While in the holding cell he presented me
5  with a write-up of the incident. He claimed that, in the
6  write-up he claimed that I threatened, threatened and
7  disorderly behavior or something like that. Disorderly
8  behavior. I don't believe it was threatening. It was
9  more like disorderly behavior on the write-up. That's
10 when I checked the box that I would like to be present
11 for that write-up, to explain my side.
12 Q. So he showed you the write-up?
13 A. Yes.
14 Q. Did you get a copy of it?
15 A. Yes.
16      MS. KELLY: I'm going to mark this as
17 Exhibit 1.
18      (Holland Deposition Exhibit 1 was marked for
19 identification.)
20 Q. Mr. Holland, I'm going to show you what has been
21 marked as Exhibit 1. I want you to take a look at it,
22 read it over, and let me know when you are done looking
23 at it.
24 A. Yes, this is the write-up for Lieutenant Nock.

Page 57

1  Q. You have seen this document before?
2  A. Yes.
3  Q. What is it called at the top? What is the title?
4  A. "Community Corrections Program Violation." And
5  it has got -- you said up here?
6  Q. Yes, yes.
7  A. It is "Program Violation."
8  Q. We are looking at the same thing.
9       Now, if you look at the "Details of the
10 Incident" section, I don't know if you've had a chance to
11 read that over.
12 A. No, I haven't. I haven't seen this for some
13 time.
14 Q. Okay. Read it over.
15 A. All right.
16 Q. Did you have a chance to look at that?
17 A. Yes, I had a chance to read it.
18 Q. Now, the "Details of the Incident" that is
19 written down there, is that what you remember as to what
20 happened?
21 A. Yes, slightly. But he, in the write-up he argued
22 that I over aggressively threatened him, which I never
23 made any threats. That's the reason why I wanted to be
24 present for the write-up.

15 (Pages 54 to 57)

Case 1:05-cv-00464-SLR    Document 53-4    Filed 11/27/2006    Page 5 of 9

Holland                                v.                    Taylor, et al.
Kevin Holland          C.A. # 05-464-SLR              August 22, 2006

Page 58

1  Q. Now, you are saying that you wanted to be present
2  for the MDT meeting; is that right?
3  A. Yes.
4  Q. And I believe what you testified to earlier was
5  that you were not present?
6  A. Yes.
7  Q. Do you see here where it says "MDT Date:
8  6/29/2004, Resident Present, yes"? Do you see where it
9  says that?
10 A. Say that again. Where is that?
11 Q. It is towards the bottom of the form. Below
12 where it says, "I will appear."
13 A. Yes, I see it down here.
14 Q. It says "Resident Present" and yes is checked
15 off.
16 A. Mm-hmm.
17 Q. So you are saying that's incorrect?
18 A. That's incorrect.
19 Q. You were not there?
20 A. Yes.
21 Q. Do you know who these people are, these members
22 present, Raymond, Justice, DeMarco? Do you know who any
23 of these people are?
24 A. No. Is that the MDT board?

Page 59

1  Q. It look like it.
2  A. At the time of the copy sheet of this, I had --
3  there is a copy sheet of the sanction that's given, and
4  on the copy sheet of the sanction that's given, which I
5  don't have anymore, these people aren't listed on the
6  bottom, which issued the sanction, that gave me the 14
7  days.
8  Q. You are saying that it is other people?
9  A. Yes. It was, I think Tom -- Bill Etto, which I
10 think was the security chief or something like that. It
11 was two other people who is listed in the complaint.
12 Excuse me for a minute.
13    I believe it was Steven Devine and Helen
14 Moore.
15 Q. So you received a different piece of paper that
16 had the names of Steven Devine and Helen Moore?
17 A. Yes.
18 Q. They were listed as the MDT board members?
19 A. Yes, through the sanction that was given to me.
20 Q. When you saw this form right after the write-up
21 was done, it didn't have this little section on the
22 bottom beginning "MDT Date," right? That part wasn't
23 filled in?
24 A. The section has the length of sanction, that's

Page 60

1  given, and it has the people who were -- who issued the
2  sanction, the three people that was on the sanction,
3  Moore was on there, Devine was on there, and I believe it
4  was Etto, Bill Etto.
5       But, no, I didn't see these people on the
6  transfer -- on the piece of paper that I had received.
7  Q. So just to be clear, when CO Nock gave you the
8  program violation, the only part that had writing on it
9  was up to your signature; is that right?
10 A. Yes. That's the part that I signed. I didn't
11 see this part.
12 Q. The bottom was empty; is that right?
13 A. Right. They didn't have this because I just
14 received the write-up. And I wouldn't have received this
15 unless at the hearing. All I received was the transfer
16 papers where it was sent from work release to SVOP for a
17 period of 14 days.
18 Q. So you have never seen Exhibit 1 with this
19 writing down at the bottom before today?
20 A. No.
21 Q. Is it accurate that you were sentenced to two
22 weeks, or sanctioned, sent to two weeks at SVOP?
23 A. That's correct.
24 Q. And you were to go back to CVOP to await bed

