Page 78

1  extremely curious for anyone to be transferred from work
2  release to one facility to another facility without any
3  cause, other than to wait for bed space, I mean.
4      Q.  So what do you think Barbara Costello should have
5  done?
6      A.  I mean, if a person in a position, in her
7  official capacity, would have -- if she was doing her job
8  in her official capacity could have notified or even saw
9  that there might have been a discrepancy in the sanction
10 order that was given, once sent or sent to the facility,
11 to notify the proper authorities.  I didn't know the
12 counselor at the time so I couldn't name her either.
13     Q.  Did you file a grievance about this whole issue
14 with the mail supplies while you were at SVOP?
15     A.  No.
16     Q.  Why is that?
17     A.  I didn't have proper mailing utensils.
18     Q.  You could have at some point gotten writing
19 supplies while you were there, right?
20     A.  With 14 days, by the time I got the proper
21 mailing supplies, writing utensils and mailing supplies,
22 whatever I need, my 14 days would have been nearly done.
23 By the time I filed the grievance I would have been out
24 of the facility before the process, before the

Page 79

1  disciplinary or grievance would have ever been heard.  I
2  only had 14 days.
3      Q.  Okay.  You moved back to CVOP on July 14, 2004?
4      A.  Mm-hmm.
5      Q.  And you have made certain claims against Cindy
6  Scala.  Is that how you say her name?
7      A.  Yes, I believe so.
8      Q.  One of the things I just want to clarify with you
9  is that Cindy Scala has not been served with the
10 complaint, so she is not actually a defendant in the case
11 now at this time and I'm not representing her.  But
12 because this section of your complaint has a lot to do
13 with her, I'm going to ask you about what happened with
14 her so that I have that information.
15         Now, overall, what are your claims against
16 her about?
17     A.  She was my counselor.
18     Q.  Okay.  When you got back to CVOP?
19     A.  Mm-hmm.
20     Q.  And what do you feel that she did improperly?
21     A.  I made numerous complaints to Mrs. Scala about my
22 situation and my transfer back to work release,
23 concerning -- can you hear me -- concerning my sanction.
24         Every time I spoke with her she indicated

Page 80

1  that I'm on a waiting list, not ever indicating where or
2  how soon I should be transferred back to work release.
3         After months pass, I'm seeing there was
4  people leave from Central Violation of Probation Center,
5  CVOP to MCI.  On different days they have transfers
6  leaving out to different facilities, like maybe on a
7  Thursday or a Friday, you might have Plummer Center
8  leaving out, on a Tuesday or Wednesday they might have
9  MCI leaving out, and on maybe a Monday they may have
10 Georgetown leaving out.
11        But on certain days they tell individuals --
12 this is only within my pod.  I'm not talking about other
13 pods.  I was on Pod 2.  The people that is housed on my
14 pod who left to go to MCI, I mean MCCC, there were
15 individuals who I was there before them who left, while I
16 still, I still stayed awaiting bed space.
17        Now, if I was to be transferred SVOP to
18 CVOP, we basically would have seen that the individuals
19 within, especially my counselor who has, who has somewhat
20 power over my case, would at some point during the four
21 or five months I stayed, that I was housed within the
22 Central Violation of Probation Center, would have moved
23 me to my proper status.
24        In failing to do so, she neglected her

Page 81

1  duties as well as -- because she is my counselor, in her
2  official capacity.
3         Once I brought it to her, I expressed to her
4  numerous times of my dislike of the incident, how I felt
5  about some of the staff within this facility, not in a
6  harmful way, but what I mean by that is I expressed to
7  her that I believe that most of the staff that was there
8  were out to send me back to CVOP from unjust reasons.
9         Now, I explained that to her several times
10 throughout, and during, during that time is when I
11 contracted shingles, which was a stress-related injury.
12     Q.  Okay.  Do you think you were on a waiting list?
13     A.  I don't know.  I haven't seen a waiting list.
14 After five months and seeing so many people leave before
15 me, who I was there before, I don't believe I was.
16     Q.  Do you know who those people were that came after
17 and left before?
18     A.  I don't know offhand, no.
19     Q.  Now, you said that you felt that there were
20 officers or people at CVOP who wanted you, what are you
21 saying, they wanted you to stay there?
22     A.  No, I believe they wanted to have me transferred
23 either back to DCC or back to SVOP.
24     Q.  Okay.  Do you know who those people were?

