Exhibit G,



05-130

## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

WILLIAM F. PRETTYMAN
INVESTIGATOR
SPECIAL INVESTIGATIVE UNIT

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5158

MEMORANDUM

*Trial 7-13-05*

To:        Todd E. Conner, Esquire

From:      William Prettyman
           Special Investigations Unit

Date:      2-2-05

Re:        Kenneth Holland

*Jerry Smith*
~~JERRY SMITH~~    *00 306883*
1804 W. 3rd Street        → DCC
Wilmington, DE 19805
Phone: 888-1883

Jerry was interviewed at the Plummer Center on 1-27-05. He stated Kenny and Lt. Bramble had words as Kenny waited in the chow line. Jerry said Lt. Bramble's favorite words are "I'll mace you." As Kenny was sitting and eating his breakfast, Lt. Bramble came up to him and told Kenny not to say another word or he would mace him.

Jerry said after breakfast they went back to their pod and maybe 30-45 minutes later Lt. Bramble came onto the pod. He said Lt. Bramble never came on the pod before.

Kenny approached Lt. Bramble and asked him why did he speak to him that way at the chow line. Kenny thought Lt. Bramble was disrespectful to him and wanted to know why he acted that way toward him.

Lt. Bramble responded, "You're going to SVOP, put your hands behind your back." Jerry said this was so Lt. Bramble could cuff Kenny. Kenny told Lt. Bramble he didn't do anything wrong and he refused to put his hands behind his back.

Lt. Bramble walked toward Kenny with his handcuffs in his hand and tried to grab him. Kenny refused to be handcuffed and Lt. Bramble maced him.

Lt. Bramble called for help on his radio, but Kenny was already cuffed by the time the first correctional officer came to the pod. Jerry said he never saw Kenny pick up a chair at any time during the scuffle with Lt. Bramble. He said when Kenny fell to the floor after being maced and cuffed, the lieutenant continued to mace him.

*Steven Mullins*
~~Steven Mullins~~                          → *not custody*
22 Holland Circle, Apt. 32
William Penn Village Apartments     *16 Metten Rd. Newark 19713*
New Castle, DE 19720
Phone:326-2587                      → *phone # disconnected*

Steven was interviewed at the Plummer Center on 1-27-05 after Jerry Smith said he had ~~witnessed the incident between Kenny Holland and Lt. Bramble.~~

Stevens said Lt. Bramble had an attitude with their whole pod and he didn't like Kenny particularly. He said on the day in question, Lt. Bramble came onto their pod and tried to intimidate Kenny. As he spoke to Kenny, Lt. Bramble held his hand on his mace canister. Kenny saw that and told Lt. Bramble, "Don't be shaking your can at me."

Steven said when the lieutenant took his mace off his belt and began shaking it, that's when Kenny picked up the plastic chair to block the spray of mace. Steven said he saw the lieutenant backing up and he saw the chair strike the lieutenant, but he didn't see if Kenny hit the lieutenant with the chair or if it was thrown at him. From where he stood he didn't have a good view. When the incident was over, Steven did observe a red mark on the left side of the lieutenant's neck.

Steven said he doesn't remember Jerry Smith being on the pod at the time of the incident. He said Jerry was assigned to that pod, but he doesn't remember seeing him there.

*Lateef Dickerson*
~~Lateef Dickerson~~
919 Janvier Court                   → *not in custody*
Middletown, DE 19709
*953 Carrol Dr. Dover*

Lateef was interviewed by videophone on 1-31-05 from the CVOP. He said the day of the incident Kenny and Lt. Bramble "got into it" at breakfast. When they went back to their pod, Lt. Bramble came onto their pod and the argument continued. As they argued, Kenny told the lieutenant "You need to stop threatening to mace me." With that being said, Lt. Bramble pulled out his mace and maced Kenny.

Lateef said Kenny put his hands up to block the spray of mace, but he never saw him pick up a chair. Lateef said the whole incident occurred right in front of his bunk and the lieutenant sprayed Kenny for no reason.

*James White*

~~James White~~
234 N. Queen Street
Dover, DE 19901
Phone: (302) 734-7275

*00390211*
*→ Sussex  (Half-way*

James was interviewed by videophone on 1-31-05 from the CVOP. He said the incident between Kenny and Lt. Bramble had started at breakfast. Kenny wanted to finish his tray and they argued about that. During this first argument Lt. Bramble took out his mace.

Kenny got up and went back to the pod. Shortly afterward, the lieutenant shows up on the pod. Kenny approaches the lieutenant and asks him why has he threatened him so many times with his mace. James thought that Kenny was being "a real gentleman" about it. James said the lieutenant tried to put Kenny in a headlock but Kenny slammed him.

James said he was standing alongside of Kenny when the incident on the pod took place. He said he was trying to calm Kenny down.

James said Kenny finally just gave up and laid down on the floor. He was on the floor before any of the other correctional officers arrived on the pod. James said he never saw Kenny pick up a chair.

*Paul Hayes*

~~Paul Hayes~~
100 Fantasia Drive
Newark, DE 19713
Phone: 456-1657

*100 Fantasia Dr. Newark 19713*
*→ not in custody*
*→ Phone # disconnected*

Paul was interviewed by phone from his home on 2-1-05. He said he had been released from Sussex on 1-31-05 and he is currently on home confinement.

Paul said Lt. Bramble had said something ignorant to Kenny at breakfast. When the lieutenant came on the pod a short time later, Kenny and the lieutenant got into an argument over what had happened at breakfast.

Paul said the lieutenant maced Kenny and Kenny picked up a chair to defend himself against the spray of the mace. Paul said he saw Kenny knock the can of mace out of the lieutenant's hand as he picked up the chair, but he never saw Kenny hit the lieutenant with the chair. Kenny and the lieutenant scuffled on the pod floor and Paul witnessed this from the front of the pod.

Paul said the pod was full at the time, but he doesn't remember who was there watching the incident.

Westlaw.

MHU
Law Library

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

▷

Greason v. KempC.A.11 (Ga.),1990.
United States Court of Appeals,Eleventh Circuit.
Marilyn GREASON, et al., Plaintiffs-Appellees,
**v.**
Ralph KEMP, et al., Defendants-Appellants.
**No. 88-8563.**

Jan. 9, 1990.

Personal representatives of a Georgia prison inmate who committed suicide filed civil rights action against prison officials responsible for his custody and those who provided his mental health care for deliberate indifference to his psychiatric needs. The United States District Court for the Northern District of Georgia, No. 1:86-cv-2615-WCO, William C. O'Kelley, Chief Judge, denied defendant's motion for summary judgment on ground of qualified immunity, and defendants appealed. The Court of Appeals, Tjoflat, Chief Judge, held that: (1) at time of inmate's suicide legal precedent clearly established that Eighth Amendment protected inmates from deliberate indifference to psychiatric needs; (2) jury questions existed as to whether conduct by mental health officials constituted deliberate indifference, thus precluding summary judgment on qualified immunity grounds; and (3) jury question existed as to whether supervisory prison official's conduct amounted to deliberate indifference of inmate's mental health needs, precluding summary judgment on issue of qualified immunity.

Affirmed.

Edmondson, Circuit Judge, filed a dissenting opinion.
West Headnotes
**|1|** Civil Rights 78 ☜1376(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
                (Formerly 78k214(7))
For purposes of determining qualified immunity in civil rights action, at time of inmate's suicide,

reasonable mental health professionals at correctional center would have known that providing an inmate with inadequate psychiatric care could violate inmate's Eighth Amendment right not to be subjected to cruel and unusual punishment particularly where inmate had been receiving psychotropic drugs which were abruptly discontinued by the mental health center's psychiatrist. U.S.C.A. Const.Amend. 8.

**|2|** Federal Civil Procedure 170A ☜2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Evidence created question of fact as to whether mental health center's psychiatrist provided grossly inadequate psychiatric care to prison inmate and that he realized he was doing so at the time precluding summary judgment for psychiatrist on grounds of qualified immunity; after first brief visit with inmate, director abruptly discontinued inmate's antidepression medication, without reviewing inmate's clinical file or conducting a mental status examination which would have revealed inmate's extensive history of mental illness and numerous hospital admissions for psychiatric reason, and which contained reports stating that inmate would pose substantial suicide risk without antidepression medication. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amends. 8, 14.

**|3|** Civil Rights 78 ☜1376(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
                (Formerly 78k214(7))
Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted or threatened suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference for purposes of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829                                                                Page 2
891 F.2d 829
**(Cite as: 891 F.2d 829)**

qualified immunity from damages. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 8.

**[4] Federal Civil Procedure 170A** ⟜2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
A jury question existed as to whether failure by
mental health team leader at county mental health
center to monitor inmate after having been warned by
inmate's parents and two other inmates that inmate
had tried to commit suicide constituted deliberate
indifference, thus precluding summary judgment as
to team leader's qualified immunity from damages.
U.S.C.A. Const.Amend. 8.

**[5] Civil Rights 78** ⟜1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
        (Formerly 78k207(2))
In determining whether prison personnel supervisor
could be held independently liable under § 1983 for
acts of subordinates, court had to determine whether
in failing to adequately train and supervise
subordinates, supervisor was deliberately indifferent
to inmate's mental health care needs, whether
reasonable person in supervisor's position would
know that failure to train and supervise reflected
deliberate indifference, and whether supervisor's
conduct was causally related to constitutional
infringement by subordinate. 42 U.S.C.A. § 1983;
U.S.C.A. Const.Amends. 8, 14.

**[6] Federal Civil Procedure 170A** ⟜2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
Material issue of fact existed as to whether
correctional center's clinical director, who was
immediate supervisor of psychiatrist, engaged in
conduct constituting deliberate indifference to
inmate's mental health needs, precluding summary

judgment as to director's qualified immunity from
damages; there was evidence that director was aware
of inadequacy in psychiatric care being provided but
failed to take action in response to complaints and
another inmate's suicide after abrupt discontinuance
of his antidepressant medication, that reasonable
person in director's position would have known that
conduct reflected deliberate indifference and that
conduct was causally related to grossly inadequate
psychiatric care that violated inmate's Eighth
Amendment rights. 42 U.S.C.A. § 1983; U.S.C.A.
Const.Amends. 8, 14.

**[7] Civil Rights 78** ⟜1432

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1432 k. Defenses; Immunity and Good
Faith. Most Cited Cases
        (Formerly 78k244)
Jury question existed as to whether director of mental
health for State Department of Corrections was
entitled to qualified immunity from damages for
inmate's suicide; record showed that director was
aware of grossly inadequate mental health care
conditions, that mental health treatment plans
arguably necessary for adequate care were not used at
facility, that there were no policies or procedures
designed to help staff and guards recognize suicidal
tendencies and prevent suicide attempts and of
excessive burden on staff psychiatrists who could not
adequately treat all inmates in need of mental health
care, and that supervisor was also aware of possible
results from abrupt discontinuation of antidepressant
medication for inmate with suicidal tendencies but
failed to take any action to prevent reckless
discontinuation of medication. 42 U.S.C.A. § 1983;
U.S.C.A. Const.Amend. 8.

**[8] Civil Rights 78** ⟜1429

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1429 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
        (Formerly 78k244)
Jury question existed as to whether supervisory
liability could be imposed on warden of prison for
inmate's suicide following abrupt discontinuation of
antidepressant drugs; record indicated that although
warden was aware of inadequacy of mental health
services provided to inmates, he did not attempt to
remedy problem, and that warden was familiar with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

Page 3

prior incident in which inmate committed suicide after abrupt discontinuation of antidepressant medication but did not attempt to take adequate measures to investigate treatment or change method of treatment after incident. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 8.

*830 Neal B. Childers, Cathy A. Cox, Asst. Attys. Gen., Atlanta, Ga., for defendants-appellants.
*831 Joseph H. Chambless, Emmitte H. Griggs, Harriss, Watkins, Davis & Chambless, Macon, Ga., for Fodor.
Robert B. Remar, Susan M. Garrett, Remar & Graettinger, Atlanta, Ga., for plaintiffs-appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and ATKINS [FN*], Senior District Judge.

