

**WILCOX & FETZER LTD.**

In the Matter Of:

# Holland
## v.
## Taylor, et al.

C.A. # 05-464-SLR

---

Transcript of:

Kevin Holland

August 22, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:05-cv-00464-SLR   Document 99-3   Filed 06/03/2008   Page 2 of 12

Holland                                    v.                         Taylor, et al.
Kevin Holland                       C.A. # 05-464-SLR                August 22, 2006

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE
KENNETH L. HOLLAND,            )
                               )
         Plaintiff,            )
                               )  Civil Action
   v.                          )  No. 05-464-SLR
                               )
STANLEY TAYLOR, et al.,        )
                               )
         Defendant.            )
```

Deposition of KENNETH L. HOLLAND taken pursuant to notice at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, beginning at 10:14 a.m., on Tuesday, August 22, 2006, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

    EILEEN KELLY, ESQ.
    DEPUTY ATTORNEY GENERAL
      Department of Justice
      820 North French Street - 6th Floor
      Wilmington, Delaware  19801
      for the Defendants

ALSO PRESENT:

    ERIKA TROSS, Deputy Attorney General

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Holland v. Taylor, et al.
Kevin Holland    C.A. # 05-464-SLR    August 22, 2006

Page 2

1    KENNETH L. HOLLAND,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5        EXAMINATION
6    BY MS. KELLY:
7    Q. Mr. Holland, my name is Eileen Kelly. I'm from
8    the Attorney General's Office, and I'm here to take your
9    deposition today. You should have received a notice of
10   deposition telling you that this was going to happen
11   today.
12   A. Yes, I did.
13   Q. Okay. This is Erika Tross. She is also from the
14   Attorney General's Office. She is another deputy.
15       Could you state your name for the record,
16   please, your full name?
17   A. Kenneth Lee Holland.
18   Q. As you probably know, but I just want to put this
19   on the record, I represent Stanley Taylor, Vincent
20   Bianco, Adam Bramble, Michael Records, Robert George,
21   Michael Costello, Barbara Costello, the Department of
22   Correction, Steven Devine and Helen Moore. I also
23   represent Adam Bramble in his counterclaim against you.
24       I just want to give you first a few basics

Page 3

1    of how a deposition works. First, we have to speak one
2    at a time. The court reporter can't take us down
3    speaking at the same time. So you need to wait until I
4    stop talking before you speak.
5        The other thing is all your responses must
6    be verbal. She can't take down a nod or shake of the
7    head. So you need to say yes or no.
8        I'm going to assume that if you go ahead and
9    answer my question that you understood it. If at any
10   time you don't understand what I've asked, you need to
11   let me know and I'll rephrase it. Do you understand what
12   I've just told you?
13   A. Yes.
14   Q. Have you ever had your deposition taken before?
15   A. No.
16   Q. Have you ever testified in court before?
17   A. Yes.
18   Q. When did that happen?
19   A. I believe it was -- give me a minute because it
20   has been awhile. I believe it was August or something,
21   the last time I was -- there was criminal trial of, where
22   I was accused of assaulting Adam G. Bramble. I don't
23   have the approximate date with me.
24   Q. That was last year; is that correct?

Page 4

1    A. Yes.
2    Q. Have you testified in court on any other
3    occasion?
4    A. No.
5    Q. Before this case have you ever been a party to a
6    civil lawsuit?
7    A. No.
8    Q. Have you ever been known by any names other than
9    Kenneth Holland?
10   A. Kenny.
11   Q. And what is your date of birth?
12   A. 5/15/70.
13   Q. Where were you born?
14   A. Lewes, Delaware.
15   Q. Prior to your current incarceration where were
16   you living?
17   A. 211 North New Street.
18   Q. In what town?
19   A. Dover, Delaware.
20   Q. How long were you living there?
21   A. For about two months.
22   Q. Are you married?
23   A. No.
24   Q. Do you have any children?

Page 5

1    A. Yes.
2    Q. How many?
3    A. I have two.
4    Q. And how old are they?
5    A. I have one 15 and one 10.
6    Q. What is your highest level of education?
7    A. The ninth, 9th grade.
8    Q. And where did you go to school?
9    A. Dover High, in Dover, Delaware.
10   Q. What is the last job that you held prior to this
11   incarceration?
12   A. Manpower Temporary in Dover, Delaware, Loockerman
13   Street.
14   Q. What kind of things were you doing for Manpower?
15   A. Construction.
16   Q. How long were you doing that?
17   A. For about five months.
18   Q. How much were you making there?
19   A. Roughly around about 6.50 an hour.
20   Q. I'm going to ask you a few questions about your
21   criminal background. I want to caution you not to
22   discuss any current criminal charges that are pending
23   against you. Do you understand what I'm saying?
24   A. Yes.

2 (Pages 2 to 5)

Holland                                   v.                         Taylor, et al.
Kevin Holland              C.A. # 05-464-SLR                    August 22, 2006

Page 6

1   Q. Are you currently a sentenced inmate here at DCC?
2   A. Yes.
3   Q. You are not a pretrial detainee, right?
4   A. No.
5   Q. And what charge are you currently incarcerated
6   for?
