IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| KENNETH L. HOLLAND, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Civ. No. 05-464-SLR |
|  | ) |  |
| ADAM J. BRAMBLE, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

Douglas E. McCann, Esquire, Charles B. Vincent, Esquire and Linhong Zhang, Esquire of Fish & Richardson P.C., Wilmington, Delaware. Counsel for Plaintiff.

Catherine Damavandi, Deputy Attorney General, State of Delaware, Department of Justice, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: April 6, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Kenneth L. Holland ("plaintiff"), an inmate at the James T. Vaughn Correctional Center ("the Correctional Center"), Smyrna, Delaware, filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983.[1] Plaintiff alleged violations of his constitutional rights to equal protection and due process, deliberate indifference, cruel and unusual punishment, and false imprisonment. An amended complaint was filed thereafter. (D.I. 13) Among the many defendants sued was defendant Adam Bramble ("Bramble"). Bramble answered the amended complaint and filed a counterclaim against plaintiff. (D.I. 33) Plaintiff filed a responsive pleading to Bramble's counterclaim. (D.I. 39)

Through a summary judgment motion practice and voluntary dismissals (D.I. 109, 115), the case has been resolved as to all of the defendants save for Bramble,[2] who has now moved for entry of a summary judgment. (D.I. 152) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, the court will deny defendant's motion for summary judgment.

## II. BACKGROUND

---

[1] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] As the only remaining defendant, Bramble shall be referred to hereafter as "defendant."

At all relevant times, defendant was a Correctional Lieutenant employed by the Delaware Department of Correction ("DOC") at the Central Violation of Probation Center ("CVOP") located in Smyrna, Delaware. Plaintiff was an inmate incarcerated at the CVOP in November 2004.

On the morning of November 26, 2004, defendant was on duty in the chow hall at the CVOP. There is no dispute that plaintiff and defendant had an exchange of words in the chow hall that morning when plaintiff did not leave his table as directed by defendant. It was not until defendant presented his capstun[3] in the chow hall that plaintiff returned to his dormitory housing unit (Pod 2). There is no dispute that, less than 30 minutes after defendant finished his duties in the chow hall, plaintiff and defendant had a second altercation as defendant was conducting an area check of the East Wing of the CVOP (where Pod 2 was located). (D.I. 159, ex. 1 at DOC 01226-27) The parties dispute the events surrounding the second altercation.

According to plaintiff, when he returned to Pod 2, he wanted to file a grievance about the incident in the chow hall. According to the instructions on the grievance form, however, inmates are required to attempt to resolve their complaints prior to filing a formal grievance. Plaintiff attempted to do so with defendant, after defendant had entered Pod 2 on his rounds; the conversation ended when defendant told plaintiff that "he was tired of his 'smart ass mouth.'" (D.I. 158 at 3) Plaintiff walked away but, a few moments later, defendant approached him with capstun. "[Plaintiff] picked up a chair

---

[3]Capstun "is a spray containing liquid capsaicin pepper oil" and is a non-lethal weapon system which provides officers a humane means of effecting the submission of violent subjects. (D.I. 158 at 3, n.5, citing *Wilson v. Taylor*, 597 F. Supp. 2d 451, 456 (D. Del. 2009).

2

from the pod to block the CapStun, and tried to move away from him before [defendant] tackled him. . . . The two men wrestled on the floor before [plaintiff] was ultimately handcuffed by [defendant] and other officers who came to assist in taking him to a secure holding cell." (*Id.*)

According to defendant's version of the events, plaintiff threatened him while he was performing the area check in Pod 2, "stating that he would slit [defendant's] throat. . . . When [defendant] attempted to escort [plaintiff] from the area, [plaintiff] picked up a chair and swung it at [defendant]. . . . The chair struck [defendant], causing physical injury. [Plaintiff] cut [defendant's] neck with a sharp object; as a result, defendant sustained various physical injuries." (D.I. 153 at 6)