Page 61

1  space for work release, right?
2  A. That's what it says.
3  Q. At the bottom it says you went to SVOP on July 1.
4  Is that right?
5  A. At the bottom right here?
6  Q. Yes. The little section that's circled?
7  A. Yes, July the 14th. I went to SVOP July 1 of
8  2004. And maxed out, went to CVOP July 14th, 2004.
9  Q. Okay. In your complaint you indicate that you
10 were given the required preliminary hearing by Nock.
11 Does that ring a bell with you? Do you have a copy of
12 your complaint?
13 A. No, I don't have it.
14 Q. I'm going to mark this as Exhibit 2.
15    (Holland Deposition Exhibit 2 was marked for
16 identification.)
17 Q. I'm going to show you what has been marked as
18 Holland Exhibit 2. Take a look.
19 A. Any particular part?
20 Q. No, just the general document. I want to know
21 whether you have seen it before and do you know what it
22 is.
23 A. Yes, this is my complaint.
24 Q. And you prepared this document?

| Holland | v. | Taylor, et al. |
|---|---|---|
| Kevin Holland | C.A. # 05-464-SLR | August 22, 2006 |

Page 62

1  A. Yes.
2  Q. Okay. What I particularly want to draw your
3  attention to is paragraph number 13.
4  A. Paragraph 13 and it is marked, right?
5  Q. Number 13, paragraph number 13.
6  A. All right.
7  Q. Do you see that?
8  A. Mm-hmm.
9  Q. And it says, "The plaintiff was later called out
10 and was given his required preliminary hearing by CO
11 Nock." What does that mean?
12 A. That's the write-up. Preliminary stages of the
13 MDT board. What happens is he brings the write-up to me.
14 I sign it, that type of thing.
15 Q. So you are saying he showed it to you and you
16 signed it?
17 A. Right. He let me know what I can do, if I choose
18 to be -- to appear at the MDT board, not to appear or
19 whatever.
20 Q. Now, you talked about receiving transfer papers;
21 is that right?
22 A. Mm-hmm.
23 Q. And when did you get those?
24 A. At the time when I first arrived, Central

Page 63

1  Violation -- SVOP, and my arrival date, along with the
2  rest of personal things I may have had at the time,
3  because they take you out of your street clothes and put
4  you in blues, and they pass me a pink sheet of paper,
5  which is the copy form of my sanction time.
6  Q. Okay. So is the transfer paper and a copy of
7  your sanction time two different documents?
8  A. Well, it will say, it will say where you are
9  being transferred to and the time you are going to spend.
10 So it would be in the same, the same form.
11 Q. So it is just one piece of paper?
12 A. Right.
13 Q. And you don't have that piece of paper anymore?
14 A. It was taken from me while I was at Central
15 Violation of Probation Center, after the Lieutenant
16 Bramble incident.
17 Q. Did this sanction paper list the MDT board
18 members?
19 A. At the time, the MDT board members, which I
20 believe, if these are the MDT board members, then the
21 ones that was listed on the paper that I got couldn't
22 have been. But at the time, which I believe it was MDT
23 board members.
24 Q. I'm trying to find out, the sanction paper that

Page 64

1  you got when you arrived at SVOP, what type of
2  information was on there?
3  A. It had the members who approved the transfer, as
4  well as the, I guess the sanction, and it had the time
5  that was spent, where I was supposed to be transferred
6  to, and the time that I was supposed to have been spent.
7  On the reverse side I believe it had to ask
8  if you wanted to appeal the issue or not. And I don't
9  know if this is the whole complete sheet because on here
10 I don't see where it says nothing about appeal on it, on
11 the piece of paper I have.
12 Normally when you get a program violation or
13 anything like that, normally request if you like to
14 appeal the conviction or whatever, and it didn't have
15 that. This one don't have it. This is just a program
16 violation, which is a basic write-up on a disciplinary
17 form.
18 Q. Are you saying that ordinarily the program
19 violation would have a back to it?
20 A. No, this wouldn't have a back to it. What
21 happens is if you received a sanction for anything --
22 Q. Oh.
23 A. -- they would have appeal process that you could
24 appeal the verdict.