Case 1:05-cv-00464-SLR    Document 53-5    Filed 11/27/2006    Page 2 of 9

Holland                                    v.                            Taylor, et al.
Kevin Holland                    C.A. # 05-464-SLR                    August 22, 2006

Page 82

1   A. CO Ford I believe was one of them. I stated to
2   Miss Scala and a couple other individuals. I wouldn't
3   quite say, but I would say Bramble, because I had -- his
4   actions towards me was like, more like dislike. I don't
5   think he liked me too much.
6           There was another officer, I believe he was,
7   at the time he was the staff lieutenant in that facility.
8   Q. Do you know what his name was?
9   A. No, not offhand.
10  Q. Now, what made you think they were out to get
11  you, Ford and Bramble?
12  A. The smart comments, the bad looks, the verbal
13  comments that before you go, go to work release you will
14  go back to SVOP, comments like that.
15          Mike Records was one of the officers who I
16  even told this to in numerous sessions with him.
17  Q. Who?
18  A. Mike Records. He is also one of the defendants
19  listed I believe.
20  Q. What was his job?
21  A. He was I believe supervisor, director, whatever,
22  for the Central Violation of Probation Center, something
23  like that.
24  Q. When you were at CVOP, what you wanted was to go

Page 83

1   to work release in Morris; is that right?
2   A. I wanted to go back to my assigned status, which
3   was work release. If that wasn't happening, they could
4   at least violate my probation and had me go before the
5   judge to correct the wrongness of whatever they
6   sanctioned -- they committed me to.
7   Q. You have some claim in your complaint about
8   wanting, filing a modification of sentence?
9   A. Yes, yes.
10  Q. Do you remember that?
11  A. Yes. I believe it was in October.
12  Q. And --
13  A. 2004.
14  Q. Is it write that Cindy Scala gave you the
15  paperwork?
16  A. She gave me the paperwork. But she was aware
17  that the only time a modification can be done is due to
18  the facility. She said that she was not -- she could not
19  do a -- she made reference to something about Mike
20  Records, that Mike Records wouldn't approve it either.
21  So she says, "I can give you one. You can file it
22  yourself."
23          I lacked either the legal know-how to file a
24  modification regarding that situation.

Page 84

1   Q. Did you actually file one?
2   A. Yes.
3   Q. And what happened with that?
4   A. It was denied.
5   Q. What was your modification of sentence asking
6   for?
7   A. For -- I need some water. For relief.
8   Q. Do you want to take a break?
9   A. Yes.
10          (Recess taken.)
11  BY MS. KELLY:
12  Q. I might have to go back over what we were just
13  talking about to find my space. You said that you had
14  sent in a modification of sentence?
15  A. Yes.
16  Q. And what were you asking for?
17  A. For relief of remaining on my sentence due to the
18  fact that I was on Level IV from, whenever it started to
19  October, of the time that I filed, that it passed more
20  than, I believe it was more than six months already, it
21  was close to eight months, it was like seven and
22  something.
23          And I think I cited a few other things like,
24  you know, normally if a person that has more than half or

Page 85

1   90 days -- it is half or 90 days, whichever comes first,
2   of the sentence that they normally flow down to the next
3   available level. And since the bed space at work release
4   is extremely long, that I would request that the court
5   grant me the next available level, lower level, which was
6   III, Level III, probation.
7   Q. Okay. So you were asking for Level III?
8   A. Right.
9   Q. I think you testified before about getting
10  shingles?
11  A. Yes.
12  Q. And you feel that was due to stress?
13  A. It was.
14  Q. And the stress was caused by what?
15  A. From the extreme wait, waiting to be returned
16  back to work release, and dealing with the situation
17  within the center.
18          I, at first we were under the impression
19  that it might have been poison ivy, because a lot of
20  people that comes from out -- the facility is like, it is
21  like, it is kind of hard to explain, if you are in the
22  facility, and you waiting to go to work release or other
23  facilities on Level IV, you are placed within that
24  facility and what you do is you work towards fines,