> FN* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

TJOFLAT, Chief Judge:
This is an action for money damages. It was brought under 42 U.S.C. § 1983 (1982) [FN1] by the personal representatives of the estate of Charles Greason, a Georgia prison inmate who committed suicide while incarcerated. The plaintiffs claim that their decedent committed suicide because the defendants-the prison officials responsible for his custody and those who provided his mental health care-were deliberately indifferent to his psychiatric needs, in violation of his rights under the eighth and fourteenth amendments to the United States Constitution.[FN2] The defendants contend that, under the circumstances of this case, they are not answerable in money damages because they have qualified immunity. They presented this defense to the district court in a joint motion for summary judgment, arguing that the evidence before the court conclusively demonstrated that they had responded to Greason's psychiatric needs in a constitutional manner.[FN3] The court rejected their argument and denied their motion. The defendants then took this interlocutory appeal to obtain review of the court's ruling. We affirm. [FN4]

> FN1. Section 1983 states, in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

> FN2. The eighth amendment proscribes the imposition of "cruel and unusual punishments." U.S. Const. amend. VIII. This proscription applies to the states through the fourteenth amendment. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947). For convenience, we treat appellees' claim as having been brought under the eighth amendment.

> FN3. The relevant evidence consisted mainly of depositions, affidavits, and medical records and reports.

> FN4. This court has jurisdiction to review this interlocutory appeal under 28 U.S.C. § 1291 (1982). See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (denial of qualified immunity is appealable final order within meaning of 28 U.S.C. § 1291).

I.

The district court refused to grant the defendants summary judgment because the court was not prepared to hold, on the record before it, that the defendants were entitled to qualified immunity as a matter of law. In deciding whether the court erred, we take the record as it was presented to the district court and view it in the light most favorable to the plaintiffs. See Waldrop v. Evans, 871 F.2d 1030, 1034-35 (11th Cir.1989). Viewed in this light, the record reveals the following.

In early June 1985, Charles Greason, the plaintiffs' decedent, pled guilty but mentally ill to assault charges and was sentenced to prison for a term of five years.[FN5] After he was sentenced, Greason was taken to the Georgia Diagnostic and Classification Center (GDCC) for a mental health evaluation and any treatment that might be necessary.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829                                                                        Page 4
891 F.2d 829
(Cite as: 891 F.2d 829)

FN5. Greason was charged with aggravated assault for indiscriminately firing a rifle out of his bedroom window at a neighbor's house. No one was injured.

Greason had a history of mental illness. He had recently been treated at the Gwinnett County Mental Health Center for depression and given anti-depression medication because he had contemplated suicide. Susanna Stoltzfus was Greason's *832 therapist at that facility. Upon learning of Greason's incarceration at the GDCC, she sent a letter to the clinical director there, R.T. Oliver, M.D., describing Greason's current mental status and relating his history of mental illness. In her letter, Stoltzfus noted that Greason had been hospitalized thirteen times at the Gwinnett County Mental Health Center during the ten years prior to his incarceration and that he had been diagnosed as a schizophrenic with suicidal tendencies. She therefore urged Dr. Oliver to continue Greason's anti-depression medication and to monitor him closely. Albert Duncan, Ph.D., the mental health director for the Georgia Department of Corrections, received the same advice from James Brooks, M.D., a psychiatrist with the Georgia Department of Human Resources, who had evaluated Greason before his transfer to the GDCC. In a formal report to Dr. Duncan, Dr. Brooks stated that Greason continued to have suicidal thoughts and needed to be maintained on his anti-depression medication. After these two reports were read, they were placed in Greason's clinical file.

Greason was kept at the GDCC for four months.[FN6] During that time, he was seen twice by the Center's psychiatrist, Frank Fodor, M.D., who was responsible for the evaluation and treatment of the mentally ill prisoners at the GDCC. Dr. Fodor came to the GDCC one day a week for six and one-half hours; during these visits, he saw as many as twenty-five to thirty inmates, spending, on the average, less than fifteen minutes per inmate.

FN6. During that time, Greason was kept in what was essentially solitary confinement; he was let out of his cell three times a week to take a shower.

The first time Dr. Fodor saw Greason was on August 22, 1985, two and one-half months after Greason's arrival at the GDCC. Dr. Fodor spent a few minutes with Greason and promptly concluded that Greason's condition had stabilized and that his anti-depression medication should be discontinued; he therefore

discontinued Greason's medication without reviewing Greason's clinical file or assessing his mental status to determine his current potential for suicide.

Calvin Brown, the mental health team leader at the GDCC, was the staff person responsible for Greason's case. Brown worked under Dr. Fodor's supervision; Fodor instructed him on the type of care Greason should receive, e.g., medication, counselling, or monitoring. Brown, in turn, kept Fodor apprised of Greason's progress, reporting to Fodor when Fodor made his weekly visits or more often if necessary.[FN7]

FN7. Brown's duties included scheduling the inmates' appointments with Dr. Fodor.

Following his August 22 visit with Greason, Dr. Fodor instructed Brown to discontinue Greason's anti-depression medication, but he did not tell Brown to monitor Greason for the adverse effects the discontinuance might produce. Dr. Fodor informed Dr. Oliver of his instruction to Brown; the information was contained in some cursory notes Fodor gave Oliver about his visit with Greason. Oliver put the notes in Greason's clinical file but took no other action. In particular, he did not direct Brown to monitor Greason.

Dr. Fodor's second, and final, visit with Greason occurred twenty-eight days later, on September 19. This session, like the first, lasted but a few minutes and was perfunctory. Dr. Fodor made no assessment of Greason's mental status and left no instructions with Calvin Brown. As before, Dr. Fodor made some cursory notes of his visit with Greason and left them with Dr. Oliver, who placed them in Greason's clinical file.

A few days later, Greason's parents visited him at the GDCC. Greason told them that since the discontinuance of his anti-depression medication, he had been unable to sleep, had been experiencing feelings of despair and thoughts of suicide, and on one occasion had attempted to kill himself by tying something around his throat.[FN8] They *833 met with Brown following the visit, told him what their son had said, and urged Brown to have Greason transferred to a hospital, fearing that he might attempt suicide again.

FN8. Two inmates, Douglas Lewis and Billy Foraker, also reported to Brown that

Greason had attempted suicide.

Brown told Greason's parents not to worry about their son, that he would "take care of it." Brown, however, did nothing. He neglected to contact Dr. Fodor; consequently, Fodor had no knowledge of Greason's suicide attempt. Brown could have placed Greason on "a suicide watch," a procedure in which suicidal inmates are placed in stripped cells and subjected to around-the-clock observation, but he chose not to take this step. In sum, he made no effort to have Greason monitored.

On October 13, 1985, twenty-four days later, Greason was found dead in his cell; he had hung himself from the cell bars with his sweat shirt. The Greasons thereafter brought this action, seeking money damages against Calvin Brown and Dr. Fodor, those immediately responsible for providing Greason mental health care. The Greasons also sought damages from their superiors: Ralph Kemp and Dr. Oliver, respectively the warden and the clinical director of the GDCC, and Dr. Duncan, the mental health director of the Georgia Department of Corrections.

## II.

The doctrine of qualified immunity insulates government officials from personal liability for money damages for actions taken pursuant to their discretionary authority. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court established the test for courts to use in determining whether, in a given case, such immunity is available. The Court said that "government officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The appellants, here, claim that, as a matter of law, they met this test; accordingly, the district court should have granted them summary judgment. They advance two independent arguments in support of their position. First, the defendants argue that, at the time of Greason's suicide, prison inmates had no clearly established constitutional right to psychiatric care. Second, they argue that, even if such a right existed, reasonable persons, standing in appellants' respective shoes, would not have known that the conduct appellees challenge violated that right. We turn, now, to these arguments.

### A.

To decide whether, at the time of Greason's suicide, prisoners had a clearly established constitutional right to psychiatric care, we look to the law established by the Supreme Court, the courts of appeals, and the district courts. *See Harlow,* 457 U.S. at 819 n. 32, 102 S.Ct. at 2738 n. 32. We begin with *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which was decided by the Supreme Court nearly a decade before the events in this case took place. In *Estelle,* the Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (citation omitted). Because *Estelle* involved the provision of medical care rather than psychiatric care, however, the appellants in the present case argue that reasonable persons occupying their roles in a state prison system would not have known that *Estelle* condemned the type of conduct appellees complain of here.

[1] The district court, in rejecting appellants' argument, stated:
From a strictly pragmatic perspective, the line separating traditional medical care from psychiatric treatment is blurred indeed, particularly in cases, such as the instant one, when psychotropic drugs are prescribed. Both a medical doctor practicing medicine and a medical doctor practicing psychiatry, such as Dr. Fodor, can prescribe these drugs, and the mere fact that a drug is prescribed by one as opposed to the other should not alone characterize the nature *834 of the treatment for Eighth Amendment purposes. Certainly any reasonably competent prison counselor or administrator, would realize that denying a prisoner needed psychotropic drugs might trigger liability under *Estelle*-just as any physician who declined to treat a gangrenous infection with antibiotics might reasonably expect a constitutional challenge. Even if this case involved failure to provide psychotherapy or psychological counselling alone, the court would still conclude that the psychiatric care was sufficiently similar to medical treatment to bring it within the embrace of *Estelle.*

This rationale has been used by other courts in disposing of cases involving the delivery of mental health care to prison inmates. In fact, every reported decision handed down after *Estelle* and before the events in this case occurred-i.e., the decisions that would have informed persons in appellants' positions as to the state of the relevant law-recognized that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

Page 6

deliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977).[FN9] We accordingly hold that, at the time of Greason's suicide, reasonable persons in appellants' positions would have known that providing an inmate with inadequate psychiatric care could violate the inmate's eighth amendment right not to be subjected to cruel and unusual punishment.[FN10]

FN9. We followed this precedent in a recent case involving Dr. Fodor. *See Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989). In *Waldrop,* an inmate of the GDCC claimed that he suffered self-inflicted injuries because Dr. Fodor abruptly discontinued his psychotropic medication; he sued Fodor, alleging that the discontinuance of the medication constituted cruel and unusual punishment under the eighth and fourteenth amendments. Dr. Fodor contended that he was immune from suit because a psychiatrist's liability under the eighth amendment for deliberate indifference to an inmate's mental health needs had not been clearly established when the alleged misconduct occurred. We disagreed, finding that such liability had been recognized long before Dr. Fodor committed the act in question. *See id.* at 1033; *see also Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986) (deliberate indifference to prisoners' medical needs violates eighth amendment).

FN10. The dissent recognizes this proposition but argues that Greason could not have had a clearly established constitutional right to have his medication continued because "no precedent existed that discontinuing psychotropic drugs under circumstances materially similar to these amounted to deliberate indifference." *Post* at p. 841. This argument fails for two reasons. First, one simply cannot say that a prisoner has a clearly established

constitutional right to adequate psychiatric care but that that right is not violated by a particular treatment amounting to grossly inadequate care unless some prior court has expressly so held on "materially similar" facts. Such an approach would add an unwarranted degree of rigidity to the law of qualified immunity. Second, the argument fails because it ignores this court's holding in *Waldrop,* 871 F.2d at 1033, in which the court implicitly held, on virtually identical facts, that the prisoner had a clearly established right to have his psychotropic medication continued if discontinuation would amount to grossly inadequate psychiatric care.

B.

We now turn to appellants' argument that, even if legal precedent clearly established that the eighth amendment protects prison inmates from deliberate indifference to their psychiatric needs, reasonable persons occupying appellants' positions would not have known that the conduct complained of in this case constituted such indifference. To decide whether a reasonable person would have known-at the time of the challenged conduct-that what a particular appellant did amounted to deliberate indifference to Greason's needs, we must focus on what was apparent to that appellant when he acted. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *see also Clark v. Evans,* 840 F.2d 876, 881 (11th Cir.1988). There are two discrete groups of appellants in this case; thus, in conducting*835 our inquiry, we treat them separately. The first group consists of those who were directly responsible for Greason's psychiatric care-Dr. Fodor and Calvin Brown; the second group consists of those who were responsible for supervising them-Dr. Oliver, Dr. Duncan, and Warden Kemp.

1.

[2] Turning to the first group, we begin by considering the case against Dr. Fodor. Dr. Fodor argues that a trier of fact might find that he had handled Greason's case negligently; it could not, however, find that he had been deliberately indifferent. His argument does not persuade us.