7   A. Violation of probation.
8   Q. When did you arrive here?
9   A. May the 17th.
10  Q. Of this year?
11  A. Yes.
12  Q. Do you have a short-term release date?
13  A. Short-term release date is March of 2008, the
14  16th or the 17th of the month, of that month, I mean.
15  Q. Have you been incarcerated on occasions prior to
16  this time?
17  A. Rephrase the question.
18  Q. You are currently incarcerated at DCC. Before
19  this time have you been in jail before?
20  A. Yes.
21  Q. And when was that?
22  A. Last year.
23  Q. How long was that?
24  A. For about, nearly nine months to a year.

Page 7

1   Q. Where were you?
2   A. I was in Pretrial.
3   Q. Was that here?
4   A. Yes, that was in maximum security, on charges of
5   Lieutenant Bramble.
6   Q. On charges of?
7   A. Of Lieutenant Bramble.
8   Q. Okay. And when was that nine months? When did
9   that begin and when did that end?
10  A. Between November 26th and August the 18th of
11  2000 -- of 2005. 2004 to 2005.
12  Q. So you were released in August of 2005; is that
13  right?
14  A. August, 2005.
15  Q. So you were out of prison from August 2005 until
16  May of 2006?
17  A. Yes.
18  Q. Is that right?
19  A. Yes.
20  Q. Have you been incarcerated any other times?
21  A. Yes.
22  Q. And when were those?
23  A. I believe it was in '99, I got -- I was
24  incarcerated from May to, May of '99 to I believe it was

Page 8

1   -- don't quote me on this, this is roughly -- I would say
2   around about June or -- no, January or February of 2004.
3   Q. Where were you?
4   A. I was sent from here to Webb Correctional Center
5   in Wilmington, from there to Central Violation of
6   Probation Center, and from there I was sent to MCI.
7   Q. So you went from DCC to Webb --
8   A. Where I waited for about a month and a half, and
9   then I went to MCI, which is Central Violation of
10  Probation Center, where I stayed nearly about another two
11  months or a month and a half, and I was transferred from
12  there to MCCC, which is Morris Correctional.
13  Q. And how long were you there?
14  A. I was there for two weeks.
15  Q. And then what happened?
16  A. I received a write-up from CO Nock, which accused
17  me of disorderly behavior.
18  Q. And then what happened? After you got the
19  write-up from CO Nock, then what happened?
20  A. I was on -- when I received the write-up, I was
21  going with the write-up to request for a, to be present
22  at a hearing, which is at a MDT board hearing, which I
23  had checked the box that I would like to be present.
24      After that they -- the very next day, I

Page 9

1   believe it was June the 29th, of 2004, which is -- I was
2   called out to work. A meeting was held or the hearing
3   was held without me, and later I found out that I was
4   being transferred from that facility to Central Violation
5   of Probation Center for 14 days.
6   Q. Now you transferred to where?
7   A. The SCI -- I mean SVOP, which is down Georgetown.
8   It is Sussex Violation of Probation Center. I'm sorry.
9   Q. And how long were you at SVOP?
10  A. For 14 days.
11  Q. And then where did you go?
12  A. To CVOP, Central Violation of Probation Center,
13  located here in Smyrna.
14  Q. And how long were you there?
15  A. For about nearly four or five months.
16  Q. And then where did you go?
17  A. From there I came here to a receiving room where
18  I was charged with assault in a detention facility.
19  Q. Now, when you came to prison in 1999 what was the
20  charge?
21  A. Possession of burglary tools, I believe.
22  Q. And did that go to trial or was that a plea?
23  A. That was a plea.
24  Q. Prior to May of '99 have you spent any time in

3 (Pages 6 to 9)

| Holland | v. | Taylor, et al. |
|---|---|---|
| Kevin Holland | C.A. # 05-464-SLR | August 22, 2006 |

Page 10

1  prison?
2  A. Yes.
3  Q. When was that?
4  A. I'm not quite sure of the correct date. I
5  believe it was in '96 to '97, '96 to '97, for a violation
6  of probation.
7  Q. And where were you housed?
8  A. D Building.
9  Q. Here at DCC?
10  A. Here at DCC, D Building.
11  Q. And prior to '96 were you ever incarcerated?
12  A. Yes, in '91, for a drug trafficking charge.
13  Q. Was that a trial or did you plea?
14  A. It was trial.
15  Q. How long were you in prison?
16  A. For about three years mandatory.
17  Q. And were you here at DCC?
18  A. Yes.
19  Q. Prior to '91 have you spent any time in prison?
20  A. Not Smyrna, not adult prison.
21  Q. Okay. Where are you currently housed?
22  A. I'm currently housed in the Maximum Security
23  Housing Unit.
24  Q. What building are you in?

Page 11

1  A. 23.
2  Q. Have you been in Building 23 since you arrived
3  here in May?
4  A. Yes.
5  Q. Have you received any write-ups since you have
6  been here in May?