Even with the varying versions of the facts, several are not in dispute. First, by the end of his conversation with plaintiff, defendant had decided to remove plaintiff from the pod. Second, as plaintiff was walking away from defendant, defendant had in hand both his handcuffs and capstun and followed plaintiff across the pod, some twenty or so feet. Third, defendant did not warn or otherwise notify plaintiff of his plans to remove plaintiff from the pod. Finally, by the time defendant had closed to within four to six feet of plaintiff, plaintiff had a plastic chair in hand and defendant had emptied his capstun at plaintiff. (*See* D.I. 159 at 84-90) Defendant sustained injuries during the altercation, including cuts to the left side of his neck and spraining his left thumb, index and middle finger. (D.I. 154 at A00031)

Defendant, in the "Arrest/Incident Report" he filed, described the incident with plaintiff as "assault on staff;" the restraint used was "physical" and "chemical." (D.I. 154 at A00031) According to the "Crime Report" filed by defendant's supervising officer,

3

after being subdued, plaintiff was "escorted to a holding cell, where he was read his miranda rights and remained until transferred to [the Correctional Center] on an administrative warrant and pending investigation." (*Id.* at A00034-35) On November 30, 2004, plaintiff in fact "was arrested on charges of Assault in Detention Center," 11 Del. C. § 1254, and committed to the Correctional Center on $5,000 cash only bond. (*Id.* at A00036) Plaintiff was acquitted of this charge at the conclusion of a jury trial in September 2005. Plaintiff never filed any grievances relating to the November 26, 2004 incidents; the instant lawsuit was filed on July 5, 2005.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts

and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. ANALYSIS

Defendant moves for summary judgment on three grounds: (1) plaintiff's claims must be dismissed because he failed to exhaust his administrative remedies prior to filing suit; (2) defendant is immune from liability in his individual capacity pursuant to the doctrine of qualified immunity; and (3) plaintiff's claim against defendant in his official capacity is barred by the Eleventh Amendment to the United States Constitution. Each of these arguments shall be addressed in turn.

### A. Failure to Exhaust

#### 1. Standard of review

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see*

*Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Because an inmate's failure to exhaust under PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199 (2007). Failure to exhaust administrative remedies must be pled and proved by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Under *Woodford v. Ngo*, 548 U.S. 81 (2006), exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88. As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA. *Jackson v. Ivans*, 244 Fed. Appx. 508, 513 (3d. Cir. 2007) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.")). The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner*, 532 U.S. 731 (2001).

6

Third Circuit precedent makes clear that a prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *Nickens v. Department of Corr.*, No. 07-2207, 2008 WL 2018435, at *4 (3d Cir. May 12, 2008) (citing *Williams*, 482 F.3d at 639; *Spruill*, 372 F.3d at 228, 231). In this regard, however, the Third Circuit also recognizes that "prison grievance procedures supply the yardstick for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (internal quotations marks omitted).

The Inmate Grievance Procedure ("IGP") at the DOC is "designed to reduce tension in correctional facilities and to effectively resolve the vast majority of cases within our system." (D.I. 154 at A00006) The DOC IGP provides for a multi-tiered grievance and appeal process, as described in DOC Policy 4.4. First, the prisoner must file a grievance within seven days with the Inmate Grievance Chair, for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance Resolution Committee ["IGC"] for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer conducts the final level of review. (*Id.* at A00006-12)

At issue in this case is Section V.2 of DOC Policy 4.4, which provides as follows:

> All inmates, regardless of physical condition/security status/ administrative status, shall be entitled to use the IGP. **Inmate complaints regarding policies and conditions must be within DOC jurisdiction.** This includes actions by employees, inmates, and incidents occurring within the institution that affect them personally. **NOTE: Policies that have their own formal appeal mechanisms are not grievable through the IGP. Specifically excluded from the IGP are issues concerning**

7

**Disciplinary, Classification, and Parole Board decisions.**

(D.I. 154 at A 00007-8)(emphasis added) With respect to situations where an inmate is transferred to another institution after an incident, the IGP provides as follows:

> When possible, transfers shall be delayed for any inmate who has filed a grievance and been notified of an RGC hearing date until the hearing has concluded. If circumstance requires immediate transfer, the IGC at the institution where the grievant filed will proceed in the grievant's absence utilizing the normal IGP process steps through Level II. . . . Grievances filed against the sending institution after an inmate's transfer, but inside the standard seven day window following an incident, shall be forwarded by the IGC at at the new location to the IGC at the original location for processing.