Page 65

1  Q. So the sanction form has a backside to it that
2  indicates whether you want to appeal?
3  A. Right. Right.
4  Q. And you are saying that you got that, the
5  sanction form, when you arrived at SVOP?
6  A. Yes.
7  Q. So it is your understanding that you can appeal a
8  sanction for a program violation?
9  A. Yes, that's, I was under the impression you can
10 appeal, when I read the form that I was under the
11 impression that you can appeal a program violation.
12 Q. And do you base that understanding on the actual
13 form that you got?
14 A. And what I read on the form. The forms are
15 similar to the ones they have here. Once you receive
16 sanction, they give you -- on the form it has where if
17 you choose to appeal, the reason for appeal and things
18 like that.
19 Q. Is it right that your understanding was that,
20 when you filed your lawsuit, was that Etto, Devine and
21 Moore are the people that issued the sanction against
22 you?
23 A. Yes.
24 Q. And why did you sue these people, those three

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:05-cv-00464-SLR    Document 53-4    Filed 11/27/2006    Page 7 of 9

Holland                              v.                         Taylor, et al.
Kevin Holland              C.A. # 05-464-SLR                  August 22, 2006

Page 66

1  people I just mentioned?
2  A. All right. If these people were the ones that
3  issued the sanction, and that signed the document that
4  said that I was present at the hearing, which at the time
5  I wasn't, then they unreasonably sanctioned me to a long,
6  lengthy sentence, which was outside the guidelines that's
7  required for that facility to issue.
8  Q. What do you mean when you say the sanction was
9  outside the guidelines?
10 A. All right. According to the law or the statute
11 that mandates how much time they be giving on a minor or
12 technical violation, which this would be, that wants an
13 individual to be placed at another Level IV facility,
14 would mandate that the time period be no more than five
15 days or ten days in any one calendar year.
16      And they, in each facility is supposed to
17 cater or fit the rules and regulations according to that
18 mandated law.
19 Q. What law are you talking about?
20 A. Title 11, 3443 -- I mean 4344 Delaware Code,
21 Section D.
22 Q. 43, say that again, Title 11?
23 A. Title 11, Delaware Code, 4334.
24 Q. Okay.

Page 67

1  A. Section D.
2  Q. So based on your understanding of the law, the
3  sanction of two weeks was outside the law; is that what
4  you are saying?
5  A. It was more than outside the law due to the fact
6  that two weeks extended to more than five months, by
7  waiting for bed space.
8  Q. So are you suing Devine and Moore because they
9  sanctioned you outside of the law?
10 A. I'm suing Devine and Moore for, I believe -- I
11 believe it is in my lawsuit. I'm suing for the nol due
12 process, cruel and unusual punishment.
13 Q. All right. Let me make it a little simpler. You
14 feel that they did something wrong in sanctioning you to
15 two weeks that stretched into five months; is that right?
16 A. Right.
17 Q. What else do you feel like they did wrong?
18 A. Well, because of the lack, lack there of -- I'm
19 saying I'm pretty sure that their capacity in which they
20 operate within the facility would let them or they should
21 have been aware of the time frame that any individual who
22 has been sanctioned to a period of sanction or to be
23 placed at a Level IV facility for sanction, they should
24 then knew the period that was required, they are required

Page 68

1  for the facility and for that person to serve.
2       And then to -- excuse me for a minute. Give
3  me a minute. It would require that the individual, after
4  that, be placed back within the facility which gave him
5  the sanction. But with the sanction that was given,
6  which they ordered me to go from one facility to another
7  facility and then wait for bed space, that would
8  determine -- that would give me an indication that they
9  gave up the bed space that should have been held for me
10 to return.
11      By giving up the bed space, they required me
12 to do more time, which was subsequent to any unusual
13 punishment that I normally wouldn't have received due to
14 any other circumstances.
15 Q. Are you complaining in this lawsuit about the
16 fact that you weren't at the MDT hearing?
17 A. If I was at the MDT board I'm pretty sure I
18 wouldn't have received the sanctioned time that was given
19 and the length of the sanction time that was given.
20 Q. Why is that?
21 A. Because there was -- I mean, he claims in the
22 sanction time, which I would hope to prove through
23 witnesses and my testimony that there was no threat.
24 Excuse me. That the sentence, what I said to -- what I

Page 69

1  said underneath my breath was never meant for him to
2  hear. Because he gave me a direct order, you have got to
3  follow a direct order.
4       He then used that direct order to punish me
5  or to disciplinary -- give me a program violation on what
6  I said.
7  Q. So did you have witnesses to what you said?
8  A. Yes.
9  Q. Do you remember who they were?
10 A. No, not at this time. It has been more than,
11 what, two years.
12 Q. Right. Is there anything else that you feel like
13 Steven Devine and Helen Moore did incorrectly?
14 A. No. If they not the ones that sanctioned me,
15 then I believe -- I believe amendment, amendment of my
16 complaint should have been in order and they should be
17 relieved of any wrongdoing in that matter.
18 Q. Based on that Exhibit 1 --
19 A. Exhibit 1.
20 Q. -- it looks like the MDT board members were
21 somebody else, not Moore and --
22 A. Yes. If this is correct, then if these are the
23 ones who sanctioned me, these are the ones who should be
24 liable for anything.