Page 86

1  meaning you go out on bus runs where you collect trash
2  along highways, things of that nature, and some of the
3  individuals that do that, they come in and they might
4  contract poison ivy or whatever, or ticks or whatever.
5        And at the time that I had broke out, I
6  believe the nurse thought it was poison ivy. It was
7  later detected, about at least three or four days later,
8  that it was, turned out to be shingles.
9    Q.  So you saw the nurse at CVOP about it?
10   A.  Mm-hmm.
11   Q.  And she thought it was poison ivy?
12   A.  Yes, at first.
13   Q.  And then who diagnosed it as shingles?
14   A.  One of the other nurses. I'm not quite sure what
15  her name is. But one of the other nurses, having using
16  medication for about four days and nothing was going to
17  happen, and I requested to see the nurse again because
18  the pumps started blistering up and pus, and they sent me
19  to the nurse's station, which the nurse then diagnosed me
20  as shingles because she said she had it at one time and
21  it was exactly what she had.
22        She printed up on the computer what shingles
23  looked like and how it was contracted, and then she,
24  like, since no one else in that facility had it or was

Page 87

1  contracted with it at that time, she determined that it
2  had to be from stress.
3    Q.  And you went to DCC at that point?
4    A.  She had called the doctor. She just requested,
5  she called at DCC to a Dr. Rodgers, I believe her name
6  is, and Dr. Rodgers advised her that, to give me pain
7  medication, because it is extremely painful. They
8  prescribe me to I believe it was anywhere between 8- to
9  1600 milligrams of pain medication and some other pill to
10  cure or to get rid of the blister and bumps that I had.
11   Q.  Did you go to DCC?
12   A.  The shift, the staff -- the staff lieutenant, I'm
13  not sure what his name is, he was unhappy that I couldn't
14  wear a V neck. Over there you must wear a V neck at all
15  times unless you are going to bed. He was unhappy that I
16  was ordered by the doctor and the nurse to only wear the
17  lightest garment possible, since you can't go
18  bare-chested, which was a T shirt or other light garment
19  for a top.
20       They didn't want to pop the blisters that I
21  broke out in and the fluids maybe contracted on the
22  chair, pass it on to somebody else, because it is highly
23  contagious. So what they wanted me to do is wear a T
24  shirt, and that would have protected at least the fluids

Page 88

1  if any bumps would have been popped, would have busted,
2  the T shirt would have soaked up and they wouldn't have
3  went through, you know.
4        So the staff lieutenant was unhappy I was
5  just wearing a T shirt and couldn't wear a V neck over
6  top, so he requested for administrative move to be
7  quarantined, from the infirmary over here, and to be
8  isolated. Since I'm on Level IV, I had to be shielded
9  off from anybody else, with no phone calls, nothing of
10  the sort, for about a week.
11   Q.  Okay. So you came over to the infirmary here for
12  treatment for the shingles?
13   A.  Yes.
14   Q.  After a week did the condition clear up?
15   A.  The condition cleared up, but the pain remained.
16  It is normally after a week or two, a week or week and a
17  half after the blisters reside, you still go through pain
18  for another week and a half. They kept me on pain
19  medication.
20   Q.  For how long?
21   A.  For about a week and a half.
22   Q.  What parts of your body had shingles?
23   A.  My whole left side, back, and under the arm area.
24   Q.  Once you were back at CVOP did you get shingles

Page 89

1  at any other time?
2    A.  Un-un.
3    Q.  So it was just that one occurrence?
4    A.  Yes. Once you -- I'm not quite sure how far,
5  what the doctor say, but she advised me once you break
6  out in shingles that occurrence is rare, when it returns.
7    Q.  Do you remember when you got the shingles?
8    A.  In August. Not precise day but in August.
9    Q.  That would have been August of 2005?
10   A.  2004.
11   Q.  Oh, no. 2004, right.
12   A.  She did let me know that it was very rare that,
13  because of my age at the time, that someone that young
14  catches shingles. She said it is normally older, elderly
15  normally it.
16   Q.  And this was the nurse?
17   A.  No, doctor.
18   Q.  The doctor said that?
19   A.  Yes.
20   Q.  Dr. Rodgers?
21   A.  Rodgers.
22   Q.  Now, at any time did you talk to Cindy Scala
23  about wanting to get moved to DCC?
24   A.  Yes. I asked her if -- I relayed to her if I'm

23 (Pages 86 to 89)