We have said that a trier of fact can conclude that one who provides grossly inadequate psychiatric care to a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prison inmate is deliberately indifferent to the inmate's needs. _Waldrop v. Evans_, 871 F.2d 1030, 1033 (11th Cir.1989). In this case, we believe that a trier of fact could find that Dr. Fodor provided such care and, moreover, that he realized that he was doing so at the time. As noted, after his first visit with Greason, which lasted but a few minutes, Dr. Fodor abruptly discontinued Greason's anti-depression medication. He did so without reviewing Greason's clinical file or conducting a mental status examination. Had he reviewed the file, Dr. Fodor would have discovered that Greason was a schizophrenic with an extensive history of mental illness and numerous hospital admissions for psychiatric treatment.[FN11] Moreover, he would have seen the reports from Stoltzfus and Brooks, which stated that without anti-depression medication, Greason would pose a substantial suicide risk. In short, Dr. Fodor would have realized that Greason would have to be monitored very closely if his medication were withdrawn.

> FN11. Appellants' expert witness, a psychiatrist, opined that Greason possessed a great number of the characteristics associated with a high suicide risk; for example, he was divorced, came from a lower socio-economic background, had limited education, had a history of alcohol abuse, and suffered a sense of failure.

There is expert opinion testimony in the record to the effect that Greason received grossly inadequate psychiatric care and that, from a professional point of view, Dr. Fodor handled his case in a grossly incompetent manner. To be sure, there is expert opinion testimony to the contrary that Dr. Fodor met the professional standards expected of a psychiatrist under the circumstances-or, at worst, was merely negligent-and that Greason received adequate care. The presence of such testimony, however, does not end the matter. In a nearly identical case, _Waldrop v. Evans_, 871 F.2d at 1035, we were faced with the same problem: conflicting expert opinion concerning the extent to which a psychiatrist may have departed from professional standards in abruptly discontinuing an inmate's psychotropic medication. We affirmed the district court's denial of the psychiatrist's motion for summary judgment, concluding that the conflict among the experts concerning the propriety of the psychiatrist's professional judgment calls had to be resolved by the jury. _Id._ at 1035; _see also Rogers v. Evans_, 792 F.2d 1052, 1058 (11th Cir.1986) ("Whether an instance of medical misdiagnosis

resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses."). In sum, because a jury could find (1) that Dr. Fodor provided grossly inadequate care and (2) that a reasonable person in Dr. Fodor's position would have known that the care delivered constituted deliberate indifference to Greason's eighth amendment rights, the district court acted correctly when it denied Dr. Fodor summary judgment.

We next examine the conduct of Calvin Brown, the mental health team leader at the GDCC. The question here is a narrow one: whether Brown's failure to monitor Greason after having been warned by Greason's parents and two inmates [FN12] that Greason had tried to commit suicide constituted deliberate indifference.

> FN12. _See supra_ note 8.

[3][4] Where prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take **\*836** steps to prevent that inmate from committing suicide can amount to deliberate indifference. _See Waldrop_, 871 F.2d at 1036 (failure of prison staff member, who was not a psychiatrist, to notify competent officials of inmate's dangerous psychiatric state can constitute deliberate indifference); _Edwards v. Gilbert_, 867 F.2d 1271, 1276 (11th Cir.1989) (stating in dicta that deliberate indifference standard is met if there is a strong likelihood that self-infliction of harm would result from failure to act); _Cabrales v. County of Los Angeles_, 864 F.2d 1454 (9th Cir.1988) (denying defendants' motion for judgment n.o.v. where jailers had rescued decedent from previous suicide attempt), _vacated_, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989) (remanded for consideration in light of _City of Canton v. Harris_, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); _Partridge v. Two Unknown Police Officers_, 791 F.2d 1182 (5th Cir.1986) (plaintiff stated a valid claim where it was known that his decedent, a detainee, had attempted suicide in previous confinement); _Guglielmoni v. Alexander_, 583 F.Supp. 821 (D.Conn.1984) (defendants' motion for summary judgment denied where inmate had "faked" suicide by hanging then actually hung himself a month later); _Matje v. Leis_, 571 F.Supp. 918 (S.D.Ohio 1983) (defendants' motion for summary judgment denied where inmate's attorney told jail officials that inmate would attempt suicide by smuggling in drugs behind her diaphragm, and body cavity search was not performed).

Because a jury could find (1) that Brown's conduct infringed Greason's eighth amendment right not to be subjected to grossly inadequate psychiatric care and (2) that a reasonable person in Brown's position would have known that his provision of care constituted deliberate indifference to Greason's eighth amendment rights, we conclude that the district court properly denied Brown's motion for summary judgment.

2.

Appellants Oliver, Kemp, and Duncan, the second group of appellants, contend that they cannot be held vicariously liable under 42 U.S.C. § 1983 (1982) for the acts of those they supervise. We recognize, of course, that supervisory personnel cannot be held liable under *section 1983* for the acts of their subordinates under the doctrine of *respondeat superior, see Monell v. Department of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir.1986)*; this, however, does not preclude an inquiry into whether the supervisors were independently liable under section 1983.

[5] Using a negligence standard to determine a supervisory official's liability would result in de facto *respondeat superior* liability for the official, *cf. City of Canton, 489 U.S. at ----, 109 S.Ct. at 1206*; therefore, the official is immune under *Harlow* unless a reasonable person in his position would know that his own conduct infringed a constitutional right of the plaintiff, [FN13] *see Creighton, 483 U.S. at 641, 107 S.Ct. at 3040.* Consequently, a supervisor can be held liable under *section 1983* when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff, *see Fowler v. Cross, 635 F.2d 476, 484 (5th Cir. Jan.1981),* [FN14] and his conduct was causally related to the constitutional violation committed by his subordinate, *see Wilson v. Attaway, 757 F.2d 1227, 1241 (11th Cir.1985); Hewett, 786 F.2d at 1086-87 (citing Barksdale v. King, 699 F.2d 744, 746 (5th Cir.1983)).* Thus, under *Estelle* and its progeny, courts must apply a three-prong test to determine a supervisor's liability: (1) whether, in failing adequately to train and supervise subordinates, he was deliberately indifferent to an inmate's mental[FN15] *837 health care needs; [FN16] (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference; and (3) whether his conduct was causally related to the constitutional

infringement by his subordinate. Because a supervisor's orders and directions are tantamount to official policy in the eyes of a subordinate, we find the analogous situation of municipal liability under *City of Canton* to be helpful in determining whether a supervisor was deliberately indifferent to an inmate's psychiatric needs. In *City of Canton,* the Supreme Court held that a municipality can be liable for deficient training of city officials if the city's policymakers were deliberately indifferent to infringements of constitutional rights that are caused by lack of training and supervision. *489 U.S. at ----, 109 S.Ct. at 1205.* [FN16] We recently applied *City of Canton* in *Kerr v. City of West Palm Beach, 875 F.2d 1546, 1555-57 (11th Cir.1989).* [FN17] Although we are not here concerned with municipal liability, the analysis used in those cases is applicable to the case at hand, in which we must determine whether quasi-policymakers have been deliberately indifferent in their supervision of subordinates. Thus, as we explore the supervisors' conduct in this case, we will borrow from the Court's analysis in *City of Canton* and our analysis in *Kerr* to help determine whether the supervisors were deliberately indifferent to Greason's eighth amendment rights.

> FN13. Under *Estelle* and its progeny, an inmate's eighth amendment rights are infringed by a prison official's deliberate indifference to the inmate's mental health care needs. *See supra* 891 F.2d at 833-34.

> FN14. In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

> FN15. The same standard of deliberate indifference applies to both inadequate training and inadequate supervision. *Cf. Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir.1989)* (applying *City of Canton* to question of municipal liability).

> FN16. In that situation, the Court held, the officials' conduct could be deemed the policy of the city.

> FN17. *Kerr* involved the question of a municipality's liability for its police officials' alleged failure adequately to train police officers in the safe use of police dogs. *See Kerr, 875 F.2d at 1546-53.*

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

Page 9

The determination of whether a supervisor was deliberately indifferent and whether that indifference was causally related to the constitutional violation [FN18] is a fact-sensitive inquiry. *See Waldrop, 871 F.2d at 1034.* Therefore, we consider Oliver's, Kemp's, and Duncan's conduct separately.

> FN18. A causal connection can be established when, for example, the inmate's injuries result from the supervisor's failure to provide an adequate staff to administer medical or mental health care, *see Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir.1988), vacated, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989)* (remanded for consideration in light of *City of Canton* ), or from the supervisor's promulgation of "haphazard and ill-conceived procedures," *see Todaro v. Ward, 565 F.2d 48, 52 (2d Cir.1977).* The required causal connection can also be established when a history of abuse by subordinates has put the supervisor on notice of the need for improved supervision and training, and his failure to take corrective action sets the stage for the inmate's injury. *See Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.1985).*

a.

As clinical director of the GDCC, Dr. Oliver was responsible for coordinating the provision of medical and psychiatric care at the GDCC. Additionally, Dr. Oliver was Dr. Fodor's immediate supervisor and reviewed all of Fodor's treatment notes.

The evidence suggests that Oliver, in his capacity as clinical director, knew about the severe lack of staff members capable of providing psychiatric care to the inmates. In deposition, Fodor stated that he complained to Oliver many times of inadequate staff and of his inability to spend sufficient time with the inmates. Apparently, Oliver did nothing in response to these complaints. Expert testimony in the record reveals that the number of staff members capable of providing psychiatric care was clearly inadequate, and a jury could find that a reasonable person in Dr. Oliver's position would be aware of the inadequacy. Fodor also complained to Oliver about the lack of an institutionalized mental health unit for inmates with severe emotional problems at the GDCC. Again, Dr. Oliver failed to take any action in response to these

complaints. A jury could easily construe this failure to act as deliberate indifference to the eighth amendment rights of GDCC inmates. [FN19]

> FN19. We have held that the political subdivision charged with maintaining the facility in question-here the State of Georgia-has a non-delegable duty to provide the funds necessary for such maintenance. *See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir.1985).* Therefore, if the supervisory officials can show that they attempted to remedy the staffing problems at the GDCC but were unable to do so because of lack of funds, then they can escape liability on this point. The record contains no evidence on this issue.

**\*838** With regard to Greason in particular, a jury could find that Oliver's conduct constituted deliberate indifference. As Fodor's immediate supervisor, Oliver was aware of the Timothy Waldrop incident, which occurred at the GDCC almost one year prior to Greason's suicide, *see generally Waldrop v. Evans, 871 F.2d 1030 (11th Cir.1989).* As in the Greason incident, Fodor had abruptly discontinued Waldrop's anti-depressant medication. Shortly thereafter, Waldrop, an inmate, committed several acts of self-mutilation. *See id. at 1032.* Oliver regularly reviewed all of Fodor's treatment notes and knew that the acts of self-mutilation were preceded by Fodor's discontinuance of Waldrop's medication. In fact, Oliver took part in a meeting called after the incident to evaluate the treatment leading up to the acts of self-mutilation.

After having read Susanna Stoltzfus' letter, which warned of Greason's suicidal tendencies and recommended the continuation of his medication, Oliver was aware of Greason's precarious mental condition. Having read Fodor's notes, Oliver was also aware that Fodor had discontinued Greason's medication but had given Calvin Brown no specific instructions to monitor Greason. In fact, Oliver admitted that he did nothing in response to the Stoltzfus letter, apparently not even relaying its contents to Fodor or Brown.

[6] We think that a jury could conclude that Oliver's conduct satisfied the three-prong test for determining a supervisor's liability, *see supra* at p. 836. Given Oliver's awareness of the Waldrop incident and its probable causes,[FN20] of the warnings from Susanna Stoltzfus, and of Fodor's method of treating Greason,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

a jury could conclude that Oliver acted with deliberate indifference toward Greason's eighth amendment rights in failing to ensure that competent officials took steps to protect Greason. As we have held, "failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference." _Waldrop,_ 871 F.2d at 1036. Furthermore, Oliver's failure to institute corrective procedures after the Waldrop incident could also be viewed as deliberate indifference. _Cf. City of Canton,_ 489 U.S. at ---- n. 10, 109 S.Ct. at 1205 n. 10 (failure to take remedial action after plainly unconstitutional conduct by police officers could constitute deliberate indifference); _Kerr,_ 875 F.2d at 1556 (jury could find that failure to take corrective action after plainly unconstitutional use of police dogs constituted deliberate indifference).

> FN20. This awareness on the part of not only Oliver, but also Duncan and Kemp, separates this case from those cases involving only a single errant official and a single incident of errant behavior. _See, e.g., Merritt v. County of Los Angeles,_ 875 F.2d 765, 770 (9th Cir.1989); _Rodriguez v. Avita,_ 871 F.2d 552 (5th Cir.1989).