7  A. No.
8  Q. Do you know what your current point status is?
9  A. I believe I have 14 points.
10  Q. Are you involved in any programs or work?
11  A. No.
12  Q. Who is your counselor?
13  A. I'm not, I'm not even sure of that. I've been,
14  only been here for like three months, a little over three
15  months.
16  Q. The first thing I want to go over with you is the
17  incident involving Lieutenant Bramble at CVOP.
18  A. Yes.
19  Q. And according to your complaint, that happened on
20  November 26th, 2004; is that right?
21  A. Yes.
22  Q. Why don't you describe for me how the incident
23  began?
24  A. Which part?

Page 12

1  Q. In your complaint you had first mentioned an
2  incident in the chow hall?
3  A. Yes.
4  Q. What happened?
5  A. Well, it was approximately 4:30. I was housed on
6  Pod 2. Pod 2 was called out to chow. Entered chow. I
7  received my tray. I sat down at a row of tables,
8  approximately 10 feet long, and about five people sit at
9  this table.
10      I shortly noticed after I sat down that I
11  was missing contents from my tray. I raised my hand, and
12  got the attention of the acting staff in the chow hall,
13  which was Lieutenant Bramble.
14      He let me know that -- I asked him could I,
15  was it possible that I could get up and retrieve the
16  other contents that was missing on my tray. He notified
17  me, let me know that, according to the housing rules,
18  that once you sat down you can't receive anymore items
19  off your tray, if you are missing anything. You need to
20  check that, check your tray before you sat down.
21      I then went on, continued eating. Due to my
22  comment of missing items off my tray, other inmates who
23  was currently in line started causing a slight commotion,
24  because they were missing contents off their tray as

Page 13

1  well.
2      Shortly after I sat down, four minutes, he
3  -- three minutes at the most, three minutes, Lieutenant
4  Bramble started calling off tables to leave out of the
5  chow hall.
6      He quickly ran through the list. By the
7  time he got to my table, I wasn't nearly finished. I
8  only been sat down for about four minutes at the most,
9  and he required my table to leave.
10      I required -- I asked him for more time. He
11  then pulled his can of cap-stun out, extended, brandished
12  it in my face and told me to move, yelled, loudly.
13      I then stood up and looked at the clock. It
14  was placed in the back of the chow hall. I noticed that
15  the required time for us to eat hasn't expired yet. I
16  brought that to his attention. He then asked me to leave
17  and I left.
18      After returning to the pod I asked the pod
19  officer for a grievance form so I can grieve the matter.
20  On the back of the grievance form, it is cited on the
21  back of the grievance form that before grieving any
22  incident that took place you first must try to resolve
23  the issue.
24      A short time later, Lieutenant Bramble

Page 14

1  entered the pod with no supporting staff. When he first
2  entered the pod he approached me, asked me did I have a
3  problem with him. I told him, "I don't have a problem
4  with you but the incident that took place." I then asked
5  him to -- you got to excuse me. It has been awhile.
6      I then asked him to -- not asked him, but
7  then I told him about the incident that took place and
8  the required time that's permitted within the operating
9  procedure manual over there with the inmates are given at
10 the time of arrival that the required time hasn't expired
11 before he dismissed me.
12     Not in those terms. It was more like, "You,
13 you sent me out of the chow hall before the allowed
14 time." He then replied he tired of my -- excuse me for
15 the language -- my smart ass mouth.
16     I walked away, towards the table to get my
17 grievance form. He then said something to me, and in
18 some form all I remember is hearing in the background
19 another inmate said, "Look out." I turned around. He
20 maced me. He continued to mace me.
21     I picked up a chair and blocked the mace. I
22 dropped the chair in order to flee. He tackles me and
23 begin to roughly man handle me.
24     A short time after that, after he tackles

Page 15

1  me, he is up top me, I happened to see Lieutenant Bramble
2  with a pair of handcuffs in one hand and mace in the
3  other, reached up to call for backup and injured himself.
4      Once other units arrived, he then comes on
5  the tier, they come on the tier, handcuff me and place me
6  in a holding cell.
7  Q. Now, when you were in the chow hall, you said
8  that Lieutenant Bramble took out his cap-stun?
9  A. Yes.
10 Q. Did he stay anything to you about the cap-stun?
11 A. He stuck it in my face and yelled. He told --
12 verbally, loudly told me to move, move.
13 Q. Did you make any comment back to him?
14 A. Other than, I'm not quite sure what my exact
15 words was, but was more in line of this placement and
16 that the required time wasn't, wasn't ended. We are
17 required 15 minutes to eat. He only gave me four.
18 Q. Did you tell him, "That shit doesn't bother me
19 any"?
20 A. Did I tell him, "The shit doesn't bother me"?
21 Q. Yes.
22 A. I'm not -- I don't recall that. But...
23 Q. Do you remember the names of any of the other
24 offenders that were at the table with you, chow?

Page 16

1  A. Yes, I have -- well, not at the chow table. I
2  believe I requested for a copy of all individuals' names
3  at the time. But I have a list of people that was --
4  that I believe I sent to your office, of, in discovery,
5  of individuals who gave testimony of what happened at the
6  time it was on the pod. Not in the chow hall.