(*Id.* at A00012)

### 2. Discussion

Defendant argues that, because plaintiff was "disciplined" through the State's criminal justice system rather than through the CVOP's internal disciplinary system, Section V.2's exclusion does not apply and plaintiff was required to follow the IGP; his failure to do so requires dismissal of the case. Because this argument was not raised until defendant's reply brief,[4] plaintiff has not had the opportunity to respond.[5]

Nevertheless, the court finds that the circumstances of this case warrant an exclusion from the requirements of the IGP.[6] Not only was plaintiff arrested on state

---

[4] Along with the submission of a supplemental appendix. (D.I. 163)

[5] Although the court has resolved the matter based on the record presented, the court recognizes that the issue was not fully addressed by either party. Therefore, the court will entertain requests for further, focused briefing **if** based on the identification of additional authorities (as opposed to simply reargument based on the record).

[6] Plaintiff's motions to strike and defendant's motion for leave to file a sur-reply brief (D.I. 157, 169) are denied as moot.

8

charges and transferred from the CVOP immediately following the incident, he was prosecuted on, and ultimately acquitted of, those same charges. According to Section V.2, the IGP is applicable only to "inmate complaints regarding policies and conditions . . . within DOC jurisdiction" and which do **not** "have their own formal appeal mechanisms." The court concludes that, when DOC incidents result in charges under the Delaware Code which are resolved outside the jurisdiction of the DOC, the IGP is not applicable. Therefore, defendant's motion is denied in this regard.

### B. Qualified Immunity

#### 1. Standard of review

Although not mandatory,[7] the defense of qualified immunity is appropriately analyzed under the two-step test as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). Under the *Saucier* protocol, the court first examines whether or not the alleged conduct, taken in the light most favorable to plaintiff, violated a constitutional right. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* If the allegations amount to the violation of a constitutional right, the court proceeds to the second inquiry and determine if the right was "clearly established in the specific context of the case." *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Saucier*, 533 U.S. at 202 (noting that an officer is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should

---

[7]*See Pearson v. Callahan*, - U.S.-, 129 S. Ct. 808, 818 (2009).

be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 129 S.Ct. at 818.

## 2. Discussion

"The test for whether a claim of excessive force is constitutionally actionable is 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The Third Circuit has directed courts to review the following factors in making their determination as to whether a claim of excessive force has passed constitutional muster: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Giles*, 571 F.3d at 326 (citing *Whitley*, 475 U.S. at 321 and *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)). The analysis of the *Whitley* factors "serves as a touchstone of the established law of which a reasonable officer may be presumed to have have been aware." *Giles*, 571 at 326.

In the case at bar, there remain genuine issues of disputed material fact as to whether defendant used excessive force during the November 26, 2004 incident with plaintiff and, thus, violated his constitutional rights. The court concludes that a determination of whether defendant violated plaintiff's Eighth Amendment rights

remains a question for a jury trial. Accordingly, the court will deny defendant's motion for summary judgment on the issue of qualified immunity.

### C. Eleventh Amendment Immunity

#### 1. Standard of review

The Eleventh Amendment guarantees that non-consenting states may not be sued by private individuals in federal court unless Congress abrogates the states' immunity pursuant to a valid exercise of its power. *See Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 363 (2001). State officials acting in their official capacities have the same Eleventh Amendment immunity from damage suits as the state itself. *See Hafer v. Melo*, 502 U.S. 21, 30 (1991). Section 1983 did not abrogate the State of Delaware's Eleventh Amendment immunity and it has not waived its immunity. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (section 1983 was not intended to abrogate a State's Eleventh Amendment immunity); *Brooks-McCollum v. Delaware*, 213 F. App'x 92, 94 (3d Cir. 2007) (not published) (the State of Delaware has not waived its immunity from suit in federal court).

#### 2. Discussion

Plaintiff is not suing defendant in his official capacity. (D.I. 158 at 5) Therefore, defendant's motion for summary judgment on this point is moot.

## V. CONCLUSION

For the reasons stated, defendant's motion for summary judgment is denied. An appropriate order shall issue.

11