18 (Pages 66 to 69)

Case 1:05-cv-00464-SLR   Document 53-4   Filed 11/27/2006   Page 8 of 9

Holland                                    v.                              Taylor, et al.
Kevin Holland              C.A. # 05-464-SLR                           August 22, 2006

Page 70

1  Q. Once you received your sanction paperwork and you
2  indicated that on the back there was some writing that
3  asked if you wanted to appeal?
4  A. Mm-hmm.
5  Q. Did that paperwork give you a space to write down
6  the reasons for your appeal?
7  A. Yes. It was a few lines.
8  Q. Did you ever fill out that form?
9  A. Yes. But the only, only thing is that the
10 facility in which I was sent, which is SVOP, in order to
11 get any mailing supplies, envelopes, stamps, writing
12 utensils, anything like that, you have to fill out pay
13 to, and you have to wait for the necessary supplies to
14 come to you before you can mail out anything.
15         The required deadline date for the appeal,
16 which I believe is 72 hours, and I wouldn't have reached
17 that deadline in time to appeal.
18 Q. I'm sorry. If you already answered this, I
19 apologize. Did you fill out the paperwork?
20 A. Yes.
21 Q. You did. And so you wrote the basis of your
22 appeal down. What did it say?
23 A. That I wasn't present at the MDT board, and that
24 at the time I didn't know about the length of the

Page 71

1  sanction time that can be given. I just knew I wasn't
2  present at that MDT board at the time that the sanction
3  was given.
4          And I argued that I didn't commit the
5  infraction or the infraction that was listed of
6  disorderly and threatening behavior. Verbal statement
7  that I gave was never intended for Lieutenant, CO Nock,
8  for CO Nock to hear me, so I argued that also in the
9  appeal.
10 Q. Those were the two bases for the appeal?
11 A. There might have been another one. But it has
12 been so long I can't remember.
13 Q. Okay. And did the form indicate who you were
14 supposed to send this to?
15 A. To -- well, I was going to send it back to the
16 Morris Correctional Institution. MCCC.
17 Q. Is that where it was supposed to go?
18 A. That's where I was going to send it.
19 Q. Did the paper say anywhere on it send it here or
20 there?
21 A. Due to the fact that the paper normally requires
22 once you fill it out you can either slide it through
23 accounts or something, so now that I'm holding at the
24 facility, I'm assuming I sent it back to the facility.

Page 72

1  Q. You already talked about this a little bit, but I
2  just want to go over this. Are you claiming that someone
3  at SVOP did something wrong that kept you from filing
4  your appeal?
5  A. Well, the procedures at SVOP you said, right?
6  The procedures at SVOP allows anybody, anyone, because of
7  the mailing procedures there, not to file any timely
8  appeal process ever.
9          Now, if I arrive on one day, and then I put
10 in pay to, a pay to, to request mailing supplies, it is
11 never going to meet the required deadline date by the
12 time I get the supplies back and mail out the appeal
13 process. You are never going to meet the deadline.
14 Q. So at SVOP you had to put in a request for? What
15 was it that you were asking for, stamps?
16 A. Stamps, envelopes.
17 Q. So you needed the actual stamps and envelopes to
18 mail --
19 A. Mm-hmm.
20 Q. -- the appeal form?
21 A. Mm-hmm.
22 Q. And at SVOP you can't get that the same day?
23 A. No.
24 Q. How often do they do it?