Page 90

1 not on a waiting list, if it is possible I be transferred
2 back to DCC so I can go before my judge. Numerous times,
3 as a matter of fact.
4   Q. Now, why would you go back before the judge if
5 you got moved to DCC?
6   A. Because if the facilities, if the facility was
7 unwilling to grant me any type of relief from the time
8 period I was there, the only other way was to go back, if
9 you go back, then you have to go up before your judge.
10      I even asked her if it was possible, without
11 me going back, if she could just, you know, maybe violate
12 the remaining conditions of my Level IV and have me go up
13 before the judge. She was unwilling to have me do so. I
14 believe she said to me at one time that it wasn't up to
15 her, it was up to Mike Records.
16   Q. So you wanted to be violated and sent back to
17 Level V?
18   A. Well, it is not -- once you are violated, they
19 have to immediately bring you before the judge.
20   Q. The sentencing judge?
21   A. Sentencing judge, in order to, on a hearing on
22 the violation. That's the only quickest way to be
23 relieved from the situation I was in.
24   Q. And if you were before the sentencing judge you

Page 91

1 wanted to tell him about what was going on in CVOP and
2 asked to be moved to Level III; is that it?
3   A. Either, if not Level III, another less -- even
4 home confinement would have been good.
5   Q. Did you take any action at CVOP to get yourself
6 back to DCC?
7   A. I'm not following you.
8   Q. Did you do anything to get yourself violated?
9   A. Un-un. Willingly, no. Other than make numerous
10 requests.
11      MS. KELLY: I'm going to mark this as
12 Exhibit 3.
13      (Holland Deposition Exhibit 3 was marked for
14 identification.)
15   Q. I'm going to show you what has been marked as
16 Exhibit 3 and ask you to look it over and let me know
17 when you've had a chance to read it.
18   A. All right.
19   Q. Have you ever seen that document before?
20   A. Yes.
21   Q. And it is an incident report dated October 21,
22 2004; is that right?
23   A. Mm-hmm.
24   Q. There is a "Facts of Incident" stated at the

Page 92

1 bottom.
2   A. Mm-hmm.
3   Q. And can you tell me, is this description accurate
4 as to what happened?
5   A. The incident is not quite exactly what happened.
6   Q. Why don't you tell me what happened, in your
7 view.
8   A. All right. At this time, incident where me and
9 another individual -- I don't see his name on here --
10 began horse playing. The officer -- I don't see his name
11 on here. Is his name on here?
12   Q. Is it David Thorp?
13   A. Yes. All right. I see it. CO Thorp had told us
14 to break the incident up. After that he called for
15 assistance with other COs and to be escorted to a holding
16 cell.
17      While in the holding cell I explained that,
18 I expressed my concern of no longer wanting to be in
19 Central Violation of Probation Center, and he then wrote
20 this incident up hoping, in order -- his words were that
21 "I hope you get what you looking for." He says, "You
22 don't have to do this. You can go another way."
23      But the incident was resulting in horseplay.
24 But the incident of the threat, that never took place.

Page 93

1   Q. Did you say, "I will do whatever or beat up
2 whoever I need to in order to get out of here"?
3   A. No.
4   Q. And you answered that you didn't say that?
5   A. No. He put that in there, this is Thorp, Thorp,
6 CO Thorp put that in there in order to insure -- well,
7 try to get me sent back, and hopefully go up before the
8 judge.
9      What happened with me and the other
10 individual, who I don't see his name in here, began horse
11 playing on the tier, and after that, he took me to a
12 holding cell, and he asked me, he begin to ask me why I
13 was horse playing. I'm like, "Oh, we were just playing
14 around. But I don't really want to be here anyway." I
15 say, "I'd rather just be sent out so I can go before the
16 judge."
17      But Thorp, he said, well, he says I don't --
18 he says, "You can't just horseplay not on my watch." He
19 says, he expressed to me, he says, "Look, I'll write this
20 in," he said that I, something about I would beat up
21 whoever, whoever, whatever. But that statement was never
22 made.
23   Q. So David Thorp made that up?
24   A. Well, I don't know if it is in here, but at the

24 (Pages 90 to 93)

Case 1:05-cv-00464-SLR   Document 53-5   Filed 11/27/2006   Page 5 of 9

Holland                           v.                    Taylor, et al.
Kevin Holland          C.A. # 05-464-SLR                August 22, 2006