Under the second prong of the test, a jury could find that a reasonable person in Oliver's position would have known that his conduct reflected deliberate indifference to Greason's psychiatric needs. _Cf. Creighton,_ 483 U.S. at 641, 107 S.Ct. at 3040. A jury also could find, under the test's third prong, that Oliver's conduct was causally related to the grossly inadequate psychiatric care that violated Greason's eighth amendment rights. We have held that when understaffing appears to have contributed to a violation of an inmate's eighth amendment rights, a causal link exists between that violation and the city's policy if officials are aware of the staffing problem but fail to take corrective action. _See, e.g., Anderson v. City of Atlanta,_ 778 F.2d 678, 685-86 & n. 11 (11th Cir.1985); _see also Cabrales v. County of Los Angeles,_ 864 F.2d 1454, 1461 (9th Cir.1988), _vacated,_ 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989) (remanded for consideration in light of _City of Canton_ ). We think a reasonable jury could find such a causal link in this case. Furthermore, a jury could find that Oliver's failure to warn competent officials in light of Stoltzfus' letter and the *839 Timothy Waldrop incident was causally related to Greason's grossly inadequate psychiatric care.

Thus, because a jury could find that Oliver acted with

deliberate indifference to Greason's eighth amendment rights, that a reasonable person would have known that Oliver's conduct constituted deliberate indifference, and that Oliver's conduct was causally related to the violation of Greason's eighth amendment rights, the district court acted correctly in denying the supervisory officials' motion for summary judgment with respect to Oliver.

b.

[7] Dr. Duncan, at the time of Greason's suicide, held the position of director of mental health for the Georgia Department of Corrections. As mental health director, Duncan was responsible for ensuring that all mental health programs were properly implemented at all institutions, including the GDCC.

The record reveals that Duncan was aware of many conditions at the GDCC that could lead to grossly inadequate mental health care. Duncan knew, for example, that many of the inmates did not receive enough recreation time, and he admitted that lack of recreation could be damaging to an inmate's mental health. In fact, the record reveals that Greason was allowed out of his cell for recreation only eight times during his entire stay at the GDCC.

Duncan was also aware that mental health treatment plans-systematic and organized treatment of an inmate-were used at other Georgia facilities, but not at the GDCC. Fodor stated that such a plan would have been very beneficial to Greason, and expert testimony suggested that such a plan was necessary for adequate care. Furthermore, Duncan knew that the GDCC had no policies or procedures designed to help the staff and guards recognize suicidal tendencies and prevent suicide attempts. Finally, Duncan was aware of the excessive burden on Fodor and admitted that Fodor could not adequately treat all of the inmates requiring mental health care. Fodor often complained to Duncan, as he did to Oliver, about the severe lack of staff members and the need for a mental health care unit at the GDCC.

With regard to Greason in particular, Duncan received and reviewed the Brooks report, which recommended that Greason's medication be continued. Duncan was also very much aware of the Waldrop incident, having authorized and conducted a review of it, and therefore was aware of what could result from the abrupt discontinuation of medication. Nevertheless, he failed to take any action to ensure that Brooks' advice for Greason would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829                                                                                          Page 11
891 F.2d 829
**(Cite as: 891 F.2d 829)**

implemented or that no reckless discontinuation of medication would occur.

In light of all the major problems at the GDCC of which Duncan was aware but which he apparently did not attempt to remedy, we have no difficulty in holding that a reasonable jury could find that Duncan satisfied the three-prong test for supervisory liability. A jury could reasonably find (1) that Duncan acted in deliberate indifference to Greason's eighth amendment rights, *see Waldrop,* 871 F.2d at 1036; *Anderson,* 778 F.2d at 685-86 & n. 11; *cf. Kerr,* 875 F.2d at 1556; (2) that a reasonable person in Duncan's position would have known that his conduct constituted deliberate indifference; and (3) that this conduct was causally related to the grossly inadequate care provided to Greason. Thus, we find no error in the district court's refusal to grant summary judgment in favor of Duncan.

c.

[8] Ralph Kemp occupied the position of warden of the GDCC at the time of Greason's suicide. As warden, Kemp was responsible for ensuring that all services at the GDCC were properly provided.

Kemp, in deposition, denied knowing the precise number of inmates that Fodor saw on a typical visit. He was, however, aware that approximately seventy to seventy-five inmates required mental care at the time and that Fodor visited the facility only once a week. Even if Kemp was unaware of the excessive burden on Fodor, Kemp was the person charged with ensuring the provision **\*840** of services at the GDCC and was primarily responsible for staffing the GDCC; he therefore "should have been aware" of the understaffing and its "attendant problems," *Fowler v. Cross,* 635 F.2d 476, 484 (5th Cir. Jan.1981). The record, though, does not indicate that Kemp attempted to remedy this problem.

Furthermore, Kemp was familiar with the Waldrop incident and knew that Waldrop's medication had been discontinued prior to the acts of self-mutilation. Kemp, however, did nothing to investigate Waldrop's treatment or to change the method of treatment after the incident. Nor did Kemp ever question Fodor; as he stated in deposition, Waldrop "was under the care of Dr. Fodor, and that was good enough for me."

We find that Kemp was aware of the same essential facts that were also apparent to Oliver and Duncan.[FN21] Therefore, we hold that a reasonable

jury could conclude from the evidence in the record before us (1) that, because Kemp failed to take adequate measures to cure the serious problems of which he was aware, he was deliberately indifferent to Greason's eighth amendment right to psychiatric care, *see Anderson,* 778 F.2d at 685-86; *cf. Kerr,* 875 F.2d at 1556-57; (2) that a reasonable person in Kemp's position would know that his conduct constituted deliberate indifference; and (3) that, because Kemp was in a position to rectify (or attempt to rectify) most of these serious problems, his failure to do so was causally related to the violation of Greason's eighth amendment rights. The district court therefore acted properly in denying Kemp's motion for summary judgment.

> FN21. Kemp also knew that the inmates received inadequate recreation time and that the guards lacked training in suicide prevention.

d.

In sum, we hold that a jury could reasonably find that the conduct of the three supervisory officials satisfied the three-part test for supervisory liability articulated above. In light of the supervisory officials' conduct as detailed above, we hold that (1) the evidence could support a finding that the conduct reflected a deliberate indifference to Greason's eighth amendment right to adequate mental health care; (2) the officials should have known their conduct constituted deliberate indifference to a clearly established constitutional right, *cf. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3040; and (3) the conduct was causally connected to the violation of Greason's eighth amendment rights. Whether the conduct *actually* constituted deliberate indifference and was causally related to the violation of Greason's eighth amendment rights is a factual question that will likely require exploration by expert witnesses at trial. *See Waldrop,* 871 F.2d at 1035. A contested factual issue having been established, the district correctly denied the supervisory officials' motion for summary judgment.

III.

We affirm the district court's order denying appellants' motion for summary judgment on the issue of qualified immunity.

AFFIRMED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829                                                          Page 12
891 F.2d 829
**(Cite as: 891 F.2d 829)**

EDMONDSON, Circuit Judge, dissenting:
Even in cases involving the practice of medicine, qualified immunity does not hinge on legal generalities. Both this court and the Supreme Court have stressed repeatedly that the law defining a constitutional tort must be clearly enough established to make it "apparent" to a potential defendant that "what he is doing" is unconstitutional. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a particularized, and hence more relevant, sense."); *see Malley v. Briggs,* 475 U.S. 335, 341-44, 106 S.Ct. 1092, 1096-97, 89 L.Ed.2d 271 (1986); *Edwards v. Gilbert,* 867 F.2d 1271, 1273 (11th Cir.1989); *841Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1322-23 (11th Cir.1989) ; *Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *Clark v. Evans,* 840 F.2d 876, 880, 881 (11th Cir.1988); *Muhammad v. Wainwright,* 839 F.2d 1422, 1424 (11th Cir.1987). "The line between the lawful and the unlawful is often vague. *Harlow's* 'clearly established' standard demands that a bright line be crossed. The line is not to be found in abstractions-to act reasonably, to act with probable cause, and so forth-but in studying how these abstractions have been applied in concrete circumstances." *Barts,* 865 F.2d at 1194 (footnote omitted).

At the time of Charles Greason's suicide in 1985, the law was clear that deliberate indifference to an inmate's serious psychiatric needs could lead to a violation of that inmate's eighth amendment rights. I disagree, however, that in 1985 it had already been clearly established that to do as defendants did-mainly, diagnose that Greason no longer needed psychotropic drugs-would amount to deliberate indifference, violating the Constitution. In 1985, no precedent existed that discontinuing psychotropic drugs under circumstances materially similar to these amounted to deliberate indifference.[FN1] The existence of an inmate's constitutional right not to be subjected to the cruel and unusual punishment that results from deliberately indifferent psychiatric care is not meaningless just because qualified immunity protects defendants in particular circumstances from the inmate's claim for damages. Qualified immunity does not bar all judicial remedies, *e.g.,* injunctive or declaratory relief and damages against defendants other than individuals who violate the Constitution.

FN1. The cases cited in today's court opinion hold only that an inmate is entitled to reasonable access to medical personnel who can provide necessary psychiatric care. *See Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977) (court expressly disavowed any attempt to second-guess the adequacy of any particular course of treatment); *see also Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1983); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 763 (3d Cir.1979).

*Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989), held that qualified immunity might be unavailable to physicians who withheld from an inmate psychotropic drugs, including Lithium, which had been used to control successfully the inmate's mental illness: within three weeks after discontinuance of the drugs, the inmate performed four separate acts of self-mutilation over a period of 40 days and the physicians, with knowledge of these self-destructive acts, never reinstituted use of Lithium in an attempt to stabilize and to control the inmate's condition. The *Waldrop* court could hold only that what the defendants did in that case was, at the time, clearly established to violate the Constitution. Because today's case involves materially different facts-defendants other than the inmate's attending physician, no series of self-inflicted physical injuries following the decision to stop medication, and no notice to any of the prison doctors that Greason had attempted suicide (if in fact he had done so) since being removed from the drugs-*Waldrop* cannot control the issue of whether the law was clearly established that what defendants did in this case was at the time unconstitutional.

Moreover, today's court denies immunity to the supervisors in this case by using a three-part test never before applied by this or any other court for an eighth amendment violation based on inadequate health care alleged against prison officials who were not directly responsible for a prisoner's psychiatric care. Although the test seems appropriate, it is a fiction to say that the law applied to the supervisors to deprive them of immunity was clearly established in the eighth amendment healthcare context in 1985. The law on point is being established today.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

891 F.2d 829
891 F.2d 829
**(Cite as: 891 F.2d 829)**

Page 13

I also disagree with the court's suggestion that defendants in this case are unentitled to immunity because a jury could find a constitutional violation from the facts presented.    Under this analysis, qualified immunity would be available in only those cases in which a jury could not find a constitutional tort.    In such cases, however, the Constitution has not been violated and no liability exists.    Immunity contemplates exemption from liability that would otherwise exist on the merits;  today's court seems to suggest that immunity is available in only those cases in which the doctrine is superfluous.

The merits of plaintiff's case and the question of qualified immunity are separate**842** questions;  we must avoid allowing the ideas to become blurred. On summary judgment, affidavits showing that medical experts disagree about the adequacy of the care provided might create a triable issue on the merits, but do not create a triable issue on qualified immunity.    Defendants do not lose their immunity because of conflicting opinion evidence about whether they were deliberately indifferent.    To the contrary, qualified immunity is warranted in an eighth amendment case when independent medical experts disagree about whether defendants' conduct was deliberately indifferent.  _Cf. Clark, 840 F.2d at 881_ (prison guard who shot escapee granted immunity despite conflicting opinion evidence about whether lethal gunfire was justified in the circumstances);  _Edwards, 867 F.2d at 1275-76_ (sheriff and correctional officer granted immunity in juvenile inmate's suicide where opinion evidence conflicted as to whether officials had properly monitored juvenile).

Nowadays, most _section 1983_ litigation involves expert testimony stating an opinion about whether the state officer was "reasonable" or used "excessive force" or was "deliberately indifferent."    Qualified immunity is intended to protect public officers not just from adverse judgments, but also from the burden of being entangled in litigation and defending themselves.  _See Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)_. To allow qualified immunity to be defeated (so that a trial must be had) by the simple expedient of producing an expert's affidavit stating an opinion on the ultimate merits adverse to the public officer, is to destroy much of what the doctrine of qualified immunity is intended to do.    Even if medical decisions are involved in a case, I think this cannot be the law.