7  Q. So now sitting here today do you remember the
8  name of any of the people who were on the chow hall at
9  the table with you?
10 A. I don't believe. If I couldn't remember names of
11 the people then, I doubt I could remember it now. It has
12 been more than two years.
13 Q. Now, you said that after you left the chow you
14 went back to your pod?
15 A. Right.
16 Q. At CVOP how are the pods set up? Is it like a
17 big dormitory?
18 A. Yes.
19 Q. And about how many offenders are in one
20 dormitory?
21 A. It normally holds about 30. On that pod I
22 believe it was a little bit -- about 25 to 27 people.
23 Q. After chow does everybody go back to the pod?
24 A. Yes.

Page 17

1  Q. So all the offenders would go back in the pod
2  then?
3  A. Yes.
4  Q. And you said that Lieutenant Bramble then came
5  into your pod by himself?
6  A. A short time afterwards.
7  Q. Do you know how long after chow ended that that
8  was?
9  A. Maybe 15, 20 minutes, maybe 30 minutes at the
10 most.
11 Q. And when he came in there what were you doing?
12 A. I was sitting at the table, reading over the rule
13 books for inmates. That's where I saw the underlined
14 heading of something of chow hall rules, which allows how
15 much time an offender within that facility is allowed to
16 participate in eating.
17 Q. How long is that?
18 A. I believe it was 15 minutes.
19 Q. When Lieutenant Bramble came onto the pod did he
20 come right up to you?
21 A. He didn't come up to me. He was entering the pod
22 and he looks over my way and makes a comment. From where
23 I was sitting from where he was at was no more than four
24 or five feet.

Page 18

1  Q. And he said something about how he was tired of
2  you?
3  A. Yes. That was afterwards.
4  Q. Oh. So, I'm sorry, you said he said to you, "Do
5  you have a problem with me?"
6  A. That's what he first said.
7  Q. That's the first thing he said. Would it be
8  unusual for an officer to come onto a pod by himself?
9  A. Yes. Due to the fact that standard operating
10 procedure manual would mandate, especially an officer to
11 be assisted with, especially the pod officer who is
12 running that tier at the time.
13 Q. Was he the pod officer at that time?
14 A. No, he wasn't. He was a staff lieutenant.
15 Q. Okay. Now, I believe you stated that you had
16 turned away from Lieutenant Bramble before he cap-stunned
17 you?
18 A. Yes, began walking away.
19 Q. You got up from the table and walked away?
20 A. Yes, I had -- I was talking about the rules,
21 which I found, that states about the rules within the
22 chow hall.
23    At the time I wanted to show him so he would
24 believe that I am following the rules. But when it was

Page 19

1  apparent that he was noncompliant to anything, any of
2  resolution of the matter, there was no need. I wanted --
3  had to be written up anyway.
4  Q. What does that mean?
5  A. Any time there is an incident with any part of
6  the facility or whatever, the offenders within a facility
7  can grieve the process. Before you grieve the process
8  you must first try to resolve the issue.
9  Q. You are supposed to try to resolve it with the
10 person you have the issue with?
11 A. Correct.
12 Q. So you felt that you had done that?
13 A. Yes.
14 Q. In speaking with him just then?
15 A. Yes.
16 Q. And before this happened an officer had given you
17 a grievance form; is that right?
18 A. Say what?
19 Q. Before Lieutenant Bramble came onto the pod, you
20 already had been given a grievance form?
21 A. Yes.
22 Q. Is that right? Do you know who gave that to you?
23 A. No, I don't know the officer's name.
24 Q. When you got up to leave the table where were you

Page 20

1  headed?
2  A. To the, back to the table where the grievance
3  form -- where the grievance -- I had to get writing paper
4  and the grievance form, because the grievance form lines,
5  if the grievance you are going -- if the incident is
6  quite lengthy, then you need additional sheets of paper
7  to make, you know what I'm saying, if you have anymore --
8  if it has to be longer than the lines, within the lines
9  that's on the grievance form, you have to put it on
10 additional sheet and attach it.
11 Q. Okay.
12 A. So I did that.
13 Q. I'm just trying to understand where everybody
14 was. When Lieutenant Bramble first came on the pod you
15 were sitting at a table?
16 A. Yes.
17 Q. Is there just one table in the pod?
18 A. There is two tables in front of the pod, next to
19 the entry door.
20 Q. Okay. So when he came in and said, "Do you have
21 a problem with me?" did you stay seated or did you get
22 up?
23 A. When he said, "Do you have a problem with me?" I
24 looked over, at the time I was seated. I then got up and

Page 21

1  grabbed the rule book and went over to him.
2  Q. Okay. So did you walk over to him and show him
3  the book?
4  A. Yes, but at that time he was in the bathroom. I
5  was in the bathroom entrance door. He was just over the
6  threshold, maybe three feet over the threshold. I was
7  still in the middle, center of the pod area when I
8  mentioned that to him. He then told, said what he said
9  to me, came after me.
10 Q. All right. So the bathroom is actually on the
11 pod?