Page 73

1  A. I'm not quite sure. I'm not quite sure. But I
2  knew that I wouldn't receive it, because I was only there
3  for 14 days. I knew I wouldn't receive it in the
4  required time for me to mail my appeal back off.
5          Later it became that, through the same Title
6  11 case, through the same Title 11, that once an
7  individual, offender arrives within a facility, pursuant
8  to any sanction that's given, that that offender -- well,
9  that offender's case is supposed to be reviewed.
10         Now, at any time that I was sanctioned for
11 the MCC incident, at some point in time they should have
12 realized, or some form or fashion, a review of my case
13 should have been done before then and that they should
14 have seen that the required time was extremely, extremely
15 past the time required or mandated by Title 11.
16 Q. Are you saying that when you were at SVOP you
17 should have seen a counselor?
18 A. No, not me -- yes, I should have seen a
19 counselor. But their rules or guidelines are more
20 stricter than CVOP's, which they both VOP centers, but
21 SVOP's is more stricter, which if they view an incident
22 to be extreme in nature, they will use extreme force
23 against the individual claiming, I don't know, being
24 disruptive or something like that, meaning that you can

Page 74

1  be subjected to harsher punishment, such as being
2  cap-stunned or doing -- being put through extreme
3  humiliating circumstances.
4       And once that was revealed that, to me by
5  one of the officers, I believe, I can't remember, they
6  let me know that I wouldn't be able to see the counselor
7  at least about two weeks, by then I would have been gone.
8  So there was nothing I could do. It was out of my hands.
9  Q. Did you ask to see a counselor?
10 A. Yes.
11 Q. Do you remember who you asked?
12 A. Un-un, I don't know the name.
13 Q. And you requested mailing materials?
14 A. Yes.
15 Q. Do you remember who you asked?
16 A. Any officer that would talk to you. I asked
17 anybody. And they said you got to put a pay to in, and
18 they explained it was going to be some time before I
19 could get the mail supplies. Some guy brings it down or
20 they approve it or something. But he said it would have
21 been three days before I -- three days or more at the
22 time that I arrived before I could get the mailing
23 supplies and I only had 72 hours to mail it.
24 Q. Did you ever get your mailing supplies?

Page 75

1  A. No.
2  Q. Did you ask for them?
3  A. It wouldn't have been no use.
4  Q. Did you ever mail your appeal form?
5  A. It would have been no use.
6  Q. Because of the time period?
7  A. The time frame would have been expired.
8  Q. Why did you sue Warden Robert George?
9  A. Robert George is the warden of the Central
10 Violation Probation Center.
11 Q. Sussex?
12 A. Right. I'm sorry. Sussex Violation Probation
13 Center. Because he is the warden and the individuals --
14 it is his, it is his responsibility to insure that all
15 requirements are met for the individuals.
16      At the time I didn't know or have knowledge
17 of the individuals directly responsible, and since he
18 oversees mostly, if not all departments or individuals
19 within this facility, he is titled.
20 Q. Did you ever speak to him?
21 A. No. I saw him. But they frown on any offenders
22 who is at the facilities speak to anybody.
23 Q. Did you ever write to him?
24 A. No. I didn't have any writing supplies.

Page 76

1  Q. Now, you have also sued Michael Costello. Why
2  did you sue him?
3  A. He is the, if I'm correct, I believe at the time
4  he was the security chief or something like that, and as
5  security chief, his responsibilities would have been to
6  -- well, would be to sit in, if not all, any, any
7  meetings or any reviews of individuals who have been
8  placed at that facility.
9       The question would have been, then, why
10 wasn't any reviews issued or reviewed, or any, any review
11 of Mr. Holland's, my case, having came up before his desk
12 at the time of my arrival.
13      The law requires that any individual who has
14 been placed at the facility for a sanction should be
15 reviewed.
16 Q. What law is that?
17 A. I mean, not law, but the Title 11 requires that
18 any offender's case pursuant to that subsection should be
19 reviewed.
20 Q. So are you saying that if your case had been
21 reviewed while you were at SVOP someone would have
22 realized about your appeal?
23 A. Would have realized not only the appeal, but the
24 coincident could have been corrected at some point in

Page 77

1  time throughout all three facilities, at least out of the
2  two facilities.
3  Q. Did you ever talk to Michael Costello?
4  A. I don't believe no one can talk to Michael
5  Costello. He talks to you. I have not personally.
6       But the incident that I have saw with
7  Michael Costello, he wasn't very nice. I saw him in the
8  chow hall yelling, within inches from somebody's face,
9  spitting in someone's face, telling them -- I think I
10 would want to try to stay as far away from that as
11 possible.
12 Q. So you never spoke with him?
13 A. Un-un.
14 Q. Did you ever write to him?
15 A. No. I didn't have any writing utensils.
16 Q. Why did you sue Barbara Costello?
17 A. She is the transportation officer in that unit.
18 She takes anybody that comes in on a transfer, she sends
19 out on a transfer, she has direct contact, knowledge of
20 anything that comes within or out of the facility.
21      I mean, it was just sense to add her in
22 claim due to the fact that if I was transferred to one of
23 the facility, sanctioned to be transferred to another
24 facility, it has to be extremely -- it has to be

20 (Pages 74 to 77)