Page 94

1  time that this incident took place, it was in no
2  altercation. He didn't mention in here that even as he
3  viewed it, it wasn't even a violation. It was more or
4  like we were just horse playing. He did state horse
5  playing.
6     Q.  But did David Thorp make up that sentence at the
7  end?
8     A.  Yes, yes, I believe so. Either that or the other
9  guy might have said that, because I didn't make the
10 statement.
11    Q.  Do you know who the other inmate was?
12    A.  No, not offhand. If I had a list of individuals
13 who were placed in the facility at the time I could tell
14 you what his name is. And it is very strange that he
15 didn't put that in there.
16    Q.  Did you ever make any comment to anybody at CVOP
17 that you would do whatever you needed to to get out of
18 there?
19    A.  I don't, I don't think so. I don't know. I
20 don't know. But I was willing, I was willing to violate
21 my probation to get out of there.
22        Physically harm somebody, I don't think that
23 would be possible.
24    Q.  When you say physically harm somebody wasn't

Page 95

1  possible, what do you mean?
2     A.  That I would not do, due to the fact I'm more or
3  less friendly and got along with everyone, I wouldn't do
4  that, put somebody in harm's way just for self gain.
5        MS. KELLY:  I'm going to mark this as
6  Exhibit 4.
7        (Holland Deposition Exhibit 4 was marked for
8  identification.)
9     Q.  I'm going to show you what has been marked as
10 Exhibit 4. It is pretty long, so take your time and look
11 it over. Let me know when you are done reading it.
12    A.  All right.
13    Q.  Have you seen this before?
14    A.  Mm-hmm.
15    Q.  I'm interested in particular if you look at page
16 2, if you look at the fifth line down, it says "Offender
17 stated," are you there? "Offender stated that he would
18 break out the glass on the pod" -- do you see that?
19    A.  Yes, I see that?
20    Q.  -- "if he had to and that it was a misdemeanor
21 and they had to send him then." Do you remember anything
22 like that happening?
23    A.  Un-un.
24    Q.  You didn't say you would break out the glass from

Page 96

1  the pod?
2     A.  No.
3     Q.  Do you remember having a conversation with Cindy
4  Scala that you asked her to do you a big favor and
5  violate him?
6     A.  Violate me?
7     Q.  Yes. Violate you. I'm sorry?
8     A.  Yes, I asked her that.
9     Q.  Did you tell her you would do whatever it took to
10 go back to DCC?
11    A.  I don't know. I might have.
12    Q.  In your complaint you are claiming that you were
13 unlawfully imprisoned at CVOP?
14    A.  Mm-hmm.
15    Q.  And what did you mean by that?
16    A.  Any time during the time that I was in-housed at
17 CVOP, due to Miss Scala, on my records, could have and
18 should have sent me to correct facility in which I was
19 supposed to have been, meaning MCCC, and doing so, they
20 failed to do so. They unlawfully imprisoned me within
21 the facility and wasn't able or refused to, through their
22 positions, transfer me.
23    Q.  Why did you sue Michael Records?
24    A.  He is, I believe, either the director or

Page 97

1  supervisor which everything that had to go through him,
2  according to Miss Scala, everything had to go through him
3  to be approved.
4     Q.  Did you ever speak with him?
5     A.  Several times.
6     Q.  Okay. And what kind of conversations did you
7  have with him?
8     A.  It was more like him talking to me. He let me
9  know that it is not going to be nobody's way but his. He
10 says that I won't go anywhere unless he wants me to go,
11 things like that.
12    Q.  So are you saying that Michael Records knew that
13 you were complaining about having been on the waiting
14 list and not being moved?
15    A.  Yes, he knew.
16    Q.  Did you ever write to him?
17    A.  I don't know. I don't think so.
18    Q.  Now, did you ever write a grievance about this
19 whole issue of being held at CVOP for too long?
20    A.  Other than the incident after it occurred with
21 Lieutenant Bramble, that's the issue, during the time I
22 was there I was under the impression that any day I could
23 be transferred or any week I could be transferred to work
24 release. Every week went by -- every week that went by,

Case 1:05-cv-00464-SLR   Document 53-5   Filed 11/27/2006   Page 6 of 9

Holland                              v.                    Taylor, et al.
Kevin Holland            C.A. # 05-464-SLR                 August 22, 2006