To avoid trivializing the eighth amendment, we must guard against confusing or allowing others to confuse malpractice with a violation of the Constitution. Whether a healthcare worker's conduct amounts to deliberate indifference so that the eighth amendment is violated is a factually sensitive issue depending on a case-by-case analysis:  medicine is a delicate blend of art and science not easily measured by hard and fast rules.    Therefore, rarely will a basis exist for an _a priori_ judgment that a healthcare worker was deliberately indifferent and thus violated clearly established rights.  _Cf. Dartland, 866 F.2d at 1323_. Put differently, qualified immunity will likely shield most healthcare workers from damages in their individual capacities even if a jury could find that the level of care given amounted to deliberate indifference.

Where, as here, no case law existed in 1985 which in a particularized way made it apparent that defendants' acts would amount to deliberate indifference and where competent medical evidence exists that in 1985 defendants' actions were not deliberately indifferent, defendants are immune from damages.    I would reverse the denial of summary judgment.

C.A.11 (Ga.),1990.
Greason v. Kemp
891 F.2d 829

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

933 F.2d 128
933 F.2d 128
(Cite as: 933 F.2d 128)

Page 1

**C**
Covino v. Vermont Dept. of CorrectionsC.A.2 (Vt.),1991.

United States Court of Appeals,Second Circuit.
**Robert H. COVINO, Plaintiff-Appellant,**
v.
**VERMONT DEPARTMENT OF CORRECTIONS;**
Joseph Patrissi, Commissioner; Heinz Arenz, Superintendent; Peter Machia; "S/S" Finnigan; "CO/B" Duel; "CO/B" Taylor; and "S/S" Charles Gross, Defendants-Appellees.
**No. 1367, Docket 91-2002.**

Submitted April 18, 1991.
Decided May 14, 1991.

Former pretrial detainee brought § 1983 action, challenging both his transfer within prison population and his transfer between prisons. The United States District Court for the District of Vermont, Albert W. Coffrin, J., dismissed, and appeal was taken. The Court of Appeals held that: (1) District Court should have analyzed state law to determine whether it prescribed mandatory procedures governing administrative segregation so as to create liberty interest in remaining in general population, and (2) District Court should have considered whether interprison transfer unconstitutionally impaired detainee's Sixth Amendment right of access to his trial counsel.

Vacated and remanded.
West Headnotes

**[1] Sentencing and Punishment 350H ☜1528**

350H Sentencing and Punishment
 350HVII Cruel and Unusual Punishment in General
  350HVII(G) Confinement
   350Hk1528 k. Pretrial Detention in General. Most Cited Cases
    (Formerly 110k1213.11)
Pretrial detainee's § 1983 claims regarding his placement within prison population were governed by due process clause rather than Eighth Amendment. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amends. 8, 14.

**[2] Constitutional Law 92 ☜272(2)**

92 Constitutional Law

92XII Due Process of Law
 92k256 Criminal Prosecutions
  92k272 Execution of Sentence
   92k272(2)  k.  Imprisonment  and Incidents Thereof. Most Cited Cases
Although transfer of inmate to less amenable and more restrictive quarters for nonpunitive reasons is generally not right protected by due process clause itself, liberty interest in remaining in general prison population is created where state, by statute or regulation, prescribes mandatory procedures that govern administrative segregation. U.S.C.A. Const.Amend. 14.

**[3] Federal Civil Procedure 170A ☜1788.10**

170A Federal Civil Procedure
 170AXI Dismissal
  170AXI(B) Involuntary Dismissal
   170AXI(B)4  Particular  Actions, Insufficiency of Pleadings in
    170Ak1788.5 Civil Rights Actions
     170Ak1788.10 k. Prisoners' Actions. Most Cited Cases
District court should not have dismissed former pretrial detainee's § 1983 claims regarding his placement in administrative segregation for nine months without reviewing state law to determine whether statute or regulation prescribed mandatory procedures governing administrative as opposed to punitive segregation so as to create liberty interest in remaining in general population, and without analyzing possible punitive aspects of such lengthy segregation. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 14.

**[4] Prisons 310 ☜13.5(1)**

310 Prisons
 310k13.5 Transfer of Custody
  310k13.5(1) k. In General. Most Cited Cases
Although due process clause is not implicated when pretrial detainee is transferred from one facility to another, transfer may unconstitutionally impair detainee's Sixth Amendment right of access to his trial counsel. U.S.C.A. Const.Amends. 6, 14.

*129 Robert H. Covino, pro se.
Michael McShane, Asst. Atty. Gen., State of Vt. (Jeffrey L. Amestoy, Atty. Gen., State of Vt., Thomas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 128                                                                                                                Page 2
933 F.2d 128
**(Cite as: 933 F.2d 128)**

J. Rushford, of counsel), for defendants-appellees.

Before LUMBARD, FEINBERG and McLAUGHLIN, Circuit Judges.

PER CURIAM:
Plaintiff-appellant Robert H. Covino was a pre-trial detainee at the Northwest State Correctional Facility ("NWSCF") in Swanton, Vermont. He brought this action for damages and injunctive relief pursuant to 42 U.S.C. § 1983, alleging that defendants-appellees Vermont Department of Corrections, its Commissioner, Joseph Patrissi, NWSCF's Superintendent Heinz Arenz and various turnkeys at NWSCF harassed Covino in violation of various rights secured by the fourteenth amendment. Specifically, Covino complains that on April 4, 1989, he was ordered to move from his single cell in the F-wing, a general population wing at NWSCF, to a double cell at the facility; he was told that the move was necessary to accommodate a handicapped prisoner. Covino claims that he asked the turnkeys not to place him in a double cell, but to place him in any other single cell at NWSCF. Taking him literally, the officials placed Covino in a single cell in NWSCF's D-wing, which allegedly is the facility's isolation wing. Covino remained in the D-wing for nine months. The record does not disclose whether Covino was tried and convicted of any crime.

[1] Appellees served a late answer and moved for summary judgment. Covino cross-moved for a default judgment. The district court granted appellees' motion, concluding that, because no liberty interest in remaining in the general population is found in the due process clause, *see Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), Covino's move from the F-wing to the D-wing did not violate his constitutional rights. In so holding, the district court correctly observed that as a pre-trial detainee, Covino's claims are governed by the due process clause, rather than the eighth amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979).

[2][3] We agree with the general proposition that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons" is not a right protected by the due process clause itself. *See Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869. However, where the state by statute or regulation prescribes mandatory procedures that govern administrative segregation, it thereby creates a liberty interest in remaining in the general prison population. *See Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990) (citing *Hewitt* ). In this case, the district court failed

to examine whether Vermont enacted such mandatory regulations or statutes, thereby creating a protected liberty interest. Covino believes *130 that 28 Vt.Stat.Ann. § 853(a) creates a liberty interest in remaining in the general population. Section 853(a) provides in relevant part:
For serious breach of the rules the disciplinary committee, in accordance with the regulations of the department, may ... recommend, and the supervising officer may order, that an inmate be confined in a cell or room, apart from the accommodations provided for inmates who are participating in programs of the facility. (1) The period of such confinement shall not exceed thirty days consecutively.

Vt.Stat.Ann. tit. 28 § 853(a)(1)(1986). By its terms, however, this statute governs *punitive* segregation, not *administrative* segregation and no one claims that Covino was initially placed in the D-wing because of a disciplinary infraction. We are unaware of any Vermont law that governs administrative segregation and the parties have not cited one.

Nevertheless, we are troubled by the district court's dismissal of Covino's complaint without an analysis of Vermont law. It should be emphasized that Covino is complaining, not merely of his initial move to the D-wing, but, more importantly, of his continued confinement there for nine months. If no state law creates a liberty interest with respect to administrative segregation, then Covino's initial confinement to the D-wing violated no protected constitutional right. *See Russell,* 910 F.2d at 77. At some point, however, the administrative necessity for involuntary lock-up begins to pale. Indeed, after nine months, it smacks of punishment. Although the state may lawfully subject a pre-trial detainee to "restrictions and conditions" "to ensure his presence at trial," "those conditions and restrictions [cannot] amount to punishment, or otherwise violate the Constitution." *Bell v. Wolfish,* 441 U.S. at 536-37, 99 S.Ct. at 1872-73. Accordingly, we remand to the district court to determine (1) whether a mandatory Vermont statute or regulation governs Covino's confinement to the D-wing, and (2) whether his nine-month stay there, which "on its face appear[s] to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Id.* at 539 n. 20, 99 S.Ct. at 1874 n. 20.

[4] In addition to the intra-prison move at NWSCF, Covino also complains that his fifth, sixth, eighth and fourteenth amendment rights were violated when he was transferred to NWSCF from Chittenden County Correctional Center, a distance, according to Covino,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

933 F.2d 128
933 F.2d 128
**(Cite as: 933 F.2d 128)**

Page 3

of 56 miles. Although the due process clause is not implicated when a pre-trial detainee is transferred from one facility to another, *see Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976); Hohman v. Hogan, 597 F.2d 490, 492 (2d Cir.1979),* the district court did not address whether the transfer unconstitutionally impaired Covino's sixth amendment right of access to his trial counsel. *See Cobb v. Aytch, 643 F.2d 946, 957 (3d Cir.1981).* This claim must also be resolved, in the first instance, by the district court.

Finally, we have considered Covino's remaining argument that the district court's denial of his motion for a default judgment was an abuse of discretion and we conclude that it was not. *See Eagle Associates v. Bank of Montreal, 926 F.2d 1305, 1307 (2d Cir.1991).*

The judgment of the district court is hereby vacated and the case remanded for further proceedings consistent with this opinion.

C.A.2 (Vt.),1991.
Covino v. Vermont Dept. of Corrections
933 F.2d 128

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

MHU
Law Library

Page 1

▷

Jones v. City of ChicagoC.A.7 (Ill.),1988.
    United States Court of Appeals,Seventh Circuit.
George JONES, Plaintiff-Appellee, Cross-Appellant,
v.
CITY OF CHICAGO, et al., Defendants-Appellants,
Cross-Appellees.
Nos. 87-2536, 88-1127.

Argued May 27, 1988.
Decided Sept. 14, 1988.
As Amended on Denial of Rehearing Nov. 15, 1988.

Former murder and rape defendant brought civil rights and state law claims against city police officers and city. A jury before the United States District Court for the Northern District of Illinois, Harry D. Leinenweber, J., found for plaintiff, awarded substantial damages, and the court made a attorney fee award. On appeal, the Court of Appeals, Posner, Circuit Judge, held that: (1) evidence was sufficient to support finding of conspiracy between police officers; (2) evidence was sufficient to place liability on supervisory police officers; (3) prosecutor's decision to charge did not break causation chain for police officer's unlawful submission of false report; (4) police department's maintenance of street files was sufficient to impose liability on city; (5) contentions dealing with jury instructions were meritless; and (6) attorney fee award was to be recalculated.

Affirmed in part, reversed in part, and remanded with directions.
West Headnotes
**[1] Conspiracy 91 ⬅1.1**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k1 Nature and Elements in General
                91k1.1 k. In General. Most Cited Cases
                (Formerly 91k1)
In a tort case, function of civil conspiracy doctrine is merely to yoke particular individuals to civil torts charged in the complaint.

**[2] Conspiracy 91 ⬅13**

91 Conspiracy

91 Civil Liability
    91I(A) Acts Constituting Conspiracy and Liability Therefor
        91k12 Persons Liable
            91k13 k. In General. Most Cited Cases
In a tort case, requirements for establishing participation in a conspiracy are the same as in a criminal or civil case in which conspiracy is a substantive wrong.

**[3] Conspiracy 91 ⬅13**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k12 Persons Liable
                91k13 k. In General. Most Cited Cases
To be liable as a conspirator, one must be voluntary participant in a common venture although one need not have agreed on details of conspiratorial scheme or even know who the other conspirators are; it is enough if one understands general objectives of the scheme, accepts them, and agrees, either explicitly or implicitly, to participate and further the objectives.