12 A. Yes.
13 Q. It is inside of the pod, right?
14 A. Yes.
15 Q. And it has just swinging doors?
16 A. No, no doors.
17 Q. It doesn't have any doors at all?
18 A. No.
19 Q. So he went in to the bathroom?
20 A. Right.
21 Q. And did you go in the bathroom with him?
22 A. No.
23 Q. Did he come back out?
24 A. Yes.

Page 22

1  Q. When he came back out of the bathroom where were
2  you standing?
3  A. In the middle of the front of the pod. The tiers
4  are quite long. In the center -- in the middle -- in the
5  front of the pod there is two tables. I'm just in front
6  of the two tables.
7  Q. And were you holding a rule book at that point?
8  A. No. I threw it on the table. I put it on the
9  table.
10 Q. Did you show it to him at any point?
11 A. Tried to. He was not compliant.
12 Q. He was not what?
13 A. He wasn't trying to hear anything I had to say.
14 Q. Now, you are standing at the table, right? Then
15 where did you go?
16 A. I was heading back towards my bedding, my bedding
17 area.
18 Q. So you turned and were headed away and had your
19 back to Lieutenant Bramble?
20 A. Yes.
21 Q. Once you had your back to him, what happened
22 then?
23 A. Another inmate shouted, "Look out behind you." I
24 turned around. When I turned around Lieutenant Bramble

Page 23

1  has his cap-stun extended in his hand and he maced me.
2  He cap-stunned me.
3  Q. When he cap-stunned you, how far was the canister
4  from your face?
5  A. About three, four feet, four feet. About four
6  feet.
7  Q. Was this a small canister, like a couple of
8  inches high, or was it a big can?
9  A. It was approximately maybe five inches long.
10 Q. Now, when he sprayed you did the spray make
11 contact with your face?
12 A. Yes.
13 Q. And do you remember how long that the spray
14 lasted? Was it one, two seconds? Or a couple seconds?
15 Do you remember?
16 A. I'm not quite sure how many seconds. But I know
17 he continued to spray me. That's what prompted me to
18 pick up the chair and block.
19 Q. Okay. So once the spray had hit your face, he
20 continued to spray you; is that what you are saying?
21 A. Yes.
22 Q. Now, you say you picked up a chair to block your
23 face?
24 A. Mm-hmm.

Page 24

1  Q. Was that one of the chairs that was at the table?
2  A. The chairs -- not at the table. The table has
3  its own connecting seating things.
4  Q. Okay.
5  A. And chairs are normally scattered around, similar
6  to these right here, throughout the entire pod.
7  Q. And this was a plastic chair?
8  A. Yes.
9  Q. So you picked it up, you say, to block the spray?
10 A. Yes.
11 Q. What part of the chair was directed towards
12 Lieutenant Bramble? Was it the legs of the chair?
13 A. No. It was the back.
14 Q. So when you picked up the chair, the back of the
15 chair was facing Lieutenant Bramble; is that right?
16 A. Yes.
17 Q. Not the legs?
18 A. Right.
19 Q. And when you picked up the chair and held it in
20 front of you, what did Lieutenant Bramble do?
21 A. I couldn't tell you because my eyes were shut. I
22 was sprayed with cap-stun.
23 Q. Okay.
24 A. I can only tell you what my actions were.

Page 25

1  Q. What did you do?
2  A. After he continued, after he continued to spray I
3  dropped the chair and went in the opposite direction to
4  try to get away from Lieutenant Bramble and his cap-stun.
5  Q. When you moved in the opposite direction from him
6  were you running?
7  A. I didn't want to run, because I could barely see.
8  I didn't want to hit nothing. So it was more like a
9  speeding walk.
10 Q. So you had your back to him?
11 A. Mm-hmm.
12 Q. And were trying to move away from him, and then
13 what happened?
14 A. He tackled me.
15 Q. Did he tackle you from the back?
16 A. Well, he was from the back, because as I was
17 turning, I had to use one hand to feel, as I was still
18 leaning away, blocking with the other hand, and that's
19 when, it is sort of like at the side, he comes from this
20 side of me, tackles me on the ground.
21 Q. So did he attack you on your left side?
22 A. Yes.
23 Q. Left side of your body?
24 A. Yes.

Case 1:05-cv-00464-SLR   Document 99-3   Filed 06/03/2008   Page 9 of 12

Holland v. Taylor, et al.
Kevin Holland   C.A. # 05-464-SLR   August 22, 2006

Page 26

1  Q. How tall are you?
2  A. About 5' 8".
3  Q. Do you remember or do you know how tall
4  Lieutenant Bramble is?
5  A. About 6'1", 6'2".
6  Q. Now, when he tackled you did he grab around your
7  body?
8  A. No.
9  Q. Or push you?
10  A. No. It was up high.
11  Q. So did he put his arms around your body or did he
12  shove you?
13  A. It was more like a shove.
14  Q. What happened to your body?
15  A. Plummeted to the ground.
16  Q. What part of your body did you land on?
17  A. My side.
18  Q. And that would have been your right side?
19  A. Yes.
20  Q. Were you able to see at this point or were you
21  still blinded by the cap-stun?