Page 98

1  I was still there.
2    Q. You have told me about experiencing stress, and
3  then the stress causing shingles. Did you have any other
4  physical problems, before the incident with Lieutenant
5  Bramble, did you have any other physical problems that
6  you felt were caused by what defendants were doing?
7    A. Other than the lack of eating, the worrisome, the
8  non-sleeping, anything possible, everything, even crying,
9  complaining, whining, everything possible.
10   Q. So you feel like you weren't eating properly
11 because you were stressed; is that what you are saying?
12   A. I wasn't.
13   Q. And you were having trouble sleeping?
14   A. I was.
15   Q. And that you felt like that was because of your
16 stress?
17   A. Every week -- let me try to explain it to you.
18 Prior to that time I done spent from '96 -- I mean from
19 '99 to 2004, incarcerated. Once my time was up, I was
20 supposed to do work release. Granted, I accumulated a
21 write-up which sent me back for a period of time.
22        During the time through the holidays, which
23 is more, you know, more sentimental to me, only having
24 phone calls with my son, which were very limited because,

Page 99

1  you know, you got other people that want to get on the
2  phone, when the holidays came up, you had Halloween, you
3  know, Thanksgiving just around the corner, because these
4  holidays are coming up, it was more and more -- and I
5  explain to him, I've been here for so long already that
6  should have been something done, something done to help
7  me get where I was going, where I was supposed to have
8  been. No one was either trying to hear my plight or
9  understand where I was coming from.
10       Every time I saw Miss Scala I said something
11 to her, either, "When are we moving, or "What else can I
12 do," other than she replied to me that "I can't do
13 nothing for you. It ain't up to me."
14       I was hopeless. I was stuck in a situation
15 of complete utter hopelessness, where I couldn't get home
16 to my family who I love.
17   Q. Were you having any other physical problems that
18 you thought were caused by stress or whatever other
19 things were going on?
20   A. Other than being in that facility, the physical
21 problems that I endured there, no other physical problems
22 other than the stress that I endured, had to endure while
23 I was there in that facility.
24   Q. You sued somebody called Daniels. Who is that?

Page 100

1    A. I was believed that the -- I believe it is the
2  classification, is it classification or -- records
3  department at the Central Violation Probation Center was
4  headed by Cline Daniels.
5    Q. Oh. So that was one word.
6    A. Huh?
7    Q. That was one name, Cline Daniels?
8    A. Right.
9    Q. That person hadn't been served either. Are you
10 aware of that?
11   A. No, I wasn't aware of that.
12   Q. So I'm not representing that person, whoever it
13 is. I just wanted to know who it was.
14       I think in your answers to interrogatories
15 you mentioned that you had served a subpoena. What is
16 that about?
17   A. Huh?
18   Q. In your answer to interrogatories you mentioned
19 that you had served a subpoena directed to defendants.
20 What is that about?
21   A. I don't have my interrogatories.
22   Q. Let me see. Let me find it. I don't have an
23 extra copy of this, but I'm just going to show this to
24 you. Look at B. First of all, just look it over. Have

Page 101

1  you seen that before, the document?
2    A. I think this is the -- yes, I seen this document
3  before. I had a paralegal help type this up. I think
4  this might be a misprint.
5    Q. Do you see B, it says, "Plaintiff has subpoenaed
6  all records." Have you done a subpoena?
7    A. Un-un.
8    Q. Okay.
9    A. I haven't done that.
10   Q. Do you know yet what witnesses you would bring to
11 trial of this matter?
12   A. Yes. I was calling some of the witnesses that I
13 already gave you a list at the time of the incident that
14 occurred on the pod. I was in the process, before the
15 incident where placed me back to Delaware Correction
16 Center, subpoena some of the witnesses that directly
17 related or knew about the incident within the MCCC.
18       I was also going to subpoena Mr. Tessler,
19 which is CEO of Tessler Roofing Company located at 480 --
20 excuse me -- 48069 South DuPont Highway, Camden,
21 Delaware, to verify the time of the write-up which was on
22 the 29th, June 29th, 2004, I was employed with him, and
23 at the times that I worked. And a few other people which
24 I don't have all -- my, my physician, medical physician.

| Holland | v. | Taylor, et al. |
|---|---|---|
| Kevin Holland | C.A. # 05-464-SLR | August 22, 2006 |