**[4] Conspiracy 91 ⬅19**

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k19 k. Evidence. Most Cited Cases
Evidence was sufficient to support determination that police officers had acted in common scheme to "railroad" former murder and rape defendant, now civil plaintiff, in violation of his rights, basis for arrest of plaintiff on momentary identification of him by child with head injury during suggestive circumstances, officers' threats to another officer to prevent exculpatory evidence from being presented to prosecutor, issuance of fraudulent evidence report to prosecuting attorney, and lab report which failed to present exculpatory evidence was sufficient. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⬅1355**

78 Civil Rights
    78II Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Respondeat Superior in General;    Supervisory
Liability in General. <u>Most Cited Cases</u>
   (Formerly 78k207(2), 78k13.7)
Supervisors who are merely negligent in failing to
detect and prevent subordinates' misconduct are not
liable under <u>§ 1983</u>, because negligence, even gross
negligence, is not culpable. <u>42 U.S.C.A. § 1983</u>.

<u>[6]</u> **Civil Rights 78** ⚷ **1420**

78 Civil Rights
   78II Federal Remedies in General
      78k1416 Weight and Sufficiency of Evidence
         78k1420 k. Criminal Law Enforcement;
Prisons. <u>Most Cited Cases</u>
   (Formerly 78k242(5), 78k13.13(3))
Evidence was sufficient to enable jury to infer that
supervisory police officers had approved of unlawful
concealment of exculpatory evidence by subordinates
and done their part to "railroad" civil plaintiff, former
murder and rape defendant, in violation of plaintiff's
rights;  deep-sixing of another police officer's report
containing  exculpatory  evidence,  supervisory
officers' attempt to prevent that other officer from
discovering  any  more  exculpatory  evidence,  and
supervisors' submission of deceitful report for use by
prosecutor was sufficient. <u>42 U.S.C.A. § 1983</u>.

<u>[7]</u> **Civil Rights 78** ⚷ **1088(4)**

78 Civil Rights
   78I  Rights  Protected  and  Discrimination
Prohibited in General
      78k1088  Police,  Investigative,  or  Law
Enforcement Activities
         78k1088(4) k. Arrest and Detention. <u>Most</u>
<u>Cited Cases</u>
   (Formerly 78k133, 78k13.4(3))
Police officers were not relieved of their civil rights
liability for attempting to railroad former criminal
defendant in violation of his rights simply because
prosecutor had brought charges and persuaded judge
to set high bail;  falsification of evidentiary report
which was submitted to prosecutors, which would
almost certainly have required prosecutors to drop
charges against former defendant, was sufficient
causation to incur liability on police officers for civil
plaintiff's false arrest and imprisonment. <u>42 U.S.C.A.</u>
<u>§ 1983</u>.

<u>[8]</u> **Civil Rights 78** ⚷ **1088(5)**

78 Civil Rights
   78I  Rights  Protected  and  Discrimination

Prohibited in General
      78k1088  Police,  Investigative,  or  Law
Enforcement Activities
         78k1088(5) k. Criminal Prosecutions. <u>Most</u>
<u>Cited Cases</u>
   (Formerly 78k134, 78k13.4(4))
Prosecutor's decision to charge a defendant with
crime, a grand jury's decision to indict, and the
prosecutor's decision not to drop charges but to
proceed to trial, will not shield a police officer from
civil rights liability after he deliberately supplied
misleading  information  which  influenced  those
decisions. <u>42 U.S.C.A. § 1983</u>.

<u>[9]</u> **Civil Rights 78** ⚷ **1088(5)**

78 Civil Rights
   78I  Rights  Protected  and  Discrimination
Prohibited in General
      78k1088  Police,  Investigative,  or  Law
Enforcement Activities
         78k1088(5) k. Criminal Prosecutions. <u>Most</u>
<u>Cited Cases</u>
   (Formerly 78k134, 78k13.4(4))
While at some point after a person is arrested,
question of whether his continued confinement or
prosecution is unconstitutional passes from the
Fourth Amendment to due process clause, police
officers who had been instrumental in plaintiff's
continued confinement or prosecution cannot escape
liability by pointing to decisions of prosecutors,
grand jurors, or magistrates to confine or prosecute
the criminal defendant;  officers cannot hide behind
the officials whom they have defrauded. <u>42 U.S.C.A.</u>
<u>§ 1983</u>.

<u>[10]</u> **Civil Rights 78** ⚷ **1088(4)**

78 Civil Rights
   78I  Rights  Protected  and  Discrimination
Prohibited in General
      78k1088  Police,  Investigative,  or  Law
Enforcement Activities
         78k1088(4) k. Arrest and Detention. <u>Most</u>
<u>Cited Cases</u>
   (Formerly 78k133, 78k13.4(3))
Police officers were not acting in good-faith
discharge of their public office when they arrested
criminal defendant and attempted to "railroad" him
into prison;  the arrest and later prosecution was
based on momentary, equivocal identification of the
civil  rights  plaintiff,  made  in  suggestive
circumstances by a child, the crime victim, with a
severe injury, which was quickly withdrawn;  no
reasonable officer could have based an arrest decision

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

on the evidence. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 4.

**[11] Civil Rights 78 ⌖1432**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1432 k. Defenses; Immunity and Good Faith. Most Cited Cases
            (Formerly 78k244, 78k13.14)
Trial judge should always decide the issue of immunity, not the jury. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ⌖1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
                (Formerly 78k206(3), 78k13.7)
City is liable to former criminal arrestee under § 1983 for actions of police officer if a custom or policy of the city was a cause of the plaintiff's injury. 42 U.S.C.A. § 1983.

**[13] Civil Rights 78 ⌖1348**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1348 k. Criminal Law Enforcement; Prisons. Most Cited Cases
            (Formerly 78k206(2.1), 78k206(2), 78k13.7)

**Civil Rights 78 ⌖1397**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1397 k. Issues, Proof, and Variance. Most Cited Cases
            (Formerly 78k237, 78k13.7)
Determination of whether city was properly held liable as party defendant for actions of police officers had little practical significance, where no damages were awarded against city which were not also awarded on joint and several basis against individual defendants, and city indemnified its employees for

damage award made against them in respective torts they committed in course of their employment. 42 U.S.C.A. § 1983.

**[14] Criminal Law 110 ⌖700(6)**

110 Criminal Law
    110XX Trial
        110XX(E) Arguments and Conduct of Counsel
            110k700 Rights and Duties of Prosecuting Attorney
                110k700(2) Disclosure or Suppression of Information
                    110k700(6) k. Prosecution's Knowledge or Possession; Searching Files. Most Cited Cases

**Criminal Law 110 ⌖700(7)**

110 Criminal Law
    110XX Trial
        110XX(E) Arguments and Conduct of Counsel
            110k700 Rights and Duties of Prosecuting Attorney
                110k700(2) Disclosure or Suppression of Information
                    110k700(7) k. Responsibility of and for Police or Other Agencies. Most Cited Cases
While *Brady* does not require police to keep written records of all their investigatory activities, attempts to circumvent that rule by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel, which contain exculpatory evidence, cannot be tolerated. 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 ⌖1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
                (Formerly 78k206(3), 78k13.7)
City police department's maintenance of "street file" written records of police officers' investigatory activities which were not provided to either prosecutors or defense counsel, even though they contained exculpatory evidence was sufficient custom to impose civil rights liability on city following civil rights plaintiff's previous arrest, false

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Page 4

imprisonment, and further attempts of police officers to "railroad" him to prison, even in face of decisive exculpatory evidence, where custom to maintain files was department wide and of long standing. 42 U.S.C.A. § 1983.

[16] Civil Rights 78 ⬯ 1088(4)

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1088 Police, Investigative, or Law Enforcement Activities
      78k1088(4) k. Arrest and Detention. Most Cited Cases
        (Formerly 78k133, 78k13.4(3))
Police officers' liability for false arrest depends on absence of probable cause for the arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[17] Civil Rights 78 ⬯ 1088(4)

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1088 Police, Investigative, or Law Enforcement Activities
      78k1088(4) k. Arrest and Detention. Most Cited Cases
        (Formerly 78k133, 78k13.4(3))
Decision by prosecutor to charge criminal defendant, now civil plaintiff, did not break chain of causation between conduct and defendant; police officers' falsification of reports to prosecutor and hiding exculpatory evidence in street files were legal cause of plaintiff's false imprisonment and arrest. 42 U.S.C.A. § 1983.

[18] Civil Rights 78 ⬯ 1487

78 Civil Rights
  78II Federal Remedies in General
    78k1477 Attorney Fees
      78k1487 k. Amount and Computation. Most Cited Cases
        (Formerly 78k302, 78k13.17(19))
Trial court should not have limited attorney fee award to successful civil rights plaintiff by using the contingency-fee contract between plaintiff and his lawyer to place ceiling on attorney fee award, and by deducting from award all fees allocable to accompanying state law claims. 42 U.S.C.A. § 1983.

[19] Civil Rights 78 ⬯ 1487

78 Civil Rights
  78III Federal Remedies in General
    78k1477 Attorney Fees
      78k1487 k. Amount and Computation. Most Cited Cases
        (Formerly 78k302, 78k13.17(19))
On appeal, if civil rights decision on the merits is affirmed and the fee award is incorrect, the fee award must be redetermined in accordance with the correct principles.


*988 Ramsay Laing Klaff, Corp. Counsel, Chicago, Ill., for defendants-appellants, cross-appellees.
G. Flint Taylor, Peoples Law Office, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before POSNER, MANION, and KANNE, Circuit Judges.
POSNER, Circuit Judge.
George Jones was arrested, jailed, and charged with murder and other crimes. After these charges were dropped, Jones sued the City of Chicago and several Chicago police officers and a police lab technician under 42 U.S.C. § 1983 for false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as conspiracy to commit these wrongs. He alleged that the defendants' conduct had denied him due process of law under the Fourteenth Amendment and violated his rights under the common law of Illinois. A jury awarded him $801,000 in compensatory and punitive damages. Judgment was entered on the verdict, and the defendants appeal. They argue that there was insufficient evidence of conspiracy; that they are insulated from liability by the decision of the state's attorney to charge and later to prosecute Jones, or at least are immune from liability for damages because they acted in good faith; and that the City cannot be held liable. Jones has cross-appealed, questioning the district court's calculation of attorney's fees.

The defendants have, as we shall see, no meritorious objections to the jury instructions; and they make only minor objections, also meritless, to the judge's trial rulings. So we must construe the evidence in the light most favorable to Jones, and this perspective discloses a frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself.

Between 4 and 6 a.m. on the morning of May 4, 1981, 12-year-old Sheila Pointer was raped, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
(Cite as: 856 F.2d 985)

bludgeoned to death, and her 10-year-old brother Purvy beaten unconscious, in their home in a poor neighborhood of Chicago. A blood-stained pipe was found in an alley behind the Pointer home. A neighbor, Nancy Coleman, reported seeing a black teenager, clad in a dark knee-length coat and a hat and carrying a red tote bag, leaving the alley at about 6 a.m.

The police had no other clues. Their only hope for breaking the case lay, therefore, with Purvy-who was in a coma. His doctors at the University of Chicago hospital told the police that it might be months before he could speak again, let alone remember anything about the assault. But Purvy's recovery proceeded more rapidly than expected. By May 11 he was able to speak (though only very hoarsely) and to respond to simple verbal cues. Police detectives Houtsma and Tosello-who are defendants in this case, as are all the police officers named in this opinion except Laverty-visited the hospital that day. Without first inquiring about Purvy's precarious mental state, they tried to interview him. Purvy found it difficult to speak, so the officers told him to signal "yes" or "no" by squeezing Houtsma's hand. After indicating in this manner that his parents (whom the police had briefly suspected) had not been the assailants, Purvy uttered the name "George." Through hand signals he conveyed the message that "George" was the assailant, and that George was a teenage gang member who lived near the Pointer home and had lighter skin than Purvy.

The detectives left the hospital and began looking for persons who lived near the Pointer home and fit the description of "George." They discovered that George Jones lived a block away. A senior at Fenger High School, and the editor of the school newspaper, the bespectacled Jones was called "Bookworm" by his classmates in grudging tribute to his studious character. He was the son of a Chicago policeman and planned to join the Air Force upon graduation from high school and afterward attend college.

*989 The police obtained a photograph of George-his graduation photograph, which showed him in a suit-from his father, and gathered some other photos in order to prepare a photo line-up for Purvy. The other photos were mug shots.