22  A. I could slightly see out of my right eye.
23  Q. Once you were down on the ground what did
24  Lieutenant Bramble do?

Page 27

1  A. Roughed me up, physical roughing up without
2  actually punching. That's the best way I can say it.
3  Mostly used forearms and knees and things like that.
4  Q. Was he on top of you?
5  A. Yes.
6  Q. You said that he was roughing you up with his
7  forearms and knees; is that right?
8  A. Yes.
9  Q. What part of your body did he make contact with?
10  A. Neck.
11  Q. Was this pressure on your neck or more like a
12  striking?
13  A. Well, it is more like a striking, followed by
14  pressure on the neck, which is -- I can't explain it. If
15  you ever had 200 pounds of anything on you, potentially
16  putting pressure on your neck, then it is almost, it is
17  slight choking. If you put enough pressure you can
18  actually choke the victim or whoever it may be by putting
19  pressure with your forearm up into the neck.
20  Q. And he would have been on the left side of your
21  neck?
22  A. He would have been on the left side of my neck.
23  Since I was on my right and slightly trying to turn
24  towards him, it would have been right up in this area, in

Page 28

1  the front side of my neck.
2  Q. You are sort of indicating sort of under your
3  jaw?
4  A. Right, near my jaw.
5  Q. Do you know how long he was on top of you?
6  A. If you ask me, it seemed like for hours. But
7  seconds, no, I can't tell you.
8  Q. Did he make forcible contact with any other part
9  of your body other than your neck?
10  A. I can't recall, other than the knee.
11  Q. And he pushed his knee into you?
12  A. Yes. And then once he flipped me over, after he
13  called for backup, he sticks his knee in my back.
14  Q. And he flipped you over on to your stomach; is
15  that what you are saying?
16  A. Yes.
17  Q. Did you hear him call for backup?
18  A. I saw him.
19  Q. Okay. So you were able to see at this point?
20  A. Yes.
21  Q. Did he have one of those things on his shoulder
22  that you use?
23  A. Yes.
24  Q. When he flipped you on to your stomach was he

Page 29

1  still on top of you?
2  A. Yes.
3  Q. And he put his knee into your back, you say?
4  A. Yes.
5  Q. What part of your back?
6  A. The center, center of my back.
7  Q. In the middle or closer to your neck? What part?
8  A. It was closer, it is in the center of my back.
9  Not closer to my neck. He had one knee on my, in the
10  center of my back, the other knee on my arm.
11  Q. On which arm?
12  A. On my left arm.
13  Q. Did he have his full weight on you?
14  A. Oh, yes.
15  Q. Now, he called for backup. Did backup show up?
16  A. Yes.
17  Q. How long did that take; do you know?
18  A. I'm not quite sure.
19  Q. Do you know how many people arrived?
20  A. Yes. Two other officers arrived.
21  Q. Do you remember who they were?
22  A. I'm not aware of the officers' names.
23  (Discussion off the record.)
24  Q. Did Lieutenant Bramble stay on your back until

8 (Pages 26 to 29)

**Page 30**

1  the backup officers arrived?
2  A. Yes.
3  Q. When the backup officers arrived what happened?
4  A. I was picked up, Lieutenant Bramble placed
5  handcuffs on my wrist, extremely tight, and then the
6  other two officers escorted me to the holding cell.
7  Q. Were you handcuffed once you were back up on your
8  feet?
9  A. Yes.
10 Q. Did you ever follow Lieutenant Bramble into the
11 bathroom?
12 A. No. I came to the entrance door, never into the
13 bathroom.
14 Q. Did you ever say to Lieutenant Bramble that you
15 would slit his throat?
16 A. Never made a threat to Lieutenant Bramble.
17 Q. Did you ever swing the chair at him?
18 A. Never swung a chair at Lieutenant Bramble.
19 Q. At any time did you scratch or cut Lieutenant
20 Bramble's neck?
21 A. I never scratched or cut Lieutenant Bramble's
22 neck.
23 Q. Do you know whether you caused any injury to him?
24 A. I caused no injury to Lieutenant Bramble.

**Page 31**

1  Q. Now, is it right that there were maybe 25 or so
2  other offenders present on the pod while this was
3  happening?
4  A. Yes.
5  Q. And do you know the names of any of those
6  individuals?
7  A. A few, which I gave you a list of names that gave
8  testimony in the prior trial, prior to trial.
9  Q. And that was the criminal trial against you?
10 A. Yes.
11 Q. Last year. Are you saying that you gave that to
12 me in the answers to interrogatories?
13 A. Yes.
14 Q. Did any offenders testify at the trial?
15 A. Yes.
16 Q. How many?
17 A. Two. The others couldn't be located at that
18 time.
19 Q. Sitting here today, do you remember the names of
20 those other offenders that testified at the trial?
21 A. I believe one was Steve, Steven Mullen and James
22 White.
23 Q. Steven Mullen and James White?
24 A. Yes.

**Page 32**

1  Q. You were present for the entire trial; is that
2  right?
3  A. That's correct.
4  Q. Did Mr. Mullen and Mr. White testify basically to
5  what you told me today?
6  A. Yes, in so many words. I can't remember exactly
7  what they said. But if you obtain trial transcripts you
8  will have that testimony.