Page 102

1  Q. We already talked about that.
2  A. Right.
3  Q. You don't remember their names?
4  A. Right.
5  Q. Do you remember the names of any of the inmate
6  witnesses besides the two you already told me?
7  A. Not without my sheet.
8  Q. You are going to give that, let me know who those
9  people are.
10       Okay. You have sued as well Vincent Bianco.
11  Who is he?
12  A. I believe he is the warden for Central Violation
13  of Probation Center, as well as Work Release Center.
14  Q. Why did you sue him?
15  A. He is in charge of all inmates within MCCC and as
16  well as inmates at Violation of Probation Center.
17  Q. Did you ever speak with him?
18  A. No.
19  Q. Did you ever write to him?
20  A. No, due to the same matters involved in most of
21  the incidents that took place within -- the most matters
22  that took place within this incident, lack of whatever,
23  whatever it may be.
24       But I do remember writing to someone about

Page 103

1  the incident, I'm not sure if it was district attorney's
2  office, regarding about the incidents before the lawsuit
3  took place.
4  Q. So you wrote to somebody at the Attorney
5  General's Office or to the Attorney General?
6  A. Attorney General's Office in Wilmington.
7  Q. Okay. About what?
8  A. The charges, as well as the incident involving
9  MVC -- CVOP.
10  Q. About being held there?
11  A. Held. I haven't got a response back.
12  Q. Do you know when you sent that?
13  A. I sent that back in, let me see, I think it was
14  February of 2004. No, not February. February 2005 or
15  March of 2005. It may have been April. It is some time
16  in 2005.
17  Q. I'm sorry?
18  A. In the beginning stages of 2005.
19  Q. And that was before you filed your lawsuit?
20  A. Yes.
21  Q. You have also sued Commissioner Stanley Taylor?
22  A. Mm-hmm, Commission of all Bureau of Prisons. He
23  is also the person who should have or gave -- let me get
24  this right.

Page 104

1       According to the Accountability Commission
2  regarding Title 11, 4334, gave at least some type of
3  guidelines on instructions in how to, all the departments
4  or facilities under his power, how to -- I had his all
5  written down -- how to conduct or go about that Title 11.
6       Now, what I'm saying? How to conduct. If
7  so. If not, he is directly responsible for not allowing
8  or giving the proper information for the facilities to
9  warrant that sanction or this incident would never have
10  occurred, that facilities had proper knowledge or
11  information about the sanction that's allowable sanction
12  time, and what procedures to follow in order to insure
13  that the person who has been given sanction to be sent
14  back to his original status or something like that.
15  Q. Did you ever speak with Commissioner Taylor?
16  A. Un-un.
17  Q. Have you ever written to him?
18  A. Un-un. Oh, I believe it was my sister, my
19  mother, along with a -- I have to get home and get ahold
20  of my mother, they wrote letters to I believe it was, it
21  was Stan Taylor, at the time I was charged with this,
22  with the incident with Lieutenant Bramble, that my mother
23  and a paralegal all got together and sent out numerous
24  letters to numerous individuals concerning the matter.

Page 105

1       Now, I have to get with my mother and get a
2  copy of the letter which she has in a pile and then I
3  will forward it to you or mail it to you by U.S. postal.
4  Q. Okay. So you believe that your sister or mother
5  wrote to Commissioner Taylor about the incident with
6  Lieutenant Bramble?
7  A. They wrote to several individuals about that
8  incident, about that matter.
9  Q. Any other communication that you know about?
10  A. I believe they tried to get ahold of a few
11  people, but it wasn't successful.
12       And they also might be called as witnesses
13  too.
14  Q. Your sister and your mother, that is?
15  A. Yes.
16  Q. And what are their names?
17  A. Anna Watson.
18  Q. Is that your mother?
19  A. No, that's my sister.
20  Q. Okay.
21  A. And Betty Bell. That's my mother.
22  Q. Betty what?
23  A. Bell, B-E-L-L.
24  Q. Mr. Holland, I'm about done asking you questions

27 (Pages 102 to 105)

Case 1:05-cv-00464-SLR  Document 53-5  Filed 11/27/2006  Page 8 of 9

Holland          v.          Taylor, et al.
Kevin Holland    C.A. # 05-464-SLR    August 22, 2006