Their shift ending, Houtsma and Tosello left the sheaf of photos for the detectives on the next shift, Kelly and Binkowsi, who that evening took the photos to show Purvy. Earlier that day Purvy had overheard a doctor ask a nurse, "Is that the boy whose sister is dead?" Upon thus learning that his sister was dead, Purvy became agitated. The officers knew this, but proceeded with the photo line-up. Officer Kelly displayed George Jones's picture and asked Purvy whether he knew the person in it. He said yes, and Kelly then asked him whether this person was the assailant. Purvy did not respond. Kelly showed him the rest of the pictures but Purvy remained unresponsive. Eventually he started crying, and the officers left.

Just before the interview, Mrs. Pointer had told Kelly that Purvy had been murmuring a name that sounded like "George Anderson," "George Henderson," or "George Harrison"-and, sure enough, during the interview Kelly and Binkowski heard Purvy repeat a name that sounded like "Anderson." So when they left the hospital they tried to find an "Anderson" in the Pointer neighborhood, but they were unsuccessful. They returned to the police station and wrote a memorandum accurately describing their interview with Purvy. Kelly gave copies of this memorandum to the other police officers investigating the case and to the sergeant on duty. He placed the remaining copy not in the police department's regular files but in its "street files." These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files. As a result, the street files were not available to defense counsel even if they contained exculpatory material. We use the past tense because the practice was discontinued following a class-action suit (inspired by the disclosure, in the criminal trial of George Jones, of the existence of the street files) to enjoin the practice. That suit is *Palmer v. City of Chicago,* the essential orders in which are reported at 562 F.Supp 1067 (N.D.Ill.1983), 755 F.2d 560 (7th Cir.1985), and 806 F.2d 1316 (7th Cir.1986). It ended without a formal ruling on the lawfulness of the practice.

The next morning (May 12), Houtsma, accompanied by Detective McGuire, went to the hospital and repeated the photo line-up. Houtsma showed Purvy the pictures one at a time, starting with George Jones's picture. Purvy made no response to it but upon seeing one of the subsequent pictures cried out "Yep, yep, that's the one who did it to me." Houtsma asked Purvy whether he knew the person's name; he made no response. He also made no response when Houtsma asked him whether he knew the person's nickname and whether it was "Bookworm."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Houtsma and McGuire left the hospital. Accompanied by officers McCabe and McNally, they went directly to Jones's high school. They sent uniformed police officers into his classroom who arrested him. They searched his locker but did not find the clothes or bag matching Nancy Coleman's description. They took him to the police station, where they questioned him and threatened him with the electric chair if he didn't confess. He denied having anything to do with the crime and was packed off to Cook County Jail after a night in a police lockup.

McCabe and McNally took George's graduation photo to Nancy Coleman, who at first was uncertain but after covering up part of the face with strips of paper said he was indeed the "clean looking" person she had seen emerging from the alley on the morning of the crime.

An assistant state's attorney suggested that an attempt be made to get Purvy to identify Jones in person as the assailant. Accompanied by two assistant state's attorneys, Houtsma and McCabe brought George Jones to Purvy's hospital room, ordered him to stand about three and a half feet from the bed, and asked Purvy whether this was the person who had hit him over the head. Speaking calmly, Purvy answered, "No, that's not the man, that's *990 not the man, no, no, no." Houtsma ordered Jones to take off his glasses and stand within two feet of Purvy. Houtsma turned up the lights, then repeated the question. "No," said Purvy-then, "Yes, that's him, yes"; then, "Yes, no, yes, no" over and over. Someone asked Purvy whether he was sure (of what?) and Purvy answered with another string of yes-nos. One of the assistant state's attorneys present, Schultz, testified in this case that Purvy's identification of George Jones was the best identification he had ever seen. Such testimony could not have helped the defendants' credibility with the jury.

The morning after this "identification," a grand jury indicted George Jones for murder, rape, attempted murder, armed violence, burglary, and home invasion. On the same day (May 13), Sergeant Palmer signed the official arrest report. A document intended for use by prosecutors, this report had been compiled the previous day by Tosello, Houtsma, McCabe, McGuire, and McNally, and signed by the first two. The report was full of falsehoods, such as that Nancy Coleman had picked out Jones's picture from a group of seven (his picture was the only one she had been shown), that Jones's father had not seen him on the morning of May 4 (in fact his father had

told the investigating officers that he had seen George at home that morning), and that Purvy had said that his assailant attended Fenger High School (Purvy had said no such thing). The report did not mention that Purvy had described his assailant as a gang member (George Jones was not a gang member), as being a lighter-skinned black than Purvy (George Jones is darker-skinned than Purvy), and as having a name like Anderson. The report also did not mention that the doctors had warned the officers at least twice that Purvy's head injury had left him with serious memory problems.

The state's attorney's office used this report to persuade the court to set George Jones's bond at $250,000, an amount his family could not raise-so George was returned to Cook County Jail. While there he had to fight off a rape attempt, was beaten up by gang members, and was forced to join a gang for self-protection, a process that included a brutal initiation rite. After a month of these horrors the court reduced the bond to an amount the Jones family could afford, and George was released.

On May 18 there was a new development in the case. Mrs. Pointer reported to the police that she had found two pairs of pantyhose in her house that belonged neither to her nor to her murdered daughter. Detective Laverty was assigned to investigate this new evidence, Houtsma and Tosello having gone on leave. Laverty went to Purvy, who was still in the hospital, and asked him what he knew about the pantyhose. Purvy said for the first time that there had been two assailants and that both had worn stocking masks. Purvy referred to one of the assailants as George Anderson and to the other as "twin brother George." He reiterated that George Anderson was a gang member. Laverty asked Purvy how he knew that one of the assailants had been George Anderson when both had worn masks. Purvy broke down and cried.

Laverty went to Commander Deas, the head of the area detective division, described to him and Sergeant Palmer Purvy's responses, and told him he was convinced the wrong person had been charged. Deas told Laverty to continue investigating but took no other action.

Houtsma and Tosello returned from leave, learned of Laverty's discoveries, and went to the hospital to interview Purvy yet again. Purvy repeated that there had been two assailants, both masked. But this time Purvy added that one of them had removed his mask during the assault. He was not asked to describe that

assailant.

Houtsma and Tosello confronted Laverty.    They were furious.    They told him that he was messing up their case, and threatened to destroy his career if he continued to "interfere."    They assured Laverty that Purvy had identified George Jones and that Jones was guilty.    Laverty said that if the case went to trial he might testify for *991 Jones;  Tosello threatened to "blow him away" if he did.

Laverty prepared an official report, but it was not submitted, because Houstma took it away and rewrote it.    The rewritten report omitted any reference to Laverty and concluded that no further investigation was warranted.    Laverty then wrote up his interview with Purvy and deposited it in the street files.

In July, 21-year-old Sharon Hudson was raped, and bludgeoned to death, four blocks from the Pointer home.    Lester Pique was arrested, and confessed to the crime.    Laverty thought that Purvy's description of his attacker:  Pique went by the name "King George," was a gang member, and had lighter skin than Purvy.    Questioned by Laverty about the Pointer crime, Pique said that it was possible he had committed it, but that as he had frequent blackouts he wasn't sure.    Laverty reported this information to Lieutenant Griffith, who was the head of the violent crimes unit of the area detective division, and asked Griffith to arrange for Purvy to view a line-up with Pique in it.    Griffith refused on the sound but surprising ground that Purvy was not competent to make an identification, falsely implying that because of Purvy's incompetence the prosecution of Jones had been abandoned.    Laverty opined to Deas that Pique, not Jones, had committed the Pointer crime.    The report was never forwarded to the state's attorney's office.

In October, with preparations for the trial of Jones proceeding at full tilt, police laboratory technician Mary Furlong, who is also a defendant in this case, discovered that George Jones had different semen and blood types from the types found in Sheila Pointer's vagina.    Furlong failed to include this information in the lab report that she was preparing for the prosecution of Jones.    After being confronted with this omission, she submitted a new report that contained the results of the blood and semen tests. And she placed in the Sharon Hudson file, but not in the Pointer file, the results of an examination of hair taken from the pantyhose that Mrs. Pointer had discovered.    This examination indicated that one of the hairs found was not Jones's but might be Pique's. The other hairs found in the pantyhose could not be tested.

Also in October, Deas asked Laverty to write a memo setting forth all he knew about the Pointer case. Laverty complied.    Deas put the memo in his desk drawer and it stayed there.

The spring of 1982 arrived and the trial against George Jones began.    A newspaper carried a report of the trial.    Laverty read it with astonishment; Griffith had told him that the prosecution had been abandoned.    Laverty went to Deas and asked him why an innocent person was being prosecuted.    Deas replied that if Jones was innocent, the jury would acquit him.    After calling the court where Jones was on trial and being referred to counsel, Laverty told Jones's lawyer about the exculpatory information secreted in the "street files."    The lawyer promptly relayed Laverty's disclosures to the judge, who declared a mistrial.    Shortly afterward the state's attorney dropped all charges against Jones.    No apology was ever made to Jones, and neither the City nor the state offered to compensate him for his ordeal.

The Pointer crime has never been solved.    Purvy, although declared "legally unavailable" to testify at the trial of George Jones's civil rights suit (implying that he was mentally incompetent), has recovered from his head injury and is today a sophomore in high school.    Although another panel of this court has said that Laverty should have been commended "for his adherence to the principles of honesty, decency, and justice," _Palmer v. City of Chicago, supra,_ 755 F.2d at 564 n. 3, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary.    He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples.    None of the defendants has been disciplined for misconduct*992 in the arrest and prosecution of George Jones.

The defendants do not quarrel with the propositions that to arrest a person without probable cause, or to prosecute a person when there is no reasonable ground for believing that he committed a crime, or to do both things to the same person, violates both the Constitution and the common law, and that the victim of such official misconduct is entitled to recover all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Page 8

damages flowing from it. These concessions make it unnecessary for us to examine the difficult question whether malicious prosecution can ever count as a deprivation of liberty without due process of law when the defendant is not imprisoned (recall that George Jones was let out on bail a month after his initial arrest). _Hand v. Gary,_ 838 F.2d 1420 (5th Cir.1988), answers this question "yes," but it is an open one in this circuit, see _Tarkowski v. County of Lake,_ 775 F.2d 173 (7th Cir.1985). It is not an issue in this appeal.

[1][2] The defendants do, however, argue that George Jones failed to prove a conspiracy. Conspiracy is a more familiar doctrine in criminal than in civil cases, except under statutes such as the Sherman Act and RICO that provide both criminal and civil sanctions for the same conspiracies. In a tort case such as this (a _section 1983_ constitutional-tort case is still a tort case, and Jones's pendent claims charge garden-variety common law torts), the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint. The requirements for establishing participation in a conspiracy are the same, however, as in a case (criminal or civil) in which conspiracy is a substantive wrong. See _Hartford Accident & Indemnity Co. v. Sullivan,_ 846 F.2d 377, 383 (7th Cir.1988).

[3] To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them. See, e.g., _id._ at 383-85; _Bell v. City of Milwaukee,_ 746 F.2d 1205, 1255 (7th Cir.1984); _United States v. Andolschek,_ 142 F.2d 503, 507 (2d Cir.1944) (L. Hand, J.). Beyond this, attempts at definition will not help.

[4] We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad George Jones.