9  Q. Do you remember who the prosecutor was?
10 A. No.
11 Q. Who was your lawyer?
12 A. Conner. I'm just -- I know Conner, last name
13 Conner. He was the public defender's office.
14    Oh, Edward, I believe it was Edward Conner
15 or something like that.
16 Q. And what was the outcome of the criminal trial?
17 A. I was found not guilty.
18 Q. After the incident with Lieutenant Bramble you
19 were taken to DCC, you were taken here; is that right?
20 A. Mm-hmm.
21 Q. And were you released before the trial date?
22 A. No, I had a pending -- I had a pending violation
23 of probation for that incident.
24 Q. Okay. Once the trial was over were you released?

**Page 33**

1  A. No. I wasn't released until after the pending
2  violation of probation, out of the incident occurred at
3  the Central Violation Center.
4  Q. Did you receive disciplinary charges for the
5  incident with Lieutenant Bramble?
6  A. Could you clarify?
7  Q. Did you get a write-up at CVOP?
8  A. No.
9  Q. I want to ask you now about what injuries you
10 sustained in this altercation with Lieutenant Bramble.
11 A. I reported to the nurse at the time, because
12 after the incident involving cap-stun, a nurse is to come
13 and see you.
14    I pointed injuries to my wrist. The
15 handcuffs were too tight. And I told her I had a pain in
16 my shoulder and pain in my face. But she dismissed me.
17 Q. This was the nurse at CVOP?
18 A. Yes.
19 Q. And she came to check on you for the cap-stun?
20 A. Yes.
21 Q. Do you remember who she was?
22 A. I don't know her name right now, not offhand. I
23 have it somewhere. But since my arrival back here most
24 of my paperwork is still home or outside.

Holland                           v.                            Taylor, et al.
Kevin Holland           C.A. # 05-464-SLR                      August 22, 2006

Page 34

1  Q. Okay. Now, were both wrists hurting?
2  A. Yes.
3  Q. And you had pain in which shoulder?
4  A. In my right shoulder.
5  Q. You also said that you were having pain in your
6  face?
7  A. Yes. Well, actually, in the neck area from the
8  pressure he applied on my neck.
9  Q. And that was the left side of your neck?
10 A. Yes. Well, actually, it was my jaw. I had pain
11 in my jaw from him pushing on my neck, and it was down
12 and up.
13 Q. Right after the incident with Lieutenant Bramble,
14 how long did you stay at CVOP before you were moved to
15 DCC?
16 A. Hours. Roughly around about from 6:00, the
17 incident happened at 6:00 or 6:15 at the most, I'm not
18 quite sure, approximately around about 6:15, I was
19 transferred around 12:00, a little after 12:00 to DCC.
20 Q. When you arrived at DCC do you get any kind of
21 medical screening?
22 A. No. Actually, no. I ain't received medical
23 screening until a week or two weeks later. I was placed
24 in isolation for 15 days.

Page 35

1  Q. So you didn't see anybody for medical for one to
2  two weeks, is that what you said?
3  A. About one to two weeks. That's a rough estimate.
4  I can't remember. It has been, it has been awhile before
5  I saw the medical treatment.
6  Q. While you were in isolation did you put in a sick
7  call request?
8  A. Yes.
9  Q. When you were seen in one to two weeks after you
10 arrived, was that in response to your sick call request?
11 A. No, it was a screening. I was seen for screening
12 before I was seen for my medical request.
13 Q. Now, after you had been in isolation for one to
14 two weeks, how were you feeling physically?
15 A. Other than sore, and emotionally distraught due
16 to the fact that I was being charged with a crime that I
17 didn't commit, crappy.
18 Q. Were particular parts of your body bothering you?
19 A. Other than my jaw, I had problems eating for
20 awhile, especially anything that was tough, I had jaw
21 pain.
22      My wrists still was irritated. I had no
23 feeling in my thumbs for, for quite some time.
24 Q. For how long?

Page 36

1  A. I would say close to four or five months.
2  Q. Now, the jaw pain that you were feeling at that
3  time, when you had your medical screening, was that
4  something that was bothering you all the time?
5  A. No. Only when I ate.
6  Q. Now, when you went through your medical screening
7  did you tell the medical person that you were having
8  these problems?
9  A. Since the problem only occurred when I ate, at
10 that time for medical screening, they only check for
11 certain things. I brought it up to them.
12      One of the things I brought up to them at
13 that time was the cap-stun, the kind of reaction it had
14 to my skin. My wrists. I don't believe I brought up my
15 jaw at that time, because it only affected me when I was,
16 like when I was chewing, if I was eating something at the
17 time. And at the time I was focused on other things,
18 mostly being charged with a crime. I don't think it
19 dawned on me to mention it to them, but I might have
20 mentioned it to her some other time.
21 Q. With respect to the cap-stun, right after it
22 happened how were you feeling physically?
23 A. Give me -- what are you saying? When he was
24 spraying me or shortly after?

Page 37

1  Q. Well, say you were moved to the holding cell
2  right after this happened with Lieutenant Bramble, the
3  incident we are talking about. How was your face feeling
4  when you were in the holding cell?