**Page 106**

1  today. One thing I wanted to do is I wanted to know if
2  there is anything that you wanted me to know about your
3  lawsuit that I haven't already asked you about.
4      A. I'm not following.
5      Q. This is your chance to tell me about your case,
6  and I've asked you lots of questions over a number of
7  hours. Is there anything else that you would want to
8  tell me that we haven't already gone over?
9      A. Let me think.
10        I would like to ask a question real quick.
11     Q. You can ask it and I'll let you know whether it
12 is something I can answer.
13     A. Well, I was wondering if I would be awarded a
14 copy of the transcripts that took place today, at the
15 expense maybe of the defendants instead of my own
16 personal expense.
17     Q. What I'll do, and we can go over that now, you
18 have the option, if you choose to do so, of looking over
19 your transcript and seeing if reading it you see any
20 errors, maybe misspellings of names or that kind of
21 thing, the court reporter didn't know, and you can then
22 send to the court reporter a list of corrections that you
23 feel are appropriate. That's something that you can do,
24 but you don't have to do. Is that something you would be

**Page 107**

1  interested in doing?
2      A. Yes. I get a copy?
3      Q. Well, to explain that, once I get it, I will send
4  you a copy with a cover letter telling you, with a piece
5  of paper saying this is the paper to write down any
6  corrections. So I'll send you the transcript, with these
7  exhibits, and give you the chance to do that, to read it
8  through and make any corrections that you feel are
9  appropriate. Okay?
10     A. Mm-hmm.
11     Q. Did I explain that clearly?
12     A. Yes.
13     Q. Okay. Is there anything else you want to tell me
14 about?
15     A. I think there was, but during the conversation I
16 think I lost the train of thought.
17        During our conversation have you identified
18 the staff member who were monitoring Pod 2 at the time of
19 the incident?
20     Q. Well, you can't really ask me questions because
21 it is my deposition. What you can do is, and you have
22 already done this, I believe, you have already sent me
23 interrogatories; is that right?
24     A. Yes, some of them. Not all of them. Yes. I

**Page 108**

1  just sent them to you not too long ago.
2      Q. Exactly. If you want to, you can send questions
3  directed to my clients, asking them for information. I
4  should tell you, though, that there is a discovery
5  deadline in this case of the 25th. I can't remember what
6  it is. Of this month?
7      A. Of this month.
8      Q. So you do have a problem in that we are on the
9  deadline.
10     A. We are on the deadline.
11     Q. So I can't really tell you anything further than
12 that. I can't give you information. It has to go
13 between the parties, not from me personally.
14        If you have procedural questions, I can
15 answer those for you, like we just went over about the
16 transcript.
17        So if you don't have anything else that you
18 want to tell me about your lawsuit, I think we can wrap
19 it up.
20     A. All right.
21        (Proceedings conclude at 1:17 p.m.)

**Page 109**

```
                  I N D E X
DEPONENT:  KENNETH L. HOLLAND              PAGE
  Examination by Ms. Kelly                   2

                  E X H I B I T S
HOLLAND DEPOSITION EXHIBITS               MARKED
1 - 6/27/04 Program Violation                56
2 - Prisoner complaint                       61
3 - 10/21/04 Arrest/Incident Report          91
4 - 10/20/04 Arrest/Incident Report          95

ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 110
CERTIFICATE OF REPORTER                  PAGE 111
```

Holland                      v.                   Taylor, et al.
Kevin Holland         C.A. # 05-464-SLR         August 22, 2006

Page 110

```
 1
 2
 3
 4      REPLACE THIS PAGE
 5      WITH THE ERRATA SHEET
 6      AFTER IT HAS BEEN
 7      COMPLETED AND SIGNED
 8      BY THE DEPONENT.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 111

```
 1  State of Delaware )
                     )
 2  New Castle County )
 3
 4          CERTIFICATE OF REPORTER
 5
            I, Eleanor J. Schwandt, Registered
 6  Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 22nd day of
 7  August, 2006, the deponent herein, KENNETH L. HOLLAND,
    who was duly sworn by me and thereafter examined by
 8  counsel for the respective parties; that the questions
    asked of said deponent and the answers given were taken
 9  down by me in Stenotype notes and thereafter transcribed
    by use of computer-aided transcription and computer
10  printer under my direction.
11          I further certify that the foregoing is a
    true and correct transcript of the testimony given at
12  said examination of said witness.
13          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17          Eleanor J. Schwandt
18          Certification No. 125-RPR
19          (Expires January 31, 2008)
20
    DATED:
21
22
23
24
```