[5][6] The least extensive participations were those of the supervisory officers (Deas, Griffith, and Palmer) and of the lab technician (Furlong). There is no principle of superiors' liability, either in tort law generally or in the law of constitutional torts. See, e.g., _Riordan v. Kempiners,_ 831 F.2d 690, 695 (7th Cir.1987); _Rosenthal & Co. v. Commodity Futures_

_Trading Comm'n,_ 802 F.2d 963, 967 (7th Cir.1986); _McKinnon v. City of Berwyn,_ 750 F.2d 1383, 1390 (7th Cir.1984). To be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct. See, e.g., _Rascon v. Hardiman,_ 803 F.2d 269, 273 (7th Cir.1986); _Duckworth v. Franzen,_ 780 F.2d 645, 651 (7th Cir.1985); _McKinnon v. City of Berwyn, supra,_ 750 F.2d at 1391; _Wilson v. City of North Little Rock,_ 801 F.2d 316, 322-23 (8th Cir.1986); _Coon v. Ledbetter,_ 780 F.2d 1158, 1161 (5th Cir.1986); _Fundiller v. City of Cooper City,_ 777 F.2d 1436, 1443 (11th Cir.1985). That is a vague standard. We can make it more precise by noting that supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under _section 1983_. See _Davidson v. Cannon,_ 474 U.S. 344, 347-48, 106 S.Ct. 668, 670-71, 88 L.Ed.2d 677 (1986); _Daniels v. Williams,_ 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); _Wilson v. City of North Little Rock, supra,_ 801 F.2d at 322 n. 3. Gross negligence is not enough either. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate,*993 reckless indifference. Cf. _Duckworth v. Franzen, supra,_ 780 F.2d at 652-53; _United States v. Cerro,_ 775 F.2d 908, 911 (7th Cir.1985); _Slakan v. Porter,_ 737 F.2d 368, 373-75 (4th Cir.1984). This heavy burden on plaintiffs is easy to understand in a case such as this case where the ground of the supervisors' liability is that they conspired with subordinates to violate the plaintiff's constitutional rights. There is no such thing as accidental or inadvertent participation in a conspiracy. There was, however, enough evidence to enable the jury to infer that Deas, Griffith, and Palmer had known every false step taken by the subordinate officers, had approved every false step, and had done their part to make the scheme work-by deep-sixing Laverty's report (Deas), by trying to put Laverty off the scent (Griffith), and by signing a deceitful report for use by the prosecution (Palmer).

Furlong testified that it was only through inadvertence that she left out of her lab report information that would have exculpated George Jones and inculpated Lester Pique. The jury was not required to believe her, especially given the evidence that she had talked to Houtsma several times by phone and that she had originally planned to file the hair study in the Pointer file but had later altered the file number to that of Sharon Hudson. The jury was entitled to conclude that Furlong, like the three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Page 9

supervisory officers, had for whatever reason decided to help the officers, centrally Houtsma and Tosello, who were determined to put away George Jones regardless of the evidence. They had a hunch he was guilty and were not going to let a mere absence of evidence stand in their way.

[7] The defendants point out that the state's attorney, who neither is nor could be a defendant, see _Imber v. Pachtman,_ 424 U.S. 409, 427-28, 96 S.Ct. 984, 993-94, 47 L.Ed.2d 128 (1976), decided to prosecute George Jones, and they argue that all of Jones's woes flow from that decision and not from their conduct. It is true that two assistant state's attorneys were present when Purvy made his dubious identification of George Jones and that Jones's claim for damages is based largely (though not entirely) on the time he spent in jail after the bond hearing, which is to say after the state's attorney had decided to prosecute him, and, later still, on the distress he suffered while awaiting and then while undergoing trial. It is also true, as a matter of elementary principles of legal causation that are as applicable to constitutional torts as to common law torts, cf. _Parrett v. City of Connersville,_ 737 F.2d 690, 695 (7th Cir.1984); _Taliferro v. Augle,_ 757 F.2d 157, 161-62 (7th Cir.1985)-and both types are charged in this case-that if George Jones would have been prosecuted even if the defendants had behaved properly, then they did not cause his injury and are not liable. But the jury could find that the defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to-that is, facts likely to influence-the decision whether to prosecute Jones and whether (that decision having been made) to continue prosecuting him right up to and into the trial. If the prosecutors had known of Laverty's evidence, they would almost certainly have dropped the charges against Jones before trial. Indeed, he might never have been charged in the first place if the prosecutors had known the facts militating against Jones's guilt, including the fact that Purvy's description did not fit him and that Purvy initially had failed to identffy him as the assailant. The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged. Cf. _Dellums v. Powell,_ 566 F.2d 167, 192-93 (D.C.Cir.1977).

[8] In constitutional-tort cases as in other cases, "a man [is] responsible for the natural consequences of his actions." _Monroe v. Pape,_ 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). This principle led the Supreme Court in _Malley v. Briggs,_ 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), to hold

that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position*994 would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." _Id._ at 345, 106 S.Ct. at 1098 (footnote omitted). The Court was speaking of immunity but its discussion is equally relevant to causation, as indeed is implied in a footnote to the Court's opinion. See _id._ at 344 n. 7, 106 S.Ct. at 1098 n. 7. By parallel reasoning, a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial-none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision. See, e.g., _Myers v. Morris,_ 810 F.2d 1437, 1457 (8th Cir.1987); _Hand v. Gary, supra;_ _Smiddy v. Varney,_ 665 F.2d 261, 266-67 (9th Cir.1981); _Dellums v. Powell, supra,_ 566 F.2d at 192-94; _Ames v. United States,_ 600 F.2d 183, 185 (8th Cir.1979) (dictum); cf. _McLaughlin v. Alban,_ 775 F.2d 389 (D.C.Cir.1985) (per curiam).

[9] It is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eighth Amendment's cruel and unusual punishments clause, but that is not relevant here). See _Johnson v. Glick,_ 481 F.2d 1028, 1032 (2d Cir.1973) (Friendly, J.); _Lynch v. Cannatella,_ 810 F.2d 1363, 1375 (5th Cir.1987); cf. _Justice v. Dennis,_ 834 F.2d 380, 382 (4th Cir.1987) (en banc); _Williams v. Mussomelli,_ 722 F.2d 1130, 1133 (3d Cir.1983). But the causal inquiry is unchanged. If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.

[10] The defendants' alternative argument is that they are immune from liability for damages because they were acting in the good-faith discharge of their public office. The "good faith" immunity of public officers from constitutional tort liability is now a misnomer; ever since _Harlow v. Fitzgerald,_ 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), it is forfeited not by showing that the officer was acting in bad faith but by showing that he was violating an established constitutional principle. The application of this concept to arrests was uncertain until _Malley v._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Briggs.* The test of *Harlow* was designed for cases where the law has changed, and so might be thought to imply that there can be no immunity for making an arrest without probable cause, because that is not a new standard. *Malley,* however, created room for an immunity defense even in cases where there was no probable cause for the arrest, by holding that "if officers of reasonable competence could disagree" on whether there was probable cause, the defendant would be immune from damages liability. See 475 U.S. at 341, 106 S.Ct. at 1096. To the same effect see *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986). In other words, only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited. Unaffected by *Malley* is the teaching of *Harlow* that an arrest pursuant to a valid warrant is not actionable in a suit for damages under section 1983 even if the officers who procured or executed the warrant were acting maliciously, although they may be liable under state law for the common law tort of malicious prosecution. *Wheeler v. Cosden Oil & Chemical Co.,* 744 F.2d 1131 (5th Cir.1984).

[11] Who decides the immunity question when facts pertinent to it are in dispute-judge or jury? See *McGaughey v. City of Chicago,* 664 F.Supp. 1131, 1139 (N.D.Ill.1987). The cases in this circuit go both ways, but our most recent and only en banc decision on the question states that the judge should always decide the issue of immunity. See *Rakovich v. Wade,* 850 F.2d 1180, 1201-02 (7th Cir.1988). That is what was done here, without objection by either party. The judge submitted the issue of probable cause to the jury and then after the jury returned its verdict made his own determination on immunity. A jury might be confused if it had to decide not **995 only whether the defendants had probable cause but also whether, even if not, reasonable officers in their position *could* have thought they had probable cause. Sensible or not, the procedure followed here was not objected to, and is not at issue in this appeal. The issue rather is whether the district judge committed a clear error in finding that no "reasonable officer in like circumstances would have acted as the defendants did," *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988).

The judge did not commit an error, clear or otherwise. The facts show conduct that no reasonable police officer would have engaged in. Although Houtsma and Tosello would have had probable cause to arrest George Jones if (1) a lucid Purvy had (2) identified Jones as the assailant,

*Gramenos v. Jewel Cos., Inc.,* 797 F.2d 432 (7th Cir.1986); *Clay v. Conlee,* 815 F.2d 1164, 1168-69 (8th Cir.1987), a reasonable trier of fact could find that Purvy had not identified Jones until Jones was brought to Purvy's hospital room, *after* having been arrested. Yet if the only defect in the arrest had been the timing of the identification, the defendants could argue strongly that Jones's damages should be limited to the period between the arrest and the identification; that while a reasonable officer might not have arrested Jones *when* these officers did, a reasonable officer would not have advised the prosecution to drop charges after the victim had identified Jones. Cf. *BeVier v. Hucal, supra,* 806 F.2d at 128; *Thompson v. Olson,* 798 F.2d 552 (1st Cir.1986); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1359 (7th Cir.1985) (concurring opinion). But Purvy's momentary identification of Jones-equivocal, made in suggestive circumstances by a child with a severe head injury, and quickly withdrawn-was worthless. It brings to mind our warning in *Gramenos* that "a 'prudent' officer may balk if the person claiming to be an eyewitness strolls into the police station and describes a crime from long ago, *or if the person leveling the accusation is babbling or inconsistent.*" 797 F.2d at 439 (emphasis added). Nancy Coleman's identification also came after the arrest, and also was worthless.

[12][13] So much for the individual defendants. The City of Chicago is liable to Jones under section 1983 if a custom or policy of the City was a cause of the plaintiff's injury. See *Monell v. Department of Social Services,* 436 U.S. 658, 690-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The issue has little, probably no, practical significance. No damages were awarded against the City that were not also awarded on a joint and several basis against the individual defendants; and since the City indemnifies its employees for damage awards made against them in respect of the torts they commit in the course of their employment, Jones will collect his judgment in full whether or not the City is held liable.

[14] The custom in question is the maintenance of the "street files," police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information that might induce him not to prosecute or, failing that, would at least be available to defense counsel under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As we noted recently, information undermining the credibility of a government witness is within the scope of *Brady's* rule. See *United States v. Herrera-Medina,* 853 F.2d 564, 567 (7th Cir. 1988).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

856 F.2d 985
856 F.2d 985
**(Cite as: 856 F.2d 985)**

Page 11

Although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law. *Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated. The City sensibly does not attempt to defend such behavior in this court.

[15] There is little doubt that the clandestine character of the street files played a role in Jones's misfortunes. Cf. *Harris v. City of Pagedale,* 821 F.2d 499, 507 (8th Cir.1987). If the state's attorney had had *996 access to them, he would have discovered memos by Kelly and especially by Laverty that would have given any prosecutor pause. Alternatively, defense counsel would have obtained them prior to trial and the trial would have ended even sooner than it did. The only question is whether this custom was a custom of the City of Chicago. As the custom was department-wide and of long standing, the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department—the standard suggested by the recent plurality opinion in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). See also *Stokes v. Bullins,* 844 F.2d 269, 273 (5th Cir.1988).

Before turning to the cross-appeal, we shall take a moment to discuss the defendants' objections to the jury instructions. They are shallow.

1. The judge refused a requested instruction that the jury could not base liability on the defendants' conducting an unduly suggestive line-up. The plaintiff had never sought to impose liability on that basis, but had merely argued that the suggestiveness of the identification procedures used by the defendants vitiated the "identifications" of Jones by Purvy and by Nancy Coleman as grounds for probable cause to detain him.

2. The defendants were refused an instruction that they had no duty to continue investigating once probable cause had been established. But that assumed that probable cause *has* been established; it never was.

3. The defendants objected to an instruction that they

say allowed the jury to award damages for a violation of the principle of *Brady v. Maryland.* The instructions that were given did no such thing, so we do not reach the question whether damages could ever be awarded for such a violation.

[16] 4. The defendants were refused an instruction that probable cause is an absolute defense to an action for false arrest, but the instructions that were given made clear that liability for false arrest indeed depends on an absence of probable cause.

[17] 5. The defendants wanted an instruction that the decision by the prosecutor to charge Jones broke the causal chain between the conduct of the defendant officers and the injury to Jones. The instruction was properly refused; as we have seen, the defendants' causal argument is unsound.

[18][19] We turn to the plaintiff's cross-appeal, which challenges the adequacy of the attorney's fee award. The plaintiff claims that the district court erred by (1) using the contingency-fee contract between him and his lawyer to place a ceiling on the attorney's fees and (2) deducting from the award all fees allocable to the state-law claims. The defendants do not defend the award, which indeed is indefensible, see, e.g., *City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Aubin v. Fudala,* 782 F.2d 287, 291 (1st Cir.1986). They merely point out that-if course-if the decision on the merits is affirmed the fee award must be redetermined in accordance with the correct principles. We accept this concession and reverse the fee order. We affirm the judgment on the merits.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.

C.A.7 (Ill.),1988.
Jones v. City of Chicago
856 F.2d 985

END OF DOCUMENT