5  A. All right. Extremely burning of the eyes,
6  burning of the skin. I'm able to breathe. It affects
7  everything from your nose to your eyes to your throat.
8  Any water, any liquid you put on the agent, apply to the
9  skin, it enhances the agent effectiveness. So I couldn't
10 rinse it out of my face. I couldn't do anything other
11 than let it, I don't know, dissipate on its own. It
12 takes about two days for it to wear off.
13      But if any time during the two days you take
14 a shower, the agent moves down, because my eyes were
15 tearing up, my nose was running, I was slobbering at the
16 mouth. The agent burned.
17 Q. How long did it take for the effects to wear off
18 for you?
19 A. About two to three days.
20 Q. Did your eyes continue to water for two to three
21 days?
22 A. My eyes continued to burn. As long as you don't
23 rub them you probably, you are normally all right.
24 Q. And how long was your skin, I guess you said it

Page 38

1  was burning?
2  A. The burning of the skin goes away. But it leaves
3  a very dry, peeling -- I can't quite explain it to you,
4  but it leaves like -- your skin becomes very dry and
5  flaky. A nurse would require you to lotion up or
6  something like that. But at the time I was in isolation,
7  I didn't have that type of remedies, cosmetics.
8  Q. What part of your body received the cap-stun?
9  Was it just your face?
10  A. It was my face -- well, actually when he sprayed
11  me it was my face. I have a longjohn top, where when he
12  first sprayed me I through my hands up to block. He
13  continued spraying. I have a line of cap-stun where you
14  could see where, after -- I believe it was before I
15  picked up the chair, that I turned away from him, and it
16  goes along the line, along my arm where I turned away
17  from him, like it was still cap-stunned.
18  Q. You are pointing at your left arm?
19  A. Yes. When he sprayed me I threw my hand up to
20  block and turned away from him, as he continued to spray.
21  That's why I picked up the chair, stuck it up to block.
22  Q. After about two to three days did you feel like
23  you had recovered from the cap-stun?
24  A. Yes, I felt I recovered from the cap-stun.

Page 39

1  Q. You said you put in a sick call when you were in
2  isolation for problems with your jaw; is that right?
3  A. No. It is from my wrists. It was for my wrist.
4  Some other things. I was still sore at the time. I
5  don't know my jaw or not. I can't quite remember. I
6  know it was for my wrist and some other -- well, the sick
7  call was for my wrist and some other things. I don't
8  know if it was my jaw or not. It might be. I can't
9  quite remember.
10  Q. At some point were you seen in sick call?
11  A. For my screening.
12  Q. And then what about after that?
13  A. The sick call, after my screening, they dismissed
14  the sick call because they, I guess they figured they
15  addressed issues in the screening.
16  Q. Did you ever put in another sick call for these
17  problems?
18  A. I believe so. I believe so. Once down the line.
19  Once down the line.
20  Q. At some point did you file a grievance regarding
21  Lieutenant Bramble assaulting you?
22  A. Yes, I filed a grievance.
23  Q. Do you remember when that was?
24  A. I'm not quite sure, but I'm sure it was shortly

Page 40

1  after they put me in Maximum Security Unit, in the
2  pretrial area, it was shortly after that.
3  But they grieved -- the answer to the
4  grievance was that it was past the filing date or allowed
5  date and that something to do with different facility. I
6  have a copy of it. I don't know if I sent it to you or
7  not.
8  Q. Why didn't you file the grievance sooner?
9  A. Because I was in maximum security for two, for
10  two weeks, 15 days. From, they transferred me to maximum
11  security violation -- Maximum Security Unit for pretrial,
12  which the only time -- the only time you can obtain paper
13  or pens or anything is through commissary, and if you
14  don't have the funds, then you have to put in for a, it
15  is -- I can't remember the name of it, but if you don't
16  have the funds they allow you every 1st of the month to
17  file for indigent, indigent person.
18  Q. Right.
19  A. And then you can get your supplies from there. I
20  didn't have a pen. So I had wait until the 1st of the
21  month.
22  Q. Had you asked somebody at DCC for the grievance
23  form?
24  A. Yes.

Page 41

1  Q. So you had the form?
2  A. I had the form. I just didn't have the writing
3  utensils.
4  Q. Once you received the response to your grievance
5  did you file an appeal on that?
6  A. No. According to their writing, the grievance, I
7  believe they were non -- if it was non-grievable issues,
8  it would be non-appealable issues as well.
9  Q. I believe that you said somewhere in your
10  complaint that Lieutenant Bramble shouldn't have
11  threatened you with the cap-stun in the chow hall?
12  A. Normally within the chow hall, if there is still
13  required time to eat, the officer normally requires for
14  everybody at that table to finish eating before he
15  dismisses the table.
16  So when I asked for him, for additional
17  time, he then forcibly threatened me, let me know that he
18  wasn't going to permit that.
19  Q. Okay. And you feel that that was not
20  appropriate?
21  A. It was most definitely not appropriate through
22  the fact that he brandished cap-stun in a threatening
23  manner when the situation wouldn't even have called for
24  it.

11 (Pages 38 